considered because of the existence of criminal charges against a party to the civil litigation. (TR389-18 to 21). In Arthur Anderson, Mark Babilonia worked to obtain discovery regarding Chandler and Prior, Architects who were defendants in the Arthur Anderson case. (TR390-19 to 391-18).

In September of 1995, Caro & Graifman worked a total of 520 hours on Joseph Gall's cases which included 100 hours for Chase Caro, 50 hours for Taryn Harry, 1 hour for Brian Graifman, 30 hours for Dana Foster, 180 hours for Eva Possavino and 160 hours for Mark Babilonia. (TR405-21 to 24; TR406-18 to 407-2). The principal work performed by Caro & Graifman in September of 1995 moving for reconsideration of the stay entered in Gall's civil cases which included filing a lengthy affidavit for Mr. Gall attesting to his compliance in document productions which resulted in the Wausau audit and a new affidavit from Charles Gruber which described the significance of the Wausau audit. (TR399-25 to 400-23). In Gall v. Summit, Mr. Caro worked on the possibility of utilizing Jonathan Sparks, Esq. as a witness to the billing practices of Summit, Woven in response to the possibility that Felice Mischel would be disqualified from testifying. (TR404-11 to 17). In Arthur Anderson there were three days of mini depositions in which the parties stipulated that limited issues would be explored. (TR404-20 to 405-11). In Gall v. Summit, there were disputes regarding the extent of the record on appeal of the denial of Summit's motion to dismiss

Gall's claims.   (TR403-15 to 23).

In October of 1995, Caro & Graifman worked approximately 464 hours on the Gall cases which included 120 hours for Chase Caro, 9 hours for Brian Graifman, 50 hours Taryn Harry, 34 hours for Dana Foster, 140 hours for Eva Possavino and 15 hours for Neil Grossman. (TR410-18 to 411-17).   In Gall v. National Union,   Caro & Graifman had received a new summary judgment motion.   (TR407-7 to 25).   In Gall v. Summit Rovins, Caro & Graifman prepared for oral argument on the appeal of the denial of the motion to dismiss Joseph Gall's complaint.  (TR408-17 to 20).   In National Union v. Gall and NCCI, Caro & Graifman performed additional research because plaintiffs' motion to amend the complaint to include a breach of contract claim was granted.  (TR408-22 to 22).   Chase Caro believe that the motion to amend the complaint five years into the litigation demonstrated the weaknesses of plaintiffs' civil fraud claim and that the attempt to transform the fraud claim to a breach of contract claim created additional problems for plaintiffs.  (TR409-2 to 14).   In National Union v. Gall and NCCI v. Gall, Caro & Graifman received opposition to the Rule 11 motion  based on plaintiffs' contention that Mr. Gall provided insufficient records to conduct an audit while discovery revealed Wausau actually  performed an audit.   (TR410-7 to 17). Plaintiffs' opposition to the sanction motion exceeded 40 pages and was accompanied by several inches of documents filed in opposition to the motion.   (TR410-7 to 17). Defendants filed motions regarding

discovery issues which were opposed by Mark Babilonia and Dana Foster. (TR409-17 to 410-6).

In November of 1995, Caro & Graifman worked a total of 466 hours on Gall matters which included 85 hours for Chase Caro, 3 hours for Brian Graifman, 30 hours for Taryn Harry, 50 hours for Dana Foster, 85 hours for Eva Possavino, 160 hours for Mark Babilonia and 53 hours for Neil Grossman. (TR419-13 to 21). The work on Gall matters for November of 1995 included filing Labor Force of America v. Damman. (TR411-25 to 413-6). Caro & Graifman assisted Jonathan Sparks with filing several Rhode Island cases. The work in November of 1995 in which Caro & Graifman assisted Jonathan Sparks in collection cases involved research on Rhode Island anti-trust statutes, consumer protection statutes and anti-fraud statutes. (TR414-7 to 12). In November of 1995, Caro & Graifman filed some collection papers including ESA v. Moore in which ESA and LFA attempted to collect monies from employee leasing clients who did not pay their bills. (TR413-12 to 414-5). Mark Babilonia and Chase Caro worked on the reply papers to the sanction motion in National Union v. Gall. (TR414-21 to 415-10).

In December of 1995, Caro & Graifman worked approximately 444 hours on Gall matters which included 50 hours for Chase Caro, 50 hours for Dana Foster, 140 hours for Eva Possavino, 30 hours for Taryn Harry, 90 hours for Mark Babilonia and 4 hours for Neil Grossman. (TR425-12 to 17). The work in Caro & Graifman's services

and <u>Gall v. Summit</u> involved an application for leave to appeal the New York State Supreme Court Appellate Division's reversal of the denial of the motion to dismiss the malpractice claim in <u>Gall v. Summit</u>. (TR420-15 to 421-6). In December of 1995, Caro & Graifman received and reviewed the expert reports from Strategic Health which criticized the payout amounts by National Union and NCCI on the workers' compensation claims for Mr. Gall and his related company. (TR420-4 to 9). In December of 1995, Caro & Graifman revised the collection complaint in the <u>ESA v. Moore</u>. (TR419-22 to 420-1).

In January of 1996, Caro & Graifman performed approximately 517 hours on Joseph Gall's cases which included 85 hours for Chase Caro, 46 hours for Brian Graifman, 30 hours for Dana Foster, 160 for Eva Possavino, 60 hours for Mark Babilonia and 136 hours for Neil Grossman. (TR429-22 to 430-12). In January of 1996, Caro & Graifman moved to reargue the reversal of Judge DeGrass denial of Summit's motion to dismiss Joseph Gall's complaint. (TR425-18 to 426-3). Discovery continued in the 1.5 million dollar counterclaim of Summit, Solomon against Joseph Gall which included responding to bills of particulars and deposition notices for ESA, LFA witnesses. (TR427-16 to 23). In January of 1996, Mr. Gall ordered offensive motions for summary judgment on the counterclaims in <u>NCCI v. Gall</u> and <u>NCCI v. LFA</u>. (TR429-4 to 12). Mark Babilonia conducted the depositions of witnesses of Barnett and Nizip in the Arthur Anderson case. (TR421-15 to 21).

In February of 1996, Caro & Graifman performed approximately 403 hours of work on Joseph Gall's cases including 67 hours for Chase Caro, 4 hours for Brian Graifman, 30 hours for Dana Foster, 120 hours for Eva Possavino, 90 hours for Mark Babilonia and 93 hours for Neil Grossman. (TR434-9 to 19). The work performed by Caro & Graifman in February of 1996, included filing a reply brief in connection with a summary judgment motion in LFA v. NCCI. (TR431-12 to 16). Dana Foster, who is admitted in Florida, took depositions in Florida cases involving Joseph Gall's companies. (TR431-16 to 432-1). In Arthur Anderson, Caro & Graifman worked on proving affirmative claims for damages and disputing the libel damages claimed by Arthur Anderson caused by the press conference. (TR433-4 to 434-2).

In March of 1996, Caro & Graifman spent approximately 573 hours on Joseph Gall's cases including 102 hours for Chase Caro, 10 hours for Dana Foster, 6 hours for Brian Graifman, 130 hours for Eva Possavino, 120 hours for Mark Babilonia, 157 hours for Neil Grossman and 50 hours for Larry Stone. (TR441-23 to 442-8). In March of 1996, the work performed by Caro & Graifman included answering interrogatories in the Arthur Anderson case and reviewing the client's files in Arthur Anderson with Mr. McLaughlin and Mr. Gall. (TR434-20 to 436-5). In Gall v. Summit, Caro & Graifman prepared and served an amended complaint as a result of the dismissal of the malpractice case in the New York State Supreme Court Appellate

Division.  (TR436-7 to 12).  Caro & Graifman continued to perform work on motions to reconsider the stays of Mr. Gall's civil cases in the United States District Court, District of Connecticut.  (TR437-7 to 24).  In March of 1996, Caro & Graifman opposed the sanction motion in National Union v. NCCI based on Mr. Gall's assertion of his Fifth Amendment privilege.  (TR437-23 to 438-7).  In March of 1996, Caro & Graifman researched the permissible scope of expert testimony of Charles Gruber's actuarial testimony and Strategic Claims Handling claim's management testimony.  (TR438-8 to 439-11).

In April of 1996, Caro & Graifman performed approximately 505 hours of work on Joseph Gall's cases including 34 hours by Chase Caro, 20 hours by Dana Foster, 1 hour by Brian Graifman, 90 hours by Eva Possavino, 160 hours by Mark Babilonia, 130 hours by Neil Grossman and 60 hours by Larry Stone.  (TR445-1 to 14).  Caro & Graifman's work in April of 1996 included listening to Joseph Gall's conversations with defendants in the Arthur Anderson case.  (TR433-4 to 18).  In April of 1996, Caro & Graifman continued to work on objections to the stay of Mr. Gall's cases in the United States District Court of Connecticut.  (TR443-16 to 21).  In USA v. Mercer, the parties exchanged initial discovery.  (TR443-22 to 444-4).  In response to the motion to file an amended complaint in Gall v. Summit, Summit cross moved for sanctions which Caro & Graifman opposed.  (TR444-10 to 13).  In ESA v. Damman, the parties exchanged

interrogatories, requests to admit and took an initial deposition. (TR444-16 to 23).

In May of 1996, Caro & Graifman worked approximately 490 hours on Mr. Gall's cases which included 60 hours for Chase Caro, 18 hours for Brian Graifman, 80 hours for Eva Possavino, 110 hours for Larry Stone, 95 hours for Mark Babilonia, 117 hours for Neil Grossman, 10 hours for Dana Foster and 10 hours for Julia Leibis. (TR448-6 to 14). In Arthur Anderson, Caro & Graifman's attorneys continued to listen to the tapes of Joseph Gall's conversations with defendants and answered a third set of interrogatories and document productions. (TR445-15 to 446-2). Caro & Graifman successfully opposed motions to dismiss Joseph Gall's counterclaims based on his exercise of his Fifth Amendment right against self incrimination. (TR446-18 to 447-17). Depositions occurred in Florida in Damman v. ESA and a pro hac vice motion was filed for Caro & Graifman admission to assist Dana Foster in Mr. Gall's Florida cases.

In June of 1996, Caro & Graifman performed 441 hours of work on Mr. Gall's caseeswhich included 40 hours by Chase Caro, 45 hours by Brian Graifman, 80 hours by Eva Possavino, 90 hours by Mark Babilonia, 135 hours by Neil Grossman and 51 hours by Larry Stone. (TR450-24-451-11). Caro & Graifman's work in June of 1996 included consideration of an appeal to the Second Circuit Court of Appeals of the United States District Court of Connecticut's stay order in Joseph Gall's civil cases. (TR448-15 to 19). In LFA v. Damman, the

38

parties exchanged document production, witness lists, and interrogatories. (TR448-23 to 449-11). Neil Grossman and Dana Foster worked primarily on the Damman case. (TR449-16 to 22). Caro & Graifman was required to obtain new counsel for ESA and LFA in workers' compensation cases in various states because of Mr. Gall's disputes with local counsel. (TR449-19 to 450-2). In Arthur Anderson, Mark Babilonia and Larry Stone worked on taking three depositions and conducting document productions. (TR450-11 to 21). Larry Stone and Mark Babilonia continued to review Joseph Gall's tapes. (TR450-21 to 23).

In July of 1996, Caro & Graifman worked a total of 361 hours on Joseph Gall's cases which included 55 hours for Chase Caro, 35 hours for Brian Graifman, 90 hours for Eva Possavino, 110 for Neil Grossman and 71 hours for Larry Stone. (TR458-15 to 25). In July of 1996, Caro & Graifman conducted research for Mr. Gall and his criminal counsel which included downloading 66 federal cases onto discs. (TR451-12 to 452-2).

In August of 1996, Caro & Graifman worked a total of 449 hours on Joseph Gall cases which included 96 hours for Chase Caro, 67 hours for Brian Graifman, 110 hours for Eva Possavino, 82 hours for Neil Grossman, 138 for Larry Stone and 10 hours for Julia Leibis. (TR459-1 to 14). A great deal of the work performed by Caro & Graifman work on <u>Gall v. Summit</u> which included research on malpractice, negligence, pleading requirements and the

39

permissibility of lawyers testifying as witnesses.    (TR459-13 to 19).

In September of 1996, Caro & Graifman performed 512 hours of work on Joseph Gall's cases which included 100 hours for Chase Caro, 51 hours for Brian Graifman, 90 hours for Eva Possavino, 102 hours for Neil Grossman, 150 hours for Larry Stone and 20 hours for Michael Sacks.    (TR461-13 to 22).  Caro & Graifman assisted Mr. Gall in his replacement of his criminal counsel, Gus Newman.    (TR461-25 to 462-5).    In ESA v. Mercer, Caro & Graifman began working on opposition to a summary judgment motion.    (TR462-11 to 23).  In Gall v. Summit Sullivan, Caro & Graifman moved to stay the counterclaim against Mr. Gall pending resolution of his criminal case but only succeeded in delaying the civil case for a couple of months.    (TR462-22 to 463-8).  Caro & Graifman began assisting Mr. Gall in civil and criminal actions filed against Mr. Gall in Massachusetts.    (TR463-13 to 18).    In Arthur Anderson, Caro & Graifman took the deposition of Arthur Anderson and Mr. Moretta.    (TR463-19 to 21).  Caro & Graifman opposed a motion to dismiss plaintiff's complaint based on the failure to turn over tape recordings and delayed the motion because a response to the motion required Caro & Graifman attorneys to listen to between 150 and 200 tape recordings.    (TR463-12 to 464-6).  Larry Stone handled tax issues for Mr. Gall based on his long background in tax law.    (TR464-10 to 13).  Caro & Graifman worked on two transactional matters for Mr. Gall involving Red Wine

Company and the Piasta Company.  (TR464-13 to 17).

In October of 1996, Caro & Graifman attorneys worked an estimated total of 377 hours in Mr. Gall's matters which included 80 hours for Chase Caro, 20 hours for Brian Graifman, 20 hours for Michael Sacks, 100 hours Eva Possavino, 32 hours for Neil Grossman and 125 hours for Larry Stone.  (TR464-18 to 465-5).  The work performed by Caro & Graifman in October of 1996 included a hearing on discovery motions in Arthur Anderson, objections to the Magistrate's recommendation for summary judgment in LFA v. NCCI, moving to amend the complaint in Gall v. Mercer and filing opposition to defendant's motion for summary judgment in ESA v. Mercer.  (TR465-14 to 466-11).  Caro & Graifman continued to perform work for Mr. Gall on the Red Wine and Piasta transactional matters.  (TR466-11 to 12).

In November of 1996, Caro & Graifman performed a total of 364 hours on Mr. Gall's matters including 61 hours for Chase Caro, 5 hours for Brian Graifman, 106 hours for Eva Possavino, 12 hours for Neil Grossman, 160 hours for Larry Stone and 20 hours for Chris Lange.  (TR456-13 to 22).  In Summit v. Gall, Eva Possavino handled the satisfaction of liens on Mr. Gall's real estate.  (TR466-23 to 467-1).  In Gall v. Summit, defendant filed discovery motions in Mr. Gall and the parties conducted depositions and document productions on an expedited bases.  (TR467-1 to 3; TR467-8 to 9).  Defendants also moved to preclude Mr. Gall's testimony and strike his answer

based on his exercise of his Fifth Amendment Rights in self-incrimination. (TR467-1 to 6). There were hearings on plaintiff's motion to stay the case pending disposition of Mr. Gall's criminal case and defendant-counterclaimant's motion for preference. (TR467-6 to 9).

In December of 1996, Caro & Graifman performed 505 hours on Mr. Gall's case which included 31 hours performed by Chase Caro, 74 hours performed by Brian Graifman, 160 hours performed by Eva Possavino, 30 hours performed by Neil Grossman, 10 hours performed by Julia Leibis, 140 hours performed by Larry Stone, and 10 hours by Chris Lange. Joseph Gall was convicted of conspiracy, mail fraud, false statements and failure to file income taxes in the United States District Court of Connecticut in December of 1996. (TR7-17 to 22; TR467-24 to 468-2). In response to Mr. Gall's conviction, Mr. Caro began preparing affidavits and a memorandum on the sentencing which included the commencement of preparation of an affidavit of the amount of the loss resulting from Joseph Gall's conviction. (TR460-3 to 460-7). Preparation of the affidavit constituted a lengthy and complex task because it involved explanation of Mr. Gall's actuary experts' calculations in the determination of the actual loss. (TR469-8 to 22). In <u>Gall v. Summit</u>, depositions of Joseph Gall and Tom McLaughlin took 4 or 5 days. (TR468-23 to 469-2). In <u>Gall v. Summit</u>, Caro & Graifman was required to oppose Summit's filing of an appeal in the New York

42

Supreme Court Appellate Division of the denial of Summit's motion for a trial prior to the determination about whether leave to appeal would be granted in the Court of Appeal on Caro & Graifman's opposition to the dismissal of Joseph Gall's affirmative claim. (TR469-24 to 470-12). In LFA v. NCCI, Caro & Graifman prepared a reply brief. In Arthur Anderson, two motions were filed and Caro & Graifman prepared the trial exhibit list and pre-trial conference information requirements. (TR470-14 to 22).

In January of 1997, Caro & Graifman performed 424 hours on Mr. Gall's cases which included 120 hours performed by Chase Caro, 41 hours performed by Brian Graifman, 130 hours performed by Eva Possavino, 20 hours performed by Neil Grossman, 10 hours performed by Christopher Lange, 10 hours performed by Michael Sacks, and 90 hours performed by Larry Stone. (TR470-23 to 471-7). In Arthur Anderson, Caro & Graifman appeared in court for jury selection and trial and settlement occurred. (TR471-8 to 17). Caro & Graifman filed an appearance in the ESA v. Linsky, a case in which Mr. Gall filed suit after he was charged with a misdemeanor. (TR472-2 to 6).

In February of 1997, Caro & Graifman performed approximately 301 hours of work which included 95 hours for Chase Caro, 1 hour for Brian Graifman, 160 hours for Eva Possavino, 25 hours for Neil Grossman, 10 hours for Christopher Lange, and 10 hours for Michael Sacks. (TR472-23 to 473-5). Chase Caro worked primarily on the restitution issues and the sentencing issues in USA v. Gall.

43

(TR473-7 to 10).   In <u>Gall v. Summit</u> there were several discovery motions and a motion for a protective order.   (TR473-10 to 15).  In <u>ESA v. Linsky</u>, Caro & Graifman responded to two discovery motions. (TR473-14 to 18).  Caro & Graifman performed work on <u>ESA v. Moore</u>, which was a collection matter.   (TR473-14 to 19).

In March of 1997, Caro & Graifman performed 399 hours on Joseph Gall's files which included 90 hours for Chase Caro, 4 hours for Brian Graifman, 150 hours for Eva Possavino, 105 hours for Neil Grossman, 20 hours for Christopher Lange, and 30 hours for Michael Sacks.  (TR473-17 to 25).   In <u>ESA v. Mercer</u>, Caro & Graifman opposed a motion for sanctions.   (TR474-1 to 6).   In <u>ESA v. Linsky</u>, five depositions occurred prior to the filing of a motion to dismiss by state defendants.   (TR474-1 to 13).   Mr. Caro attended a criminal trial in Massachusetts in which Joseph Gall was a defendant. (TR474-6 to 8).   In <u>Gall v. Summit</u> depositions of Summit Partners, Kenneth McCallion and Bernard Persky occurred.  (TR474-25 to 475-6). Caro & Graifman filed motions on discovery issues when <u>Gall v. Summit</u> document productions continued.  (TR474-25 to 475-6).  In <u>USA v. Gall</u>, Chase Caro and Neil Grossman continued working on the affidavit and sentencing memorandum on restitution issues in <u>USA v. Gall</u>.  (TR473-6 to 10).

In April of 1997, Caro & Graifman performed approximately 345 hours of work on Joseph Gall's companies which included 75 hours for Chase Caro, 24 hours for Brian Graifman, 150 hours for Eva

Possavino, 52 hours for Neil Grossman, 24 hours for Christopher Lange, and 20 hours for Michael Sacks. (TR475-25 to 476-7). Caro & Graifman completed the brief in opposition to defendants' motion for sanctions. (TR476-8 to 10). In Gall v. Summit, the depositions of Stewart Summit and Felice Mischel occurred. (TR476-16 to 20). There were two orders to show cause dealing with discovery issues in the Gall v. Summit, a motion by Summit for a trial preference, a motion to strike reply papers and motions for sanctions against Caro & Graifman and a motion to hold Felice Mischel in contempt of court were all denied. (TR476-15 to 477-2). Caro & Graifman continued to perform services for Mr. Gall and his companies even after April of 1997 despite the fact that Caro & Graifman could not obtain payments in excess of $800,000.00 for the performance of any legal services after April of 1997. (TR154-4 to 11). After Mr. Gall's conviction, Caro & Graifman opposed summary judgment on the counterclaim which were based on the argument that the criminal conviction collaterally estopped Mr. Gall's affirmative counterclaim for damages. (TR113-3 to 23). The performance of work by Caro & Graifman after April of 1997 for which Caro & Graifman did not seek compensation is documented by notations later than April of 1997 in Exhibit M, the computer summary which listed all the documents created by Caro & Graifman in the course of their representation of Joseph Gall and his related companies. (TR478-10 to 13; TR482-23 to 485-8). Mr. Caro explained that he had no agreement with Mr.

45

Gall for payment of any fees for work performed after April of 1997 but worked on those cases because "I just didn't feel right not working on some of these cases." (TR154-4 to 11).

The addition of all the hours reflected in defendants' Exhibit BD for Caro & Graifman's hours from September of 1994 until April of 1997 equals 14,718 hours. (See pages 26 to 42 and citations to the trial transcript).[1] As Caro & Graifman received $646,138.57 in payments from Mr. Gall and the cash settlement of the lawsuit agreed

_____

[1] With the exception of time estimates for June of 1995, all of Chase Caro's time estimates for Caro & Graifman's attorneys on Joseph Gall's cases were read into evidence by Mr. Caro. The number of hours for June of 1995 was 478 hours. There are some addition errors in Mr. Caro's testimony regarding his time estimates for Caro & Graifman attorneys which are also addition errors in plaintiff's Exhibit BD. For February of 1995 Mr. Caro testified that Caro & Graifman attorneys performed 463 hours on Mr. Gall's cases. The correct addition of the hours for the individual attorneys reveals 473 hours. For April of 1995, Mr. Caro testified that Caro & Graifman attorneys performed 471 hours of work on Mr. Gall's cases. (TR319-22 to 320-6). The correct addition of the hours for the individual attorneys reveals 481 hours. For October of 1995, Mr. Caro testified that Caro & Graifman attorneys performed 464 hours of work on Mr. Gall's cases. The correct addition of the hours for the individual attorneys reveals 458 hours. For February of 1996, Mr. Caro testified that Caro & Graifman attorneys performed 403 hours of work on Mr. Gall's cases. The correct addition of the hours for the individual attorneys reveals 404 hours. For March of 1996, Mr. Caro testified that Caro & Graifman attorneys performed \573 hours of work on Mr. Gall's cases. The correct addition of the hours for the individual attorneys reveals 575 hours. For September of 1996, Mr. Caro testified that Caro & Graifman attorneys performed 512 hours of work on Mr. Gall's cases. The correct addition of the hours for the individual attorneys reveals 513 hours. For April of 1997, Mr. Caro testified that Caro & Graifman attorneys performed 339 hours of work on Mr. Gall's cases. The correct addition of the hours for the individual attorneys reveals 345 hours.

to was $645,000.00, the total hourly rate Caro & Graifman would have received if Mr. Gall made the cash payment would be $87.72 per hour. If the $800,000.00 mortgage is calculated as Caro & Graifman's compensation from Mr. Gall, Caro & Graifman would receive a total of $1,445,000 for 14,718 hours of work which translates into an hourly rate of $98.18 per hour. The maximum value to Caro & Graifman from the mortgage is thus less than the original retainer letter of September 24, 1994 which set Caro & Graifman's compensation at $100 per hour.

III. CARO & GRAIFMAN AND JOSEPH GALL ENTERED INTO A VALID MORTGAGE AGREEMENT TO SECURE THE UNPAID DEBT OF $646,138.57.

Notwithstanding his agreement that he was required to pay Caro & Graifman a prepaid retainer of $30,000 per month, Mr. Gall only paid the complete prepaid retainer on the first month of the agreement. (TR62-10 to 13). Mr. Gall also did not pay the $40,000 per month due Caro & Graifman for the 400 hours per month but instead paid an average $21,000 per month throughout Caro & Graifman's representation. (TR169-24 to 170-8). As a result of Mr. Gall's failure to make his agreed payments, Caro & Graifman was "absolutely desperate and continuously begged Mr. Gall for payments" as the firm was unable to meet its overhead expenses. (TR170-15 to 171-2). Mr. Gall did not dispute that he owed Caro & Graifman $40,000 per month, but claimed he could not pay Caro & Graifman because business came to a halt and Mr. Gall's companies had large overhead. (TR51-13 to 23). Mr. Caro repeatedly advised Mr. Gall

47

that he "needed money badly," and that Caro & Graifman would not "be able to operate a law firm" if Caro & Graifman was not paid the overdue balance. (TR63-18 to 23; TR64-7 to 14). As a result of the desperate cash flow problems caused by Mr. Gall's failure to pay, Caro & Graifman's $40,000 per month, Chase Caro would make settlement offers on his fees to Mr. Gall for a fraction of the money owed so that the firm would have cash. (TR170-24 to 171-2). One offer made was to a settlement which was admitted into evidence as plaintiff's Exhibit #2 was an excel spreadsheet which listed Joseph Gall's fund shortages based on his $30,000.00 per month prepaid retainer as $323,950.52. (See plaintiff's Exhibit #2, page two). When asked by the court why he did not move to withdraw from Mr. Gall's cases, Mr. Caro indicated that he believed Mr. Gall's statements that he would get around to paying Caro & Graifman. (TR171-3 to 6).

Mr. Gall advised Mr. Caro that if Mr. Caro could get a loan of $400,000.00 secured by Mr. Gall's property, Mr. Gall would pay $400,000 in past due fees to Caro & Graifman. (TR185-15 to 24). Pursuant to Mr. Gall's request, Mr. Caro obtained a loan based on a $400,000.00 mortgage from Stergio & Gruber. (TR180-15 to 181-3). The mortgage proceeds was placed in Caro & Graifman's trust account. (TR181-4 to 6). Mr. Gall and Gloria Stevens' asked Caro & Graifman to send the trust account checks to them and promised that the $400,000 would be sent back to Caro & Graifman. (TR181-10 to 15).

48

Despite Mr. Gall and Ms. Stevens' representation that $400,000 would be sent back to Caro & Graifman, Caro & Graifman received only $80,000.00 from the $400,000.00 loan procured for Mr. Gall. (TR181-10 to 16). Ms. Stevens advised Mr. Caro that the $320,000 balance of the $400,000 loan proceeds was used to pay criminal counsel. (TR181-17 to 20). After Mr. Gall failed to remit the proceeds of the $400,000 loan to Caro & Graifman, Mr. Caro sent Mr. Gall a letter demanding payment of $1,430,000 for legal services. (A copy of the letter of Chase Caro to Joseph Gall was admitted into evidence as Exhibit AV). On November 19, 1996, Caro & Graifman filed a complaint in the State Supreme Court against Joseph Gall, Gloria Stevens and Employee Staffing of America and Labor Force of America in which Caro & Graifman sought payment of legal services rendered in transactional matters, tax matters, and 12 litigated matters. (See page 1 - 2 of Caro & Graifman's complaint which was admitted into evidence as plaintiff's Exhibit #4). The complaint recited Caro & Graifman's entitlement to payment of partners services at the rate of $250 per hour, payment of associates services at $175 per hour and $75 per hour for paralegal services. The complaint sought recovery on a quantum meruit basis. (See page two paragraph eight of the New York State Supreme Court complaint in Caro & Graifman v. Joseph Gall, et al which was admitted into evidence as plaintiff's Exhibit #4). Mr. Caro testified seeking $275.00 per hour in payment when the initial agreement provided for

$100.00 per hour was based upon monthly prepayments of $30,000 which Mr. Gall only paid once. (TR187-5 to 12). (TR591-18 to TR593-21). Mr. Caro conceded that he was not seeking a recovery of $275.00 per hour from Joseph Gall in the within case. (TR191-20 to 192-2). Mr. Caro testified that there were three ways of calculating Mr. Gall's debt to Caro & Graifman. One means to calculate the debt was to bill Mr. Gall 2-300 hours per month at $275.00 an hour for 27 months which would be $2,145,000 less the $646,000 paid by Mr. Gall which would leave a balance of $1,499,000. (TR188-10 to 189-6). A second means to calculate the balance is to multiply $30,000 per month times 27 months which equaled $810,000, add the 7.5% of the gross fees for expenses of $60,750 which equaled $870,750. The third means to calculate the amount due Caro & Graifman was to multiply $40,000 per month in fees times 31 months, add 7.5 percent per month for expenses which after a deduction for payments of $646,138.57 resulted in a balance due to Caro & Graifman of $686,861.50. Mr. Gall and Mr. Caro agreed in December of 1996 shortly after the complaint was filed that the settlement of the lawsuit would be for $645,000.00 in cash. (TR190-11 to 16). Mr. Gall testified that he thought the settlement agreement reached between him and Caro & Graifman was fair because it accorded him the benefit of the $100 per month discount rate agreed which was based on him making timely payments. (TR77-2 to 78-13). Mr. Caro advised Mr. Gall that he would prefer to be paid in cash but Mr. Gall told Mr. Caro that he

believed he could get his legal situation corrected and pay the settlement in six months. (TR191-17 to 23). Mr. Gall believed that if bail was going to be issued, it would be a big factor in his ability to pay. (TR78-14 to 21). As Mr. Gall did not have the immediate ability to pay the $645,000 settlement, Mr. Gall signed a mortgage for Caro & Graifman in the amount of $800,000 which was executed in Milford, Connecticut at a mailbox store. (TR78-23 to 79-7). (A copy of the mortgage was admitted into evidence as plaintiff's Exhibit 9). The mortgage was secured by a promissory note executed on April 24, 1997 and notarized by Patrick L. Wooley. (A copy of the note was admitted into evidence as plaintiff's Exhibit #6). Although neither the promissory note nor the mortgage articulate an interest rate, both the mortgage and promissory note provided for the payment of interest if the debt owed to Caro & Graifman was not paid on demand. Paragraph 3 lines 1 to 5 state:

> The indebtedness evidence by this Note shall become immediately due and payable at the option of the Payee immediately on demand; (b) upon the admission, in writing, of the Maker of its inability to pay any of its debts generally as the same become due;.

Paragraph 4 of the note states:

> Should the indebtedness evidenced by this Note or any thereof be collected at law or in equity, or in bankruptcy, receivership or any other court proceeding or should this Note be placed in the hands of attorneys for collection, the Maker agrees to pay, in addition to the principle amount and interest thereon, all costs of collecting or attempting to collect this Note including, without limitation, reasonable attorney's fees and expenses.

Page 2 paragraph 6 through page 3 paragraph 1 of the Note states:

It is expressly stipulated and agreed to be the intent of the Payee and the Maker to comply at all times with applicable usury laws.  If at any such time such laws would ever render usurious any amount called for under this Note or any document securing this Note, then it is the Payee's and the Maker's express intention that such excess amounts be immediately credited on the unpaid principle or if this Note has been fully paid, refunded by the Payee to the Maker (and the Maker shall accept such refund) and the provisions hereof and thereof be immediately deemed to be reformed to comply with the then applicable laws, without the necessity of the execution of any further documents, but so as to permit the recovery of the false amount otherwise called for hereunder and thereunder.  Any such crediting or refund shall not cure or waive any default by the Maker under this Note or any documents securing this Note.  If at any time following any such reduction in the interest rate payable to the Payee by the Maker there remains unpaid any principle and the maximum interest rate permitted by applicable law is increased or done away with, then the interest rate payable to the Payee shall be adjusted to the extent permitted by applicable law, so that the total amount of interest thereunder payable by the Maker to the Payee shall be equal to the dollar amount of interest which would have been paid by the Maker to the Payee without giving effect to applicable usury laws.

Page 2 and 3, paragraphs 4 and 14 (j) of the Mortgage states in pertinent part:

AND the Mortgagor covenants with the Mortgagee as follows:

4.  That the whole of said principle sum and interest shall become due at the option of the Mortgagee:  after the default in the payment of any installment of principle or interest;.

14.  That the whole of said principle sum and the interest shall become due (j) if the Mortgagor fails to keep, observe and perform any of the covenants, conditions or agreements contained in any prior mortgage or fails to pay the Mortgagee the amount of any installment of principle or interest which the Mortgagee

may have paid on such Mortgage with interest thereon as provided in paragraph 16 of this Mortgage or the Note secured hereby.

The mortgage between Caro & Graifman and Joseph Gall contains a crossed out $340,000 which is clearly replaced by $800,000. (See Exhibit 9, page 1). Neither Joseph Gall nor Chase Caro could explain the reason for the crossed out $340,000 figure on the mortgage. (TR43-15 to 44-3; TR46-2 to 23; TR545-9 to 548-2). Both Mr. Caro and Mr. Gall acknowledged that $340,000 was a settlement figure discussed in negotiations between them regarding Mr. Gall's cash payment of his debt to Caro & Graifman eight months earlier, but denied that $340,000 was inserted in the mortgage and crossed out because of the prior settlement negotiations. (TR44-4 to 12; TR548-5 to 16).

The mortgage contains a provision regarding attorney's fees which states:

> That if any action or proceeding be commenced (including all action to foreclose this mortgage or to collect the debt secured by), in which action or proceeding the mortgagee is made a party, or in which it becomes necessary to defend or uphold the lien of this mortgage, all sums paid by the mortgagee for expense of any litigation to prosecute or defend the rights and lien created by this mortgage including any reasonable counsel fees shall be paid by the mortgagor, together with interest thereon at the rate of six percent per annum and any such sum and the interest thereon shall be a lien on said premises prior to any right, or title in interest in or claim upon said premises attaching or accruing subsequent to the lien of this mortgage, and shall be deemed to be secured by this mortgage. (See mortgage, page 2, paragraph 12).

Both parties stipulated to the authenticity of the mortgage admitted

into evidence as plaintiff's Exhibit #9.

IV.  CARO & GRAIFMAN DID NOT PARTICIPATE IN THE PREPARATION OF
JOSEPH GALL'S FINANCIAL STATEMENT TO THE UNITED STATES DEPARTMENT
OF PROBATION AND ADVISED THE COURT AND NCCI'S COUNSEL OF ALL
OMISSIONS REGARDING THE MORTGAGE IN THE FINANCIAL STATEMENT

The financial statement submitted by Joseph Gall to the United
States Department of Probation which is dated April 25, 1997 has no
express reference to the note and mortgage given to Caro & Graifman
on April 24, 1997 and April 30, 1997.  (A copy of Mr. Gall's
financial statement was admitted into evidence as plaintiffs'
Exhibit #8).  Mr. Gall gave a series of reasons for the failure to
list Caro & Graifman's note and mortgage on his financial statement.
Mr. Gall stated he was not sure that the financial statement was
signed on April 25, 1997 and claimed it might have been signed prior
to the mortgage note dated April 24, 1997.  (TR27-5 to 28-17; TR86-6
to 87-8).  Mr. Gall admitted claiming in his deposition that he did
not include Caro & Graifman's mortgage on his financial statement
because he did not have enough room to include the mortgage on the
form.  (TR38-23 to 42-4).  Mr. Gall stated that the confusion on the
form was caused by the fact that he submitted more than one draft
of the form to the Department of Probation.  (TR27-13 to 28-17).
Mr. Gall indicated that he did not believe that his financial
statement was misleading because the inclusion of $640,000.00 for
credit cards and legal fees represented the approximate amount he
owed to Caro & Graifman.  (TR34-12 to 15).  Mr. Gall stated he did
not believe that the financial statement was misleading because it

54

contained no undisclosed assets and the difference between the $645,000.00 he listed as unsecured legal debt which was owed to Caro & Graifman and the $800,000.00 mortgage executed to Caro & Graifman was not important because Caro & Graifman would have taken $645,000.00 in cash at the time he executed the statement. (TR100-11 to 23).

Mr. Gall testified that no one at Caro & Graifman assisted him in the preparation of his financial statement. When Mr. Caro received Mr. Gall's financial statement, he realized that the statement did not list the mortgage and note to Caro & Graifman as a secured debt. (TR486-6 to 487-8). Mr. Caro thus appeared at Mr. Gall's restitution hearing on July 24, 1997 and advised the court and counsel about his $800,000.00 mortgage. (TR487-12 to 488-5). A copy of the restitution hearing transcript was admitted into evidence as plaintiffs' Exhibit #12 and the pertinent provisions confirming Mr. Caro's disclosure of the mortgage were read into evidence at trial. (TR488-10 to 497-2).

Mr. Gall signed a mortgage modification agreement when Mr. Caro visited him in Allenwood Prison on October 23, 1997. (TR47-13 to 48-1). Mr. Gall believed that Mr. Caro wanted the mortgage modification to provide for interest because Mr. Caro needed funds desperately and was attempting to sell the mortgage or borrow against it. (TR49-2 to 8). Mr. Gall signed the mortgage agreement because it appeared that Caro & Graifman would not get paid quickly

and he wanted to do "what was fair."   (TR49-9 to 18).

CONCLUSIONS OF LAW

I.   NEW YORK LAW APPLIES TO THE WITHIN ACTION BECAUSE MOST OF THE
PARTIES ARE NEW YORK RESIDENTS AND NEW YORK HAS THE PRIMARY
GOVERNMENTAL INTEREST IN THE CASE

In the court's prior opinion denying defendant counterclaimant's motion to dismiss, the court reserved its ruling on which state's choice of law rules should apply to the substantive issues presented in this action.  National Council on Compensation Insurance Inc. v. Caro & Graifman, 259 F.2d 172, 178 fn. 1.  Under the law of New York State and Connecticut, a court must only engage in choice of law analysis if there exists differences in the substantive law of two competing jurisdictions.   International Business Machine Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143-144 (2d Cir. 2004) (conflict of law analysis irrelevant to insured employer's declaratory judgment action because the law of California and New York is identical on insurance coverage issues in declaratory judgment action); Fieger v. Pitney Bowes Credit Corp, 251 F.3d 386, 393 (2nd Cir. 2001) (choice of law analysis required for a determination of the New York resident's claim for quantum merit basis for a commission based on his role in procuring the sale of real estate in Connecticut because New York and Connecticut law differed on the issue of whether an unlicensed real estate broker can maintain a quantum merit claim based on procuring the sale of real estate); Pantelopoulos v. Pantelopoulos, 49 Conn. Supp. 209,

56

869 A.2d 280, 283-284 (2005) (Connecticut court not required to engage in choice of law analysis to decide whether divorced husband's complaint against his former wife for intentional infliction of emotional distress as a result of her starving plaintiff's pet dog because failure of New Jersey and Connecticut to recognize a cause of action for loss of a pet rendered the issue a "false conflict.")  If there is a conflict of laws between the law of multiple states, a federal court sitting in a diversity action should usually apply the choice of law rules of the forum in which the court sits.  Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2nd Cir. 1999) (New Jersey law applied to defamation claim filed in the United States District for the Southern District of New York because New Jersey situs of alleged tort and plaintiff resided in New Jersey); Sheldon v. P.H.H. Corp., 135 F.3d 848, 852 (2nd Cir. 1998) (New York's choice of law rules apply to personal injury action transferred from Michigan to New York because the court applies the rules of transfer forum in diversity actions).

As shown below, New York and Connecticut law do not differ on the prima facie requirements for a fraudulent conveyance or the requirements to collect interest under a mortgage and note.  As there is a potential conflict between New York and Connecticut law regarding the award of prejudgment interest, choice of law analysis is required.  As the within case involves a mortgage entered into by Joseph Gall with Caro & Graifman, a New York law firm and the

mortgage secured on New York properties, in cases involving contracts and tort, the Connecticut Supreme Court has applied the substantive law of the state with the most significant relationship with the litigated dispute. <u>American States Ins. Co. v. Allstate Ins. Co.</u>, 282 Conn. 454, 922 A.2d 1043 (2007) (Florida insurance law which permits insurance carriers to preclude personal injury claims between resident relatives applied to daughter's claim  for an accident which occurred in Connecticut fact that car was principally garaged in Florida because Florida had the most significant relationship for the cause of action); <u>Reichhold Chemicals v. Hartford Accident & Indemnity Co.</u>, 252 Conn. 774, 750 A.2d 1051 (2000) (Washington law applies to coverage dispute between New York based insurance company and Washington policy holders for environmental contamination at hazardous waste site because situs of the risk in Washington and Washington's compelling  paramount interest in the health and safety of its people endowed Washington with the most significant relationship to the case); <u>Dick v. Dick</u>, 167 Conn. 210, 223-224, 355 A.2d 110 (1974) (contract between father and son to post $70,000.00 for forbearance from suit governed by New York law which was the place where defendant resided and where parties signed alleged contract).

New York law applies to the within case because New York has the most significant relationship with the facts of the within lawsuit.  Caro & Graifman was a New York law firm with principal

offices in New York which was the site where Caro & Graifman provided most of the legal services to Mr. Gall. New York is the residence of AIG, the insurance company within NCCI which has the biggest restitution claim. The mortgage between Caro & Graifman and Joseph Gall was the settlement of a lawsuit filed in the New York State Supreme Court. The two properties which were the subject of the mortgage and NCCI's restitution claim are located in New York City. Although Mr. Gall executed the mortgage in Connecticut, the mortgage was filed in New York City and only has priority over NCCI's restitution judgment on the basis of its status as a document which is filed in New York State in the Bronx County Clerk's office. New York's interest in determining the validity of secured transactions filed in New York County Clerk's offices and regulating the fees New York State's licensed attorneys are more significant than Connecticut's interests in the within case. New York law thus applies to all choice of law issues.

II.  THE MORTGAGE BETWEEN CARO & GRAIFMAN AND JOSEPH GALL IS NOT A FRAUDULENT CONVEYANCE BUT REPRESENTS BONA FIDE CONSIDERATION FOR AN ANTECEDENT DEBT

Plaintiff's allegation that Joseph Gall's mortgage to Caro & Graifman is fraudulent fails under both New York and Connecticut law because payment of bona fide consideration for an antecedent debt defeats claims that Caro & Graifman received a fraudulent transfer. McKinney's New York Debtor and Creditor Law § 273 states:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is

fraudulent as to creditors without regard to his actual
intent if the conveyance is made or the obligation is
incurred without a fair consideration.

McKinney's New York Debtor and Creditor Law § 273-a states:

Every conveyance made without fair consideration when the
person making it is a defendant in an action for money
damages or a judgment in such an action has been docketed
against him, is fraudulent as to the plaintiff in that
action without regard to the actual intent of the
defendant if, after final judgment for the plaintiff, the
defendant fails to satisfy the judgment.

McKinney's New York Debtor and Creditor Law § 271(1) defines

insolvency as follows:

A person is insolvent when the present fair salable value
of his assets is less than the amount that will be
required to pay his probable liability on his existing
debts as they become absolute and matured.

McKinney's New York Debtor and Creditor Law § 272 defines fair

consideration as follows:

Fair consideration is given for property or obligation,
a.  When in exchange for such property, or obligation, as
a fair equivalent therefor, and in good faith, property
is conveyed or an antecedent debt is satisfied, or
b.  When such property, or obligation is received in good
faith to secure a present advance or antecedent debt in
amount not disproportionately small is compared with the
value of the property, or obligation obtained.

The courts of the United States and New York have given effect

to the plain and ordinary language of New York Debtor and Creditor

Law  § 273 and 273-a and held that a transfer to an individual of

an asset to a bona fide creditor in satisfaction of an antecedent

debt cannot be a fraudulent transfer under New York law.  In re

Sharp International Corp. v. State Street Bank & Trust Co., 403 F.3d

43, 53-57 (2nd Cir. 2005) (bank which discovered through investigation that shareholders in a borrower's corporation were fraudulently looting the corporation and thus arranged for repayment of corporate loans to bank and assisted corporation in obtaining credit from other banks did not receive a fraudulent transfer because transfer is payment for antecedent debt); HBE Leasing Corp. v. Frank, 61 F.3d 1054 (2nd Cir. 1995) (mortgage to attorney by defendant during pendency of civil litigation would not constitute a fraudulent transfer if mortgage was compensation for prior legal services and mortgage represented equivalent value of prior legal services); Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A., 191 A.D. 2d. 86, 599 NYS 2d 816 (2d Dept. 1993) (bank which obtained payment of insolvent company's accounts receivable pursuant to a security agreement did not receive a fraudulent transfer because accounts receivables satisfied loans which constituted antecedent debts); Colombo v. Caiati, 131 A.D. 532, 516 NYS 2d 476, 477 (1st Dept. 1987)(conveyance of property in payment for taxes, repairs and utilities on property is not a fraudulent conveyance). The burden of proving that a transfer is fraudulent because of the lack of fair consideration rests on the party challenging the conveyance. American Inv. Bank, N.A. v. Marine Midland Bank, 491 A.D. 2d 690, 595 NYS 2d 537, 538 (2d Dept. 1993); Marine Midland Bank v. Murkoff, 120 A.D. 3d 122, 508 NYS 2d 17, 20 (1986). The burden must be met by clear and convincing evidence. Id.

61

In <u>Ultramar Energy Ltd</u>., plaintiff sold crude oil to Drexel, Burnam, Lambert Trading Corp.  Chase Manhattan Bank issued letters of credit secured by accounts receivable from third party vendors. When Chase was repaid its loans from the secured accounts receivables, plaintiff alleged a fraudulent transfer.  In granting defendant's motion to dismiss plaintiff's complaint based on an alleged fraudulent conveyance, the court emphasized that a conveyance which satisfied an antecedent debt is not fraudulent even if the transferee has knowledge of the debtor's insolvency and that payment to the transferee will preclude other creditors from obtaining payment for legitimate debts.  The court stated:

> Under the law of this state, a conveyance which satisfied an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even it its effect is to prefer one creditor over another.  (See, Debtor and Creditor Law §§ 272, 273; see also <u>Ronga v. Chiusano</u>, 97 A.D.2d 753, 468 N.Y.S.2d 174).  It is of no significance "that the transferee has knowledge of such insolvency.  Nor is the transfer subject to attack by reason of knowledge on the part of the transferee that the transferor is preferring him to other creditors, even by virtue of a secret agreement to that effect."  (30 NYJur2d, Creditor's right and Remedies § 306 [footnotes omitted]).  Even though insolvent, a debtor may properly assign assets to a creditor as security for an antecedent debt although the effect of the transfer will be to prefer that creditor.  (<u>Seip v. Laubach</u>, 333 Pa. 225, 4 A.2d 149, 150 (1939)).  "It is not unfair, and therefore is not a fraudulent conveyance, for the debtor arbitrarily to select the creditors whom he chooses to pay, although these favourites know that there will not be enough left to pay the other."  (1 Gerrard Glenn, Fraudulent conveyances and Preferences §  289a, at 494 [rev. ed. 1940]).  Thus, even if Chase had not had a security interest in the accounts receivable, even if it had known of Drexel's financial difficulties and even if Chase had known that such assignment would result in

Ultramar's not getting paid, Chase would have been within its rights in taking accounts receivable in satisfaction of Drexel's debt. <u>Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.</u>, 599 NYS2d supra at 820.

In <u>HBE Leasing Corp. v. Frank</u>, 61 F.3d 1054 (2nd Cir. 1995), the Second Circuit Court of Appeals conclusively held that a mortgage and note between an attorney and a defendant in a RICO action filed prior to the entry of formal judgment against the defendant would not be a fraudulent conveyance under New York Debtor & Creditor Law § 272-b if the amount of the mortgage constitutes the fair equivalent value of the legal services rendered prior to the entry of judgment. In <u>HBE Leasing Corp.</u>, defendant Hiram J. Frank faced a $21,000,000.00 judgment in a RICO action and conveyed the bulk of his considerable property to his lawyers, his fiancee and his mother. 61 F.3d at 1055. The court deemed the mortgage notes which constituted payment for future legal services to be impermissible under New York Debtor & Creditor Law § 272-b because New York Debtor & Creditor Law § 272-b requires permissible transfers to be fair consideration in good faith for an antecedent debt or a present advance. The court rejected defendant's argument that payments for indefinite future legal services could qualify as a present advance. 61 F.3d at 1060-1061. With respect to the mortgages for past legal services, the court held that the mortgage would be valid if it represented the equivalent value of legal services owed to the law firm. <u>Id</u>. at 1061. The court invalidated one bond for $278,000.00 because it exceeded the $75,010.00 owed for

legal services prior to the conveyance. The court indicated that another mortgage which secured approximately $144,000.00 in past legal services would be valid if the mortgage constituted the equivalent value of the $75,010.00 debt. The <u>HBE Leasing Corp</u>. court left no doubt that a mortgage to an attorney for the substantial equivalent of past due legal services would not be a fraudulent conveyance under New York Debtor & Creditor Law because the mortgage would clearly constitute fair value consideration for an antecedent debt. The court stated:

> Goldstein further asserts, however, that he was also owed fees - $75,010.00 - for services performed through October 30, 21992, that is, prior to the conveyances at issue. If true, to that extent, the property conveyed to Goldstein would satisfy the "antecedent debt" prongs of DCL § 272(a) and (b). Nonetheless, fair consideration is still lacking as a matter of law with respect to the $227,000 bond and $278,000 note, because the conceded values of those two securities each far exceeds the allegedly outstanding legal fees. Thus, under § 272(1), the value of antecedent debt satisfied ($75,010) is not a 'fair equivalent" of the bond or note conveyed to Goldstein; under § 272(b), the value of antecedent debt secured is "disproportionately small as compared with the value of the property." See <u>Clarkson Company</u>, 525 F.Supp. at 629-30 (value of stock pledged to debtor's attorney was grossly disproportionate to antecedent debt). We therefore conclude as a matter of law that fair consideration was not given for two of the three challenged conveyances to Goldstein-the North Broward bond and the Fox run Note-and these are subject to being aside as constructively fraudulent.
>
> the circumstances relating to the Chern Mortgage are somewhat different. That mortgage, which secured a debt of approximately $144,000 at the time of its transfer to Goldstein, apparently encumbers a chicken farm that is no longer in operation. We believe that genuine questions of fact exist as to whether the present value of the Chern mortgage is a "fair equivalent" of $75,010 under §

64

272(a), or whether the $75,010 is "disproportionately small as compared with" the present value of the mortgage under § 272(b). See <u>United States v. McCombs</u>, 30 F.3d 310, 326 (2d Cir. 1994) (sufficiency of consideration under DCL § 272 depends on facts and circumstances of each particular case). HBE is therefore not entitled to summary judgment as to the Chern Mortgage. <u>HBE Leasing Corp. v. Frank</u>, 61 F.3d at 1061-1062.

Connecticut's fraudulent conveyance statutes are identical to New York's because they recognize that bona fide consideration for an antecedent debt does not constitute a fraudulent transfer. Pursuant to C.G.S.A. § 52-552f (a), a party who seeks to establish that a debtor has made a fraudulent conveyance must prove (1) that the debtor made the transfer without obtaining reasonable equivalent value in exchange of the transfer; and (2) that the debtor became insolvent as a result of the transfer. <u>In re Carrozzella & Richardson</u>, 286 B.R. 480, 485 (D.Conn. 2002). <u>In re All-Type Printing, Inc.</u>, 274 B.R. 316, 322-323 (Bkrtcy.D. Conn. 2002). A party who alleges that a transfer is fraudulent bears the burden of proving fraud by clear and convincing evidence. <u>In re Carrozzella & Richardson</u>, 286 B.R. 480, 485 (D.Conn. 2002); <u>In re All- Type Printing, Inc.</u>, 274 B.R. 316, 322 (Bkrtcy.D. Conn 2002); <u>Tessitore v. Tessitore</u>, 31 Conn. App. 40, 42-43, 623 A.2d 496 (1993) (cited under C.G.S. § 52-552 (repealed)).

A party's claim that a transfer is fraudulent is defeated if the transferee establishes that the transferor received reasonably equivalent value for the payment. <u>In re Carrozzella & Richardson</u>, 286 B.R. 480, 490-491 (D.Conn. 2002) (law firm's repayment of

65