UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------
NATIONAL COUNCIL ON COMPENSATION :
INSURANCE, INC. et al.,                     :
                                            :
                        Plaintiffs,         :        Civil Action No.:
                                            :        3:00 CV 1925 (AHN)
v.                                          :
                                            :
CARO & GRAIFMAN, P.C., and                  :
JOSEPH GALL,                                :
                                            :
                        Defendants.         :        JANUARY 4, 2008
------------------------------------------------------------

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

By:    David E. Rosengren (ct05629)
       Frank A. Sherer III (ct27149)
       Pepe & Hazard LLP
       Goodwin Square
       225 Asylum Street
       Hartford, CT  06103
       Phone:  (860) 522-5175
       Fax:  (860) 522-2796
       E-mail:  fsherer@pepehazard.com

## <u>TABLE OF CONTENTS</u>

### INTRODUCTION

### FINDINGS OF FACT

<u>Page</u>

A.   The Parties ...................................................................................... 4
B.   The Relationship Between Joseph Gall and Chase Caro. ............................. 5
C.   The Fee Agreement ............................................................................ 5
D.   The Lawsuit: Caro & Graifman v. Gall .................................................. 9
E.   Amounts Paid to Caro & Graifman by Gall ........................................... 12
F.   Gall's Criminal Conviction ............................................................... 12
G.   The $800,000 Demand Note .............................................................. 13
H.   Gall's Financial Disclosure .............................................................. 14
I.   The Mortgage ................................................................................ 18
J.   The Restitution Order ...................................................................... 20
K.   The Mortgage Modification .............................................................. 22
L.   Gall's Release from Prison ............................................................... 23
M.   Caro's Guilty Plea ......................................................................... 24
N.   The Evidence of Caro & Graifman's Work for Gall ................................. 25

### CONCLUSIONS OF LAW

I.    THE ISSUE BEFORE THIS COURT, AS FRAMED BY THE PLAINTIFF'S
      COMPLAINT AND CARO & GRAIFMAN'S ANSWER, IS LIMITED TO
      WHETHER OR NOT THE DEMAND NOTE, MORTGAGE AND
      MORTGAGE MODIFICATION CONSTITUTE FRAUDULENT
      CONVEYANCES ............................................................................. 33

II.   THIS COURT SHOULD COMPLETELY DISCOUNT ANY ATTEMPT BY
      THE DEFENDANTS IN THIS CASE TO ARGUE THAT THERE WAS NO
      FRAUDULENT CONVEYANCE BECAUSE THE
      DEFENDANTS HAVE NO CREDIBILITY. ........................................... 34

III.  THIS COURT HAS JURISDICTION OVER THIS ACTION TO ENFORCE
      THE RESTITUTION ORDER. .......................................................... 37

IV.   CHOICE OF LAW. ........................................................................ 38

      A.   Connecticut Law Applies to the Causes of Action on which Connecticut
           and New York Law Do Not Conflict. ......................................... 38

i

B.   New York Law Applies to the Issue of Proof of the Quantum of Legal Services Provided by Caro & Graifman. ...................................................... 40

i.   New York Requires Contemporaneous Time Records for an Attorney to Recover the Full Amount of Fees. ............................... 42

V.   THE MORTGAGE IS INVALID BECAUSE IT SECURES A DEFECTIVE UNDERLYING OBLIGATION. ..................................................................... 43

A.   The Record in This Case Contains No Reliable Evidence of Sufficient Consideration to Support the Mortgage. ...................................................... 43

B.   No Objective Evidence Demonstrates an Underlying Obligation of Caro & Graifman to Provide Legal Services to Any Individuals or Entities other than Gall. ............................................................................ 48

VI.   THE TRANSACTION EVIDENCED BY THE NOTE AND MORTGAGE MUST BE SET ASIDE AS A FRAUDULENT CONVEYANCE UNDER CONNECTICUT LAW. ...................................................................... 49

A.   Connecticut's Uniform Fraudulent Transfer Act Applies to the Mortgage. ........................................................................................... 49

B.   Gall Conveyed His Interests in the Subject Properties to Caro & Graifman with Actual Fraudulent Intent under the Connecticut Uniform Fraudulent Transfer Act. ........................................................................ 52

i.   Gall Made the Transfer or Incurred the Obligation to an Insider. .... 53

ii.   Gall Retained Possession or Control of the Bronx and Manhattan Properties. .................................................................................. 55

iii.   Gall Concealed the Demand Note and Mortgage. ........................... 55

iv.   Gall Had Been Sued Before Making the Transfer or Incurring the Obligation. ............................................................................... 58

v.   Gall Transferred Substantial Assets to Caro & Graifman. .............. 58

vi.   Gall Did Not Receive Reasonably Equivalent Value as Consideration for the Transfer or Obligation. ................................. 59

ii

vii.    The Transfer also Occurred Shortly Before Gall Incurred a Substantial Debt ............................................................... 60

viii.    Other Circumstances Surrounding the Mortgage Illustrate Gall's Fraudulent Intent. ........................................................... 60

C.    Gall's Constructive Fraudulent Intent ......................................................... 62

VII.    THE PROCEDURAL POSTURE AND NATURE OF THE CLAIMS ASSERTED IN THIS CASE DO NOT ENTITLE CARO & GRAIFMAN TO INTEREST. ................................................................................. 63

VIII.    CARO & GRAIFMAN HAS NOT ESTABLISHED THE REQUIRED ELEMENTS OF ITS COUNTERCLAIMS. ......................................... 64

iii

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------------------------------
NATIONAL COUNCIL ON COMPENSATION :
INSURANCE, INC. et al.,                :
                                       :
                        Plaintiffs,    :       Civil Action No.:
                                       :       3:00 CV 1925 (AHN)
v.                                     :
                                       :
CARO & GRAIFMAN, P.C., and             :
JOSEPH GALL,                           :
                                       :
                        Defendants.    :       JANUARY 4, 2008
-------------------------------------------------------
```

### PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Plaintiffs, National Council on Compensation Insurance, American International Group, and American Policyholders Insurance Company (collectively "the Plaintiffs"), hereby respectfully submit the following proposed findings of fact and conclusions of law:

### INTRODUCTION

The plaintiffs brought this case to prevent a fraudulent conveyance of $800,000 from the defendant, Joseph Gall, a convicted felon, to his friend and former lawyer, Chase Caro, also a convicted felon.

In the fall of 1996, Joseph Gall, was convicted of massive insurance fraud perpetrated against the plaintiffs in this action. At Gall's subsequent restitution hearing the evidence would show that as a result of that fraud the plaintiffs suffered a collective

loss of $13 million. By the time of his criminal sentencing in the spring of 1997, whatever small fortune Mr. Gall may have accumulated as a result of his criminal activities had been reduced to approximately $1.385 million, nearly all of which consisted of his equity interests in several pieces of real estate.

Shortly before this Court issued a $13 million Restitution Order against Gall and in favor of the plaintiffs, Gall, in a desperate attempt to keep a substantial amount of his assets from falling into the hands of the plaintiffs, executed a Demand Note and Mortgage in favor of the other defendant in this case, Caro & Graifman, P.C. ("Caro & Graifman"). The Note and Mortgage purported to convey Gall's entire equity interest of $800,000 in two of his most valuable pieces of property to Caro & Graifman to secure a debt Gall allegedly owed Caro & Graifman for legal services.

The trial in this case lasted three days, during which time an overwhelming amount of evidence was produced which leaves little doubt that Gall sought to fraudulently convey his equity interests in the two properties to avoid having those interests fall into the hands of the plaintiffs pursuant to this Court's Restitution Order.

Gall deliberately sought to conceal the existence of the Demand Note and Mortgage from this Court and the plaintiffs when he intentionally failed to report the existence of the Note on the Financial Statement he was ordered to file with this Court in conjunction with his sentencing proceedings. He further deliberately concealed, by way of omission on that same form, the fact that he had been sued six months earlier by the defendant Caro & Graifman for alleged unpaid legal fees.

2

The Note and Mortgage were hurriedly and surreptitiously executed on the eve of this Court's issuance of the Restitution Order, which Gall knew would be forthcoming.

The Note and Mortgage secured a debt of $800,000 in legal fees, an amount which both Gall and Mr. Caro admitted at trial was not the amount of fees actually owed. To compound matters, because Caro & Graifman P.C. did not keep time records for the purpose of billing Mr. Gall, it is impossible to tell whether Gall owed anything to Caro & Graifman after already having paid $646,000 in fees to that firm.

The $800,000 face amount of the Note and Mortgage conveniently matched—to the penny—the amount of Gall's purported equity interest in the two properties as reported by Gall on his financial statement.

After the issuance of the Restitution Order, which expressly forbade Gall from transferring any interest in any asset he owned, he executed a modification to the Mortgage, for no consideration, purporting to grant Caro & Graifman 10% interest on the principal amount of the Mortgage until the note was paid. The Original Note and Mortgage contained *no* provision for interest on the unpaid balance.

Gall did not part with his ownership interest in the underlying real estate. Rather he gave Caro & Graifman a Note and Mortgage (on which Caro & Graifman never sought to foreclose), thereby holding out the hope that Gall might be able to work out an arrangement with his lawyer and friend Caro to split in some fashion the $800,000 after Gall's interests in the properties were liquidated either by way of sale or foreclosure.

All the foregoing facts, as more particularly set forth in plaintiffs Proposed

3

Findings of Fact filed of even date, combine overwhelmingly to prove that Gall sought to fraudulently convey the equity interest in two of his most valuable assets in order to bilk his rightful creditors, the plaintiffs in this case.

## FINDINGS OF FACT

**A.    The Parties**

1.    At all relevant times, the Plaintiff National Council on Compensation Insurance, Inc. was a corporation organized and existing under the laws of the state of Delaware with a principal place of business located in Boca Raton, Florida.  (Stip. of Uncontested Facts 1, ¶ 1, Oct. 12, 2007.)

2.    At all relevant times, the Plaintiff American International Group, Inc. was a corporation organized and existing under the laws of the state of Delaware with a principal place of business located in New York.  (Stip. of Uncontested Facts 1, ¶ 2.)

3.    At all relevant times, the Plaintiff American Policyholders Insurance Company was a corporation organized and existing under the laws of the state of Massachusetts with a principal place of business located in Burlington, Massachusetts. (Stip. of Uncontested Facts 1, ¶ 3.)

4.    At all relevant times, the Defendant Caro & Graifman, P.C. ("Caro & Graifman") was a professional corporation organized and existing under the laws of the state of New York with a principal place of business located in New York.  (Stip. of Uncontested Facts 1-2, ¶ 4.)

4

5.      The Defendant Joseph Gall ("Gall") is an individual who currently resides at 36 Woodside Avenue in Elmsford, New York.  (Stip. of Uncontested Facts 2, ¶ 5; Trial Tr., Gall Test. 7:12-24, Oct. 24, 2007.)

**B.      The Relationship Between Joseph Gall and Chase Caro.**

6.      In the 1990s, Gall was involved in massive civil litigation with, among others, the Plaintiffs in this case.  (Trial Tr., Gall Test. 8:3-6, Oct. 24, 2006)

7.      Chase Caro ("Caro"), an attorney, initially started working with Gall while Caro was employed at Schneck Weltman & Hashmall, a New York law firm.  (Trial Tr., Caro Test. 44:7-14, Oct. 24, 2007.)

8.      After working on matters for Gall at Schneck Weltman & Hashmall for several years, Caro decided to start his own law firm, Caro & Graifman, which he formed on September 24, 1994.  (Trial Tr., Caro Test. 144:18-21, Oct. 24, 2007.)

9.      Caro brought Gall with him as one of Caro & Graifman's first clients.  (Trial Tr., Caro Test. 144:22-24, Oct. 24, 2007.)

10.      For the first several months of their relationship, Caro & Graifman essentially served as in-house counsel to Gall.  (Trial Tr., Caro Test. 163:12-25, Oct. 24, 2007.)

**C.      The Fee Agreement**

11.      On or about September 24, 1994, Gall entered into a fee agreement with Caro & Graifman (Trial Tr., Gall Test. 8:7-10, Oct. 24, 2007; Trial Tr., Caro Test.

5

144:18-145:1, Oct. 24, 2007), whose principals Gall understood to be Chase Caro and Brian Graifman ("Graifman") (Trial Tr., Gall Test. 8:11-15, Oct. 24, 2007).

12.     The substance of the fee agreement between Caro & Graifman and Gall is set forth in a letter dated September 24, 1994 authored by Caro on behalf of Caro & Graifman.  (Trial Tr., Gall Test. 10:7-18, Oct. 24, 2007.)

13.     Caro & Graifman agreed to provide Gall with "at least 300 hours per month worth of legal services" at an hourly rate not to "exceed $100 per hour, billed monthly," in return for pre-payment from Gall of a $30,000 retainer  (Pl.'s Ex. 1.)

14.     The agreement between Caro & Graifman and Gall covered legal services for civil matters only.  (Trial Tr., Caro Test. 452:3-9, Oct. 26, 2007.)

15.     Gall agreed to pay Caro & Graifman an initial retainer of $30,000, due on September 26, 1994.  (Trial Tr., Gall Test. 11:25-12:4, Oct. 24, 2007; Trial Tr., Caro Test. 148:20-24, Oct. 24, 2007.)

16.     "Beyond this initial retainer, any amounts paid to [Caro & Graifman] and not properly billed [would] be returned to [Gall] at a time of [Gall's] choosing."  (Pl.'s Ex. 1; Trial Tr., Gall Test. 12:9-11, Oct. 24, 2007.)

17.     The fee agreement between Caro & Graifman contained no provision relating to penalties for Gall's non-payment of the monthly retainer.  (Pl.'s Ex. 1; Trial Tr., Gall Test. 14:5-19, 123:7-12, Oct. 24, 2007.)

18.     Gall never agreed to an alternative fee arrangement with Caro & Graifman

6

pursuant to which he would pay full hourly rates if he failed to pre-pay the monthly

retainer:

> Q.    Sir, in fact, you never had an agreement that said [Gall] would pay in the alternative . . . your full rates if . . . he didn't come through with his retainer?
>
> A.    It did not specify what the alternative was.
>
> Q.    Right.  And he never agreed to any such alternative, did he?
>
> A.    ***He did not agree to that alternative.***

(Trial Tr., Caro Test. 593:24-594:5, Oct. 26, 2007.) (emphasis added)

19.    Although Caro, testifying on behalf of Caro & Graifman, and Gall claim

that they altered the fee agreement so that Caro & Graifman would provide Gall with at

least 400 hours of legal services per month at $100 per hour, no written evidence of this

alleged modification exists.  (Trial Tr., Gall Test. 61:15-24, 110:10-13 Oct. 24, 2007.)

20.    Graifman, Caro's partner, prepared an affidavit in 2001 for this case,

describing his work on matters related to Gall.  (Pl.'s Ex. 25; Trial Tr., Graifman Test.

526:13-16, Oct. 26, 2007.)

21.    Graifman makes no mention of any modification to the original $30,000

per month fee arrangement between Caro & Graifman and Gall in his affidavit.  (Pl.'s

Ex. 25; Trial Tr., Graifman Test. 527:15-528:15, Oct. 26, 2007.)

22.    Caro maintained a spreadsheet on which he kept track of the payments

made by Gall to Caro & Graifman, updating the spreadsheet each month to reflect the

current total of Gall's payments.  (Pl.'s Ex. 3; Trial Tr., Caro Test. 583:1-585:21, Oct.

25, 2007.)

23.    According to this spreadsheet, Caro & Graifman had received
$646,138.57 from Gall as of March 13, 1997, which translates to 6,461 hours of work
under the fee agreement.  (Pl.'s Ex. 3; Trial Tr., Caro Test. 587:23-588:1, Oct. 25,
2007.)

24.    The payments from Gall to Caro & Graifman up through March 13, 1997
averaged approximately $21,000 for each month.  (Pl.'s Ex. 3; Trial Tr., Caro Test.
170:3-8, Oct. 24, 2007.)

25.    Caro claimed in his trial testimony that Caro & Graifman began to suffer
financial difficulties as a result of Gall's failure to pay the agreed upon $30,000 monthly
retainer.  (Trial Tr., Caro Test. 170:18-171:2, Oct. 24, 2007.)

26.    Yet, Caro & Graifman never applied for relief or alerted any of the courts
in which Gall's matters were pending to the financial strains allegedly being placed on
the firm as a result of the arrangement with Gall.  (Trial Tr., Caro Test. 183:5-14, Oct.
24, 2007.)

27.    Nor did Caro ever walk away from the fee agreement between Caro &
Graifman and Gall.  (Trial Tr., Caro Test. 589:17-20, Oct. 26, 2007.)

28.    However, on November 19, 1996, Caro & Graifman sued Gall, seeking
allegedly outstanding legal fees.  (Stip. of Uncontested Facts 2, ¶ 9; Pl.'s Ex. 5; Trial
Tr., Gall Test. 13:20-14:25, Oct. 24, 2007; Trial Tr., Caro Test. 556:18-22, Oct. 26,

8

2007.)

**D.    The Lawsuit: Caro & Graifman v. Gall**

29.    On November 19, 1996, Caro & Graifman filed suit against Gall, Gloria

Stevens, Employee Staffing of America, Inc., and Labor Force of America, Inc. in the

Supreme Court of the State of New York, New York County.  (Stip. of Uncontested

Facts 2, ¶ 9; Pl.'s Ex. 5; Trial Tr., Gall Test. 13:20-14:25, Oct. 24, 2007; Trial Tr.,

Caro Test. 556:18-22, Oct. 26, 2007.)

30.    The complaint alleged, in part, that:

> [i]n consideration for this retention [for legal services], [Gall] contracted
> and agreed . . . to pay [Caro & Graifman] and its officers in New York
> for all legal services rendered by it on [Gall's] behalf, at [Caro &
> Graifman's] customary rates, which are $350.00 per hour for a partner's
> time, $175.00 per hour for an associate's time; and $75.00 per hour for
> a paralegal's time.

(Pl.'s Ex. 4; Trial Tr., Gall Test. 13:20-14:25, Oct. 24, 2007; Trial Tr., Caro Test.

556:18-22, Oct. 26, 2007.)

31.    The foregoing allegations in the complaint were false.

32.    Caro testified at trial that he knew the factual allegations in the complaint

to the effect that Gall owed approximately $1.4 million in legal fees were not true:

> Q.    Now, in the complaint that you filed against [Gall] . . . it says in
> consideration for this retention, defendant contracted and agreed jointly
> and severally to pay Caro & Graifman and its officers in New York for
> all legal services rendered by it and on defendant's [sic] behalf at [Caro
> & Graifman's] customary rates of $250 an hour for partners [sic] time,
> $175 for an associate's time, $75 for a paralegal's time . . . ?

9

\* \* \* \*

A.      Yes, I see . . . that.

Q.      Flatly untrue, right?

A.      No.

Q.      Never had an agreement with Mr. Gall that that was your agreement, correct?

A.      It was our position that for litigation purposes that if [Gall] wished us to do the work and he contracted and asked us to do the work, that it would be implied that he would pay our usual rates if he didn't prepay the retainer and thus entitles himself to the discount. . . .

THE COURT:      Does it say that in the complaint?  What you just said?

\* \* \* \*

THE WITNESS:      I do not believe it includes the arguments behind it.

THE COURT:      So why didn't the complaint recite what [Caro & Graifman's] arrangement was with [Gall], that he was to pay you 30 and then it was to go to 40 and he hadn't paid it, or he hadn't paid some of it, and just show what the balance was instead of coming up with this, these allegations?

THE WITNESS:      We believed we had a better chance of getting him to reach a settlement with us.

THE COURT:      But this really wasn't true, was it?

THE WITNESS:      I would not like to take that complaint to trial.

\* \* \* \*

THE COURT:      Where is the count alleging the agreement with Mr. Gall, the 30,000 and the 40,000?

THE WITNESS:      We did not put that in.  We did not feel, A, he hadn't signed it and, B, he hadn't lived up to it.

THE COURT:      That was the basis of your claim here, isn't it?  In terms of how much he owes you, you're not making a claim here in this

10

case that he owes you money based on a, on paragraph eight of your complaint in the New York Supreme Court about your customary rates, 250 for partner—

THE WITNESS:    *You're absolutely correct, Your Honor. We're not making that argument here.*

(Trial Tr., Caro Test. 591:3-593:22, Oct. 26, 2007.) (emphasis added)

33.    Gall testified at trial that he never agreed that he owed Caro & Graifman the approximately $1.4 million claimed in Caro & Graifman's lawsuit against him. (Trial Tr., Gall Test. 77:14, Oct. 24, 2007.)

34.    Caro & Graifman filed the New York lawsuit against Gall only "in the context of trying to pressure [Gall] to pay [Caro & Graifman] . . . ." (Trial Tr., Caro Test. 184:10-11, Oct. 24, 2007.)

35.    Caro ultimately admitted that Gall never agreed to a fee arrangement in which Caro & Graifman received regular hourly rates as payment for legal services. (Trial Tr., Caro Test., 591:3-592:17, Oct. 26, 2007.)

36.    Meanwhile, while the lawsuit was still pending, Caro & Graifman continued to represent Gall. (Trial Tr., Gall Test. 15:24-16:15, Oct. 24, 2007; Trial Tr., Caro Test. 556:18-22, Oct. 26, 2007.)

37.    Gall purportedly signed a written conflict waiver pursuant to which Caro & Graifman continued to represent him. (Trial Tr., Gall Test. 72:10-13, Oct. 24, 2007.)

38.    Caro did not seek legal counsel before determining whether Caro & Graifman could, pursuant to the rules of ethics, continue representing Gall after filing

11

suit against him.  (Trial Tr., Caro Test. 556:18-24, Oct. 26, 2007.)

**E.      Amounts Paid to Caro & Graifman by Gall**

39.      As of March 3, 1997, Gall had paid Caro & Graifman a total of

$646,138.57 for legal services.  (Pl.'s Ex. 3; Trial Tr., Gall Test. 16:22-17:14, Oct. 24,

2007; Trial Tr., Caro Dep. Excerpt, 121:22-122:11; Trial Tr., Caro Test. 151:13-20,

Oct. 24, 2007.)

**F.      Gall's Criminal Conviction**

40.      While involved with massive civil litigation with, among others, the

Plaintiffs in this case, Gall was indicted for fraud and other related offenses, all

stemming from the events related to or surrounding the civil litigation.  (Pl.'s Ex. 11.)

41.      Gall was found guilty after a full trial.  (Pl.'s Ex. 11; Trial Tr., Gall Test.

7:17-22, Oct. 24, 2007.)

42.      Gall's sentencing hearing was held on April 4, 1997, at which time the

court sentenced Gall to eight years, four months in prison and five years of supervised

release (Pl.'s Ex. 5) for committing the federal offenses of conspiracy, mail fraud, wire

fraud, false statements and failure to file tax returns.  (Pl.'s Ex. 11; Trial Tr., Gall Test.

7:17-22, Oct. 24, 2007.)

43.      At the time of the sentencing hearing, Gall understood that the court

would also be issuing a restitution order in favor of the Plaintiffs.  (Trial Tr., Gall Test.

22:21-23:4, Oct. 24, 2007.)

12

44.     Gall admitted that at the sentencing hearing at which he was present, the court found that the losses sustained by the victims of his fraud exceeded $13 million. (Pl.'s Ex. 5; Trial Tr., Gall Test. 20:15-22:12.)

45.     At the sentencing hearing, the court also specifically ordered Gall "to provide . . . to the Government  and to the probation officer complete and total financial disclosure, including financial statements, tax returns, and a complete disclosure of all interest[s] that [Gall had] in any entity, whether it be as an individual, whether it be in a corporate entity, whether it be a limited partnership or any other form of ownership . . . ."  (Pl.'s Ex. 5 252:7-13; Trial Tr., Gall Test. 23:5-9, Oct. 24, 2007.)

**G.      The $800,000 Demand Note**

46.     On April 24, 1997, Gall executed an $800,000 note (the "Demand Note" or "Note") in favor of Caro & Graifman, payable on demand, and which also purported to be "secured by a mortgage . . . dated as of [April 24, 1997] . . . made by [Gall] to [Caro & Graifman] . . . ."  (Stip. of Uncontested Facts, 2 ¶ 11; Pl.'s Ex. 6; Trial Tr., Gall Test. 24:14-21, 25:12-17, Oct. 24, 2007.)

47.     The document identification number in the lower left corner of the $800,000 Demand Note contains the date of March 31, 1997.  (Pl's Ex. 6; Trial Tr., Gall Test. 101:11-102:3, Oct. 24, 2007.)

48.     The Note also stated that the mortgage which purportedly served as security for the Note encumbered "the premises known as 2105 Daly Ave., Bronx, New York [and] 130 East 117th Street, New York, [New York] held by [Gall] . . . ."  (Pl.'s

13

Ex. 6; Trial Tr., Gall Test. 25:22-26:9, Oct. 24, 2007.)

49.     The Bronx property is commonly referred to as the Trinity apartments and the Manhattan property as UPACA.  (Trial Tr., Gall Test. 26:10-19, Oct. 24, 2007.)

50.     Gall owned fifty percent of the Trinity and UPACA properties, sharing ownership with Thomas McLaughlin, his business partner.  (Pl.'s Ex. 9; Trial Tr., Gall Test. 30:3-7, Oct. 24, 2007.)

51.     However, as of April 24, 1997, Gall had not yet executed a mortgage in favor of Caro & Graifman encumbering either Trinity or UPACA.  (Pl.'s Ex. 9; Trial Tr., Gall Test. 25:17-21, 33:3-5, 105:20-24, 106:20-22, Oct. 24, 2007.)

52.     Gall nonetheless testified that at the time he executed the Note, he did intend to grant a mortgage to Caro & Graifman on his interest in Trinity and UPACA. (Trial Tr., Gall Test. 34:20-23, Oct. 24, 2007.)

53.     Gall, however, did not have any intention of quitclaiming his interest in Trinity and UPACA to Caro & Graifman, even though Caro & Graifman claimed Gall owed a substantial amount of legal fees.  (Trial Tr., Gall Test. 24:24-25:2, Oct. 24, 2007.)

**H.     Gall's Financial Disclosure**

54.     On April 25, 1997, the day after he executed the Demand Note, Gall completed and signed a personal financial statement ("Financial Disclosure") submitted to the court for use in connection with the upcoming restitution hearing in the criminal

14

case *United States v. Gall*, No. 3:95CR98(AHN) (Pl.'s Ex. 8; Trial Tr., Gall Test. 26:20-27:2, 28:14-17, Oct. 24, 1997.)

55.     The Financial Disclosure was prepared using a form provided by the United States Probation Office.  (Pl.'s Ex. 8.; Trial Tr., Gall Test. 99:10-15, Oct. 24, 2007.)

56.     Gall signed his Financial Disclosure under penalty of perjury.  (Pl.'s Ex. 8; Trial Tr., Gall Test. 98:8-16, 99:16-23, Oct. 24, 2007.)

57.     The Financial Disclosure required Gall to list "Other Debts (not included elsewhere)" and to provide to whom he owed these other debts, his relationship with these creditors, the amount owed, the nature of the obligation, and the monthly payment for each of these other debts.  (Pl.'s Ex. 8.)

58.     The Financial Disclosure also asked Gall whether he, "[w]ithin the last three years, [had] . . . encumbered or disposed of any asset or property with a cost or fair market value of more than $1,000" and if so, to provide the date, amount, property transferred and to whom.  (Pl.'s Ex. 8.)

59.     The Financial Disclosure further required Gall to list "Real Estate (Include home equity loans under mortgage balance)."  (Pl.'s Ex. 8.)

60.     Gall listed properties he owned and mortgages on those properties, but he made no mention of the mortgage on Trinity and UPACA which he intended to grant to Caro & Graifman at the time he executed the $800,000 Demand Note, one day prior to

15

completing the Financial Disclosure.  (Pl.'s Ex. 8; Trial Tr., Gall Test. 34:20-23, Oct.

24, 2007.)

61.     The financial worksheet form attached to Gall's Financial Disclosure also

required him to list his "Equity in other Assets (Market value less mortgages and other

liens)."  (Pl.'s Ex. 8.)

62.     This financial worksheet also required Gall to list his "Unsecured Debts

(Not secured by mortgages or other liens)."  (Pl.'s Ex. 8.)

63.     The foregoing requirements notwithstanding, Gall failed to list in any form

or fashion the $800,000 Demand Note nor any mortgages purportedly securing that Note

on his April 25, 1997 Financial Disclosure.  (Pl.'s Ex. 8; Trial Tr., Gall Test. 28:18-22,

29:22-30:1, 34:7-9, Oct. 24, 2007.)

64.     Gall did, however, list $61.81 in credit card debt on his Financial

Disclosure.  (Pl.'s Ex. 8; Trial Tr., Gall Test. 95:6-10, Oct. 24, 2007.)

65.     Gall testified that he included the miniscule credit card debt because he

wanted to be complete:

> THE COURT:         Did you ever see anything where you showed that
> you owed 60 dollars or 70 dollars on a financial statement?
>
> THE WITNESS:         Well, if that was left out, the problem is what it
> was prepared for.  Prepared for a probation officer as opposed—sure, if I
> was preparing that for a bank to make a loan, of course I would never
> put that in there, or to get a mortgage, but under the circumstances, the
> question are you preparing it and you're going to be held to , you know,
> someone's going to be pernickety [sic] and say you left this out, if it's a
> dollar, two dollars—

16

(Trial Tr., Gall Test. 112:24-113:10, Oct. 24, 2007.)

66.    Gall ultimately admitted at trial that the Financial Disclosure was

misleading:

> THE COURT:        All right, now I understand.  You say you only
> owed on credit card debt $61.
>
> THE WITNESS:      Yes, based upon that, correct.
>
> THE COURT:        So why would you show $645,000 and call it
> credit card debt?
>
> THE WITNESS:      No, just the way it was written originally.  Before
> this credit was put in, that's why I say with the bifurcated part.
>
> THE COURT:        Would you concede it's very misleading?
>
> THE WITNESS:      *Definitely, sir* . . . .

(Trial Tr., Gall Test. 95:6-16, Oct. 24, 2007.)

67.    The Financial Disclosure also provided space for Gall to indicate whether

he had "ever been a party to any civil suit . . . [and i]f so, [to] give, date, place, persons

involved and explain."  (Pl.'s Ex. 8.)

68.    Notwithstanding the foregoing requirement, Gall failed to list the still

pending lawsuit filed against him by Caro & Graifman five months earlier in November,

1996 seeking outstanding legal fees.  (Pl.'s Ex. 8; Trial Tr., Gall Test. 36:8-37:14, Oct.

24, 2007.)

69.    Gall did list thirteen other civil lawsuits to which he had been a party, at

least some of which had been filed against Gall prior to the Caro & Graifman lawsuit.

17

(Pl.'s Ex. 4; Pl.'s Ex. 8.)

70.    The value of Gall's equity in Trinity and UPACA as reported on Gall's Financial Disclosure conveniently corresponds to the $800,000 Demand Note and Mortgage.  (Pl.'s Ex. 8.)

71.    On his Financial Disclosure, Gall represented that his net worth was $1,385,874.  (Pl.'s Ex. 8; Trial Tr., Gall Test. 58:13-18, Oct. 24, 2007.)

72.    Gall's transfer to Caro & Graifman of his interests in Trinity and UPACA thus represented a reduction by more than half of his net worth of $1,385,874 as reported in his Financial Disclosure.  (Pl.'s Ex. 8; Trial Tr., Gall Test. 58:13-18, Oct. 24, 2007.)

I.    **The Mortgage**

73.    On April 30, 1997, just six days after executing the $800,000 Demand Note, Gall executed a mortgage (the "Mortgage") in favor of Caro & Graifman encumbering his interest in the Bronx and Manhattan properties identified in the $800,000 Note.  (Pl.'s Ex. 9; Trial Tr., Gall Test. 42:7-17, Oct. 24, 2007.)

74.    Gall intended that the April 30, 1997 Mortgage secure the $800,000 Note he gave to Caro & Graifman.  (Trial Tr., Gall Test. 42:18-21, Oct. 24, 2007.)

75.    The April 30, 1997 Mortgage deed contains a typed "$340,000" crossed out and replaced by a figure of $800,000.  (Pl.'s Ex. 9; Trial Tr., Gall Test. 43:13-20, Oct. 24, 2007.)

76.    Caro testified that his partner, Brian Graifman, personally made a trip to

18

Milford, Connecticut, where Gall's business offices were then located and presented the Mortgage as it currently appears, with all the alterations, to Gall for signature. (Trial Tr., Gall Test. 46:17-23, Oct. 24, 2007.)

77.    At trial, neither Gall nor Caro claimed to know who altered the amount listed in the Mortgage. (Trial Tr., Gall Test. 43:18-44:3, Oct. 24, 2007; Trial Tr., Caro Test. 546:1-15, Oct. 26, 2007.)

78.    Gall testified that neither he nor anyone in his office had anything to do with preparing the $800,000 Note or Mortgage. (Trial Tr., Gall Test. 44:13-14, 101:8-9, Oct. 24, 2007.)

79.    Although he cannot recall specifically, Caro believes an attorney at the New York office of Ross & Hardies prepared at least a blank form for the April 30, 2007 Mortgage. (Trial Tr., Caro Test. 545:9-25, Oct. 26, 2007.)

80.    Caro, however, could only speculate as to Ross & Hardies' preparation of the Mortgage because Caro & Graifman typically used that firm to prepare notes and mortgage instruments and because the Mortgage, unlike the Note, did not have any document identification number in the lower left corner. (Trial Tr., Caro Test. 553:25-555:6, Oct. 26, 2007.)

81.    The crossed-out "$340,000" closely corresponds to the $335,011.43 shortfall listed by Caro on the spreadsheet he kept indicating Gall's payments to Caro & Graifman up through March of 1997. (Pl.'s Ex. 3; Trial Tr., Gall Test. 44:4-9, Oct. 24,

19

2007; Trial Tr., Caro Test. 587:23-588:1, Oct. 26, 2007.)

82.    As noted above, *see supra* ¶ 22, Caro testified at trial that he kept a running total of the payments Gall made to Caro & Graifman.  As of October 31, 1996 (nineteen days before Caro & Graifman filed suit against Gall in November 1996), the spreadsheet indicates that Gall was short $318,950.52, another amount closely corresponding to the "$340,000" crossed-out on the Mortgage.  (Pl.'s Ex. 3.)

83.    The "$340,000" also corresponds to a figure negotiated by Caro & Graifman and Gall eight months prior to the April 30, 1997 execution of the Mortgage:

> Q.    Was the [$340,000] some kind of figure that you were negotiating with Mr. Gall?
>
> A.    Eight months earlier, 340 was a figure we were negotiating for a cash payment.

(Trial Tr., Caro Test. 548:5-8, Oct. 26, 2007.)

## J.    The Restitution Order

84.    On July 24, 1997, the court conducted a restitution hearing in the criminal case *United States v. Gall*, No. 3:95CR98(AHN) (Stip. of Uncontested Facts, 2, ¶ 13; Pl.'s Ex. 12; Trial Tr., Gall Test. 37:15-21, Oct. 24, 2007)

85.    At the outset of the hearing, Gall's attorney stated that "the financial statement is it.  Mr. Gall has sworn to it, he will reaffirm it, and the rumor and innuendo that somehow it's incomplete has no substantiation in this record or in fact."  (Pl.'s Ex. 12 at 16:10-13.)

20

86.     Gall did not advise his attorney at the restitution hearing of the existence of the Note and Mortgage.  (Pl.'s Ex. 12 at 58:24-59:1.)

87.     Gall only disclosed the Note and Mortgage after the court specifically inquired at the conclusion of the restitution hearing whether there had "been any other transfer of any assets or funds by Mr. Gall since he prepared [his] financial statement." (Pl.'s Ex. 12 at 56:13-15.)

88.     Gall waited two hours before informing the court of the Note and Mortgage.  (Pl.'s Ex. 12 at 58:16-18.)

89.     Caro, too, was present at the hearing, and he also waited two hours before alerting the court to the existence of the Note and Mortgage:

> THE COURT:      And is the attorney who's one of the attorneys on that mortgage sitting there in the courtroom?
>
> MR. ZIMMERMAN:      Yes, Your Honor.
>
> THE COURT:      And he didn't disclose it to you or make it known to you?
>
> MR. ZIMMERMAN:      No.
>
> THE COURT:      He's been sitting here for two hours, heard this conversation, he obviously knows what the court is trying to accomplish here this morning.  Is he concealing it?

(Pl.'s Ex. 12 at 59:2-11.)

90.     On July 31, 1997, the court in the criminal case United States v. Gall, No. 3:95CR98(AHN) entered a restitution order against Gall in favor of the Plaintiffs in the amount of $13,717,630.  (Stip. of Uncontested Facts 3, ¶ 14; Pl.'s Ex. 13; Trial Tr.,

21

Gall Test. 51:24-52:13, Oct. 24, 2007.)

91.    In the restitution order, the court further ordered "that Mr. Gall neither liquidate, transfer, or alienate any assets, nor close or transfer any personal or corporate bank accounts, except in satisfaction of this Order . . . ."  (Pl.'s Ex. 13.)

## K.    The Mortgage Modification

92.    Notwithstanding the express terms of the order, Gall proceeded to execute—without any consideration—a mortgage modification.  (Pl.'s Ex. 15; Trial Tr., Gall Test. 47:13-20, 49:2-8, Oct. 24, 2007.)

93.    On October 23, 1997, while incarcerated at Allenwood prison camp and unrepresented by counsel, Gall executed a mortgage modification agreement (the "Modification Agreement" or "Modification"), which purports to modify the April 30, 1997 Mortgage to provide for interest.  (Pl.'s Ex. 15; Trial Tr., Gall Test. 47:13-20, 49:2-8, Oct. 24, 2007.)

94.    Caro brought the Modification Agreement to the Pennsylvania prison on one of his several personal and business visits to Gall.  (Trial Tr., Gall Test. 48:8-49:1, Oct. 24, 2007; Trial Tr., Caro Test. 499:8-16, Oct. 26, 2007.)

95.    Caro explained to Gall that he needed Gall to sign the Modification in order to provide for the payment of interest.  (Trial Tr., Gall Test. 50:19-24, Oct. 24, 2007; Trial Tr., Caro Test. 194:20-195:4, Oct. 24, 2007.)

96.    Caro had previously discussed modifying the April 30, 1997 Mortgage

22

with Gall in a telephone conversation.  (Trial Tr., Gall Test. 51:7-12, Oct. 24, 2007; Trial Tr., Caro Test. 499:17-25, Oct. 26, 2007.)

97.    Gall did not have counsel representing him in connection with the Modification.  (Trial Tr., Caro Test. 500:5-9, Oct. 26, 2007.)

98.    Caro does not recall whether he advised Gall to consult an attorney before signing the Modification Agreement.  (Trial Tr., Caro Test. 557:3-6, Oct. 26, 2007.)

99.    Caro testified that he had no ethical obligation to advise a current client to seek advice of counsel before signing a document such as the October 23, 1997 Modification.  (Trial Tr., Caro Test. 557:7-12, Oct. 26, 2007.)

100.    Although Caro insisted Gall execute the Modification Agreement, Caro never at any time made demand on behalf of Caro & Graifman on the $800,000 Demand Note.  (Trial Tr., Gall Test. 108:4-109:1, Oct. 24, 2007; Trial Tr., Caro Test. 194:20-195:4; Trial Tr., Caro Test. 497:19-22, Oct. 26, 2007.)

101.    Caro & Graifman never foreclosed on the April 30, 2007 Mortgage. (Trial Tr., Caro Test. 195:5-12, Oct. 24, 2007.)

102.    The Modification Agreement contains handwritten alterations, all initialed, unlike the alterations to the April 30, 1997 Mortgage deed.  (Pl.'s Ex. 15; Trial Tr., Gall Test. 47:21-48:1, Oct. 24, 2007.)

**L.    Gall's Release from Prison**

103.    Gall was released from incarceration on April 27, 2005.  (Trial Tr., Gall

23

Test. 7:23-8:2, Oct. 24, 2007.)

104.    Caro currently considers Gall a friend.  (Trial Tr., Caro Test. 561:1-3, Oct. 26, 2007.)

105.    Gall sometimes still visits Caro's office, which Caro has maintained up through the trial of this matter.  (Trial Tr., Caro Test. 561:6-15, Oct. 26, 2007.)

106.    Gall lives across the street and only a few blocks away from Caro's office in White Plains, New York.  (Trial Tr., Caro Test. 562:7-16, Oct. 26, 2007.)

107.    Gall's residence in Elmsford, New York is only a few miles from Caro's residence in White Plains, New York.  (Trial Tr., Caro Test. 561:25-562:5, Oct. 26, 2007.)

108.    Gall has visited Caro socially, at Caro's home, on occasion.  (Trial Tr., Caro Test. 561:16-19, Oct. 26, 2007.)

109.    Gall last visited Caro's home at the beginning of July, 2007 for a family barbecue.  (Trial Tr., Caro Test. 561:20-24, Oct. 26, 2007.)

**M.    Caro's Guilty Plea**

110.    On June 21, 2007, Caro pleaded guilty in the criminal action captioned People of the State of New York v. Chase Caro, Indictment Nos. 0382S/2007 and 0383S/2007, to the class C felony of grand larceny in the second degree.  (Stip. of Uncontested Facts, 3 ¶ 15; Pl.'s Ex. 14 at 4:12-5:21, 16:6-8; Trial Tr., Caro Test. 557:13-17, Oct. 26, 2007.)

24

111.    Caro's guilty plea stems from stealing funds from two of his former clients.  (Pl.'s Ex. 14 at 10:7-18, 12:12-20, 13:25-14:13; Trial Tr., Caro Test. 557:16-17, Oct. 26, 2007.)

112.    As part of Caro's impending criminal sentence, he must make restitution to the victims of his crimes in the amount of $780,000, full payment of which would result in a sentence of five years probation.  (Pl.'s Ex. 14 at 3:7-17; Trial Tr., Caro Test. 557:18-21, Oct. 26, 2007.)

113.    If Caro makes payment of $180,000, he would face a possible reduced prison sentence of one to three years.  (Pl.'s Ex. 14 at 3:22-4:2.)

114.    If Caro does not make restitution, he faces a potential prison sentence of two to six years.  (Pl.'s Ex. 14 at 3:18-21.)

**N.    The Evidence of Caro & Graifman's Work for Gall**

115.    No complete documentation exists to support the theories underlying the various amounts to which Caro & Graifman claims entitlement for fees allegedly unpaid by Gall.  (Trial Tr., Caro Test. 551:7-552:7, Oct. 26, 2007.)

116.    During the course of Caro & Graifman's representation of Gall, Caro & Graifman never provided Gall with any written documentation of the time spent by the attorneys employed by Caro & Graifman on matters for Gall.  (Trial Tr., Gall Test. 12:15-13:3, Oct. 24, 2007; Trial Tr., Gall Dep. Except, 122:17-123:3, Oct. 24, 2007; Trial Tr., Caro Test. 149:17-19, Oct. 24, 2007.)

25

117.    Caro & Graifman did not have a billing system whereby it kept contemporaneous time records of the work spent on matters associated with Gall.  (Trial Tr., Caro Dep. Excerpt, 120:19-121:1, Oct. 24, 2007; Trial Tr., Grossman Test. 333:24-334:7, Oct. 25, 2007; Trial Tr., Caro Test. 559:25-560:3, Oct. 26, 2007.)

118.    Caro & Graifman did not require its attorneys to complete time slips documenting the time spent on matters related to Gall.  (Trial Tr., Caro Dep. Excerpt, 121:5-8, Oct. 24, 2007; Trial Tr., Grossman Test. 335:22-334:4, Oct. 25, 2007; Trial Tr., Caro Test. 559:25-560:3, Oct. 26, 2007.)

119.    Caro & Graifman's policy regarding maintenance of time records by employees on matters for the firm's clients depended on the requirements of each client. (Trial Tr., Caro Test. 560:16-19, Oct. 26, 2007.)

120.    Caro & Graifman represented clients other than Gall for whom attorneys and other employees at the firm kept time records.  (Trial Tr., Caro Test. 560:16-19, Oct. 26, 2007.)

121.    Prior to forming Caro & Graifman, Caro worked for law firms that kept meticulous records of the time spent on matters by attorneys.  (Trial Tr., Caro Test. 162:14-17, Oct. 24, 2007.)

122.    Caro's initial training as a young attorney took place at major law firms that carefully maintained time records and bills.  (Trial Tr., Caro Test. 162:18-22, Oct. 24, 2007.)

123.    In the matter currently before the Court, Caro & Graifman claims entitlement to legal fees allegedly unpaid by Gall from September 1994 up through April of 1997 because that was the terminal date of the period covered by the supposed settlement agreement between Caro & Graifman and Gall resolving their fee dispute. (Trial Tr., Caro Dep. Excerpt, 121:12-17, Oct. 24, 2007; Trial Tr., Caro Test. 154:4-11, Oct. 24, 2007.)

124.    Notwithstanding the lack of contemporaneous time records, Caro testified that, after reviewing what he claimed to be 198 boxes of Caro & Graifman's work product and other materials and documents related to Gall matters during the relevant time period, he could accurately reconstruct the specific amount of hours spent by each Caro & Graifman attorney on Gall's matters for each month during the period starting at the end of September 1994 and through April 1997. (Trial Tr., Caro Test. 230:12-23, Oct. 25, 2007.)

125.    As part of his estimate of the time spent on Gall matters, Caro used the contemporaneous time records kept by Graifman and Neil Grossman, an associate employed by Caro & Graifman, for work during the relevant time period on the Gall matters. (Trial Tr., Caro Test. 563:1-564:20, Oct. 26, 2007.)

126.    Although not required for Gall matters, both Grossman and Graifman claim that they kept contemporaneous records of the time spent working on Gall's matters and other matters during the relevant time period. (Trial Tr., Grossman Test. 333:11-23, 335:22-24, Oct. 25, 2007; Trial Tr., Graifman Test. 507:2-12, 508:11-23,

27

Oct. 26, 2007.)

127.    Grossman testified that his "primary occupation at Caro & Graifman was to work on [Gall] matters." (Trial Tr., Grossman Test. 333:4-5, Oct. 25, 2007.)

128.    Yet, more than ten years after the fact, Grossman conceded that at times even his own time entries could not refresh his recollection of the work he did on Gall matters.  For example:

> Q.      Now, with the NCCI case, you basically indicate in your entry of 6/14/96 that you were working on filing a notice of appeal?
>
> A.      Uh huh.  (Affirmative.)
>
> Q.      Does that refresh your recollection as to whether there was any appellate work that you performed on that case?
>
> A.      Well, I mean if I—you know, *I don't really have a recollection of that.  I see it here, I believe the record but I don't have a specific recollection of that*.

(Trial Tr., Grossman Test. 367:11-16, Oct. 25. 2007.) (emphasis added)

129.    Indeed, after reviewing a print-out of his time records, Grossman would not even "hazard a guess" as to the average time he billed on Gall matters for each month he worked on those matters during the relevant time period other than what he had contemporaneously recorded.  (Trial Tr., Grossman Test. 375:25-376:10, Oct. 25, 2007.)

130.    In 2000, Caro asked Grossman to prepare an affidavit in connection with this case "to the effect that [Grossman] spent a lot of time working on Gall matters . . . ." (Trial Tr., Grossman Test. 372:1-3, Oct. 25, 2007.)

28

131.    Grossman does not mention his time records in his affidavit.  (Trial Tr.,
Grossman Test. 372:3-4, Oct. 25, 2007.)

132.    Graifman prepared a similar affidavit in 2001 at Caro's request in
conjunction with this case describing his work on matters related to Gall.  (Pl.'s Ex. 25;
Trial Tr., Graifman Test. 526:13-16, Oct. 26, 2007.)

133.    In his affidavit, Graifman claimed to have:

> *particular recollection of the period ending 1995 and beginning 1996*
> *representing the five (5) months prior to the birth of [his] first*
> *daughter, Gillian, on May 1, 1996.  Although [he] was working day,*
> *night and overnight on the Gall cases*, there was no money for a draw
> during this period, except for a small draw just prior to Gillian's birth.
> *This was a particularly disorienting and nerve-wracking time, caused*
> *by the strain of taxing work on the Gall cases without adequate and*
> *expected reasonable compensation*.  These financial conditions
> contributed to cause an irreparable fracture in my marriage, which is
> currently subject of a divorce proceeding.

(Pl.'s Ex. 25; Trial Tr., Graifman Test. 529:15-530:2, Oct. 26, 2007.) (emphasis added)

134.    Notwithstanding Graifman's representations in his affidavit, Graifman's
time records, which he kept to document his work on Gall cases and other matters (Trial
Tr., Graifman Test. 507:2-12, 509:9-17, Oct. 26, 2007), reflect that even in the busiest
month of the five-month period preceding the birth of his first daughter, Graifman spent
at most fifty hours, not "day, night and overnight," on Gall matters.  (Trial Tr.,
Graifman Test. 530:3-531:8, 536:9-540:8, Oct. 26, 2007.)

135.    Indeed, Graifman admitted at trial that his time records did not reflect the
statements in his affidavit:

29

Q.      . . . just tell me what your own words were under oath sir?

A.      Day, night and overnight on the Gall cases.

Q.      . . . Sir, let me take you to your book for April of '96, if you would. . . .  Do you know looking at your book at how much time you spent in April working on Gall matters?

A.      I see by that time I was working on many other matters and not much Gall.  I guess everybody else was carrying the load on the Gall cases.

Q.      Right, so that month you weren't working day, night and all night on Gall cases, correct?

A.      No, on that month apparently—I was working mostly on other cases, correct.

Q.      Okay, and I counted it up for April, I count 5.4 hours on Gall matters.  Does that seem about right?

A.      Could be.

Q.      And then if you'd look at the previous month, in March of '96, could you look through that, take the time that you need but tell me what you were working on in March in the main.  Was it Gall cases?

A.      Well, there's some entries but mostly other cases.

Q.      Right, well would it surprise you I counted up everything I could find . . . I come up with seven hours for March?

A.      Wouldn't be surprising.

Q.      Okay.  If you take a look at February, the month previous.

A.      Yes, I see some Gall but, look, it's very few and far between. Obviously by this time I shifted away from Gall.

Q.      So surprisingly in that month, February, I come up with 3.4 hours; does that seem about right?

A.      Could be.

* * * *

30

Q.    But you have very, very small entries for time on Gall in February, didn't you?

A.    In February, that is correct.

* * * *

THE COURT:    Do they total four hours?

* * * *

THE WITNESS:    Yes.  I have, using time from February 6, February 7, I'm sorry—February 8, February 9, February 12, February 16, February 19, February 22nd, February 23 and February 26, adding up to four hours and five minutes.

* * * *

Q.    . . . I can tell you there were [by] my count 50 hours on Gall matters in January.  Does that sound about right?

* * * *

A.    I mean I don't dispute it if the records reflect it.

(Trial Tr., Graifman Test. 529:25-536:18, Oct. 26, 2007.)

136.    Even though Caro provided lengthy, detailed, and itemized explanations and breakdowns of the work done and time spent by Caro & Graifman attorneys on Gall matters during the relevant time period, he admitted that he had no current recollection of the time spent by the attorneys at Caro & Graifman on the work for Gall.  For example:

Q.    You don't have any current recollection today about how much time Mr. Grossman spent on a motion for protective order in July of 1996, do you?

A.    I have only my estimates based on what I see in the file.

31

(Trial Tr., Caro Test. 571:1-5, Oct. 26, 2007.)

137.    When asked to recount their work on Gall matters during the relevant time period, both Grossman and Graifman conceded they had little or no recollection of what took place ten to thirteen years ago, in stark contrast to the testimony of Caro, who claimed he could accurately estimate in 2007 the *amount* of time he and others in his office spent on particular matters as far back as September 1994, more than thirteen years before Caro took the stand to testify at trial.  (Trial Tr., Grossman Test. 333:1-6, 338:7-12. 339:25-340:3, 342:18-19; 344:18-19, 345:6, 345:15-16, 346:19-21, 349:7-8, 350:2-4, 350:17, 350:23, 351:5, 354:2-13, 354:25, 355:7-9, 355:12-24, 357:14-15, 357:21-358:1, 358:5-14; 358:19-23, 359:14-18, 360:25-361:4, 361:10-18, 364:6-7, 364:18-25, 365:1-17, 367:11-23, 368:17-20, 368:25-369:1, 369:16-17, 369:20-25, 379:19-20, Oct. 25, 2007; Trial Tr., Graifman Test. 514:21-23, 515:4-9, 516:8-10, 516:14-15, 517:6-7, 517:13-15, 520:16, Oct. 26, 2007.)

FAS/27103/7/835396v1
01/04/08-HRT/

## CONCLUSIONS OF LAW

**I.    THE ISSUE BEFORE THIS COURT, AS FRAMED BY THE PLAINTIFF'S COMPLAINT AND CARO & GRAIFMAN'S ANSWER, IS LIMITED TO WHETHER OR NOT THE DEMAND NOTE, MORTGAGE AND MORTGAGE MODIFICATION CONSTITUTE FRAUDULENT CONVEYANCES.**

At trial, and based on colloquy between the Court and counsel for Plaintiffs and Defendants, there appeared to be some question about the scope of the Court's ability to determine the extent of the validity and/or enforceability of the Demand Note, Mortgage and Mortgage Modification.  It is the Plaintiffs' position that the only issue before this Court, as framed by the pleadings in this case, is whether or not the foregoing documents constitute a fraudulent conveyance and should, therefore, be set aside as such.  If the Court finds the mortgage to be a fraudulent transfer, then the judgment should set it and the mortgage modification aside and there would no longer be a lien on the proceeds in escrow.  The Demand Note would still exist.

On the other hand, if the Court determines there was no fraudulent conveyance, then that would end the matter and Caro & Graifman would be free to seek enforcement of its Mortgage and Mortgage Modification in the New York courts.  Whether and to what extent Caro & Graifman's mortgage is enforceable against Mr. Gall under New York law is not an issue before this Court.  Indeed, as set forth above, *see* discussion *infra* Section III, this Court's jurisdiction is limited to deciding whether a fraudulent conveyance has occurred.

FAS/27103/7/835396v1
01/04/08-HRT/

II.   **THIS COURT SHOULD COMPLETELY DISCOUNT ANY ATTEMPT BY THE DEFENDANTS IN THIS CASE TO ARGUE THAT THERE WAS NO FRAUDULENT CONVEYANCE BECAUSE THE DEFENDANTS HAVE NO CREDIBILITY.**

As a threshold matter in this case, it is respectfully submitted that the Court should discount entirely any testimony of Messrs. Gall and Caro in support of their position that no fraudulent transfer took place in this case.  Both defendants were convicted of crimes involving egregiously dishonest behavior.  Findings of Fact, *supra*, ¶¶ 40-45, 110-4.  In Gall's case, fraud and in Caro's case, theft.  Even if one were to ignore those convictions, both defendants have demonstrated an unrestrained propensity to make false statements under oath when it suits their purpose.

With regard to Mr. Gall, this Court accurately assessed his credibility at the Restitution Hearing:

> THE COURT:       . . . [Gall's] affidavit is worthless because his word is worthless.

(Pl.'s Ex. 12 at 13:24-25.)  In addition, Gall's failure to list the Demand Note and intended Mortgage on his Financial Statement was an act of deliberate misrepresentation by way of omission.  Findings of Fact, *supra*, ¶¶ 60-63.

Mr. Caro's credibility is no better than Mr. Gall's based upon the evidence elicited in this case.  One glaring example consists of the factual allegations contained in the Caro & Graifman Complaint filed in 1996 against Gall for legal fees.  Findings of Fact, *supra*, ¶¶ 30-35.  As the Court itself noted, the factual allegations in the Complaint regarding the fee agreement between Caro & Graifman and Gall were simply untrue and,

34

by Caro's own admission, were fabricated for the purpose of giving Caro & Graifman a

better "bargaining position" with Gall:

> Q.     Now, in the complaint that you filed against [Gall] . . . it says in
> consideration for this retention, defendant contracted and agreed jointly
> and severally to pay Caro & Graifman and its officers in New York for
> all legal services rendered by it and on defendant's [sic] behalf at [Caro
> & Graifman's] customary rates of $250 an hour for partners [sic] time,
> $175 for an associate's time, $75 for a paralegal's time . . . ?
>
> *  *  *  *
>
> A.     Yes, I see . . . that.
>
> *  *  *  *
>
> THE COURT:     Does it say that in the complaint?  What you just
> said?
>
> *  *  *  *
>
> THE WITNESS:     I do not believe it includes the arguments behind it.
>
> THE COURT:     So why didn't the complaint recite what [Caro &
> Graifman's] arrangement was with [Gall], that he was to pay you 30 and
> then it was to go to 40 and he hadn't paid it, or he hadn't paid some of
> it, and just show what the balance was instead of coming up with this,
> these allegations?
>
> THE WITNESS:     We believed we had a better chance of getting him
> to reach a settlement with us.
>
> THE COURT:     But this really wasn't true, was it?
>
> THE WITNESS:     I would not like to take that complaint to trial.
>
> *  *  *  *
>
> THE COURT:     Where is the count alleging the agreement with
> Mr. Gall, the 30,000 and the 40,000?
>
> THE WITNESS:     We did not put that in.  We did not feel, A, he
> hadn't signed it and, B, he hadn't lived up to it.
>
> THE COURT:     That was the basis of your claim here, isn't it?  In

35

terms of how much he owes you, you're not making a claim here in this
case that he owes you money based on a, on paragraph eight of your
complaint in the New York Supreme Court about your customary rates,
250 for partner—

THE WITNESS:    *You're absolutely correct, Your Honor.  We're
not making that argument here.*

(Trial Tr., Caro Test. 591:3-593:22, Oct. 26, 2007.) (emphasis added)

In addition to the foregoing, the following facts in evidence severely undermine

the credibility of both Gall's and Caro's testimony at trial and the bona fides of any

defense to Plaintiffs claim of fraudulent transfer:

- Caro does not know who drafted the Mortgage.  Findings of Fact, *supra*,
  ¶¶ 79-80;

- Caro does not know who drafted the Note.  Findings of Fact, *supra*,
  ¶¶ 79-80;

- Gall does not know who drafted the Mortgage.  Findings of Fact, *supra*,
  ¶ 78;

- Gall does not know who drafted the Note.  Findings of Fact, *supra*, ¶ 78;

- The Mortgage contains numerous alterations and typographical errors, and
  neither Gall nor Caro know who made these alterations.  Findings of Fact,
  *supra*, ¶¶ 76-77;

- Gall's $800,000 reported equity in Trinity and UPACA listed on his
  Financial Disclosure conveniently corresponds exactly to the value of the
  Mortgage and Note.  Findings of Fact, *supra*, ¶ 70;

- Graifman's time records do not support the statements made under oath in
  his affidavit.  Findings of Fact, *supra*, ¶¶ 132-35;

- Gall executed the mortgage modification for no consideration.  Findings of
  Fact, *supra*, ¶ 92;

FAS/27103/7/835396v1
01/04/08-HRT/

- The haste with which Gall and Caro & Graifman completed the transaction. Findings of Fact, *supra*, ¶¶ 46-83;

- Gall's clear violation of the Restitution Order by executing the mortgage modification. Findings of Fact, *supra*, ¶¶ 91-93.

- Gall's continuous failure to disclose the Note and Mortgage to the court until the court specifically inquired at the July 24, 1997 restitution hearing. Findings of Fact, *supra*, ¶¶ 87-88;

- Caro's failure to inform the court of the existence of the Note and Mortgage until the court specifically inquired after two hours at the restitution hearing conducted on July 24, 1997. Findings of Fact, *supra*, ¶ 89; and

- Gall's failure to include the Note and Mortgage on his Financial Disclosure. Findings of Fact, *supra*, ¶¶ 60, 63.

## III. THIS COURT HAS JURISDICTION OVER THIS ACTION TO ENFORCE THE RESTITUTION ORDER.

The Plaintiffs, as victims named in the July 31, 1997 Restitution Order, have the power to enforce that order against Gall. (Pl.'s Ex. 13.) The Mandatory Victims Restitution Act gives victims named in restitution orders the power to enforce those orders. 18 U.S.C. § 3664(m)(1)(B) (setting forth enforcement mechanisms available to victims identified in restitution orders); *see also United States v. Hawkins*, 392 F. Supp. 2d 757, 759 (W.D. Va. 2005) ("Under the [Mandatory Victims Restitution Act], a victim named in a restitution order has an independent right to enforce the restitution . . . ."); *United States v. James*, 312 F. Supp. 2d 802, 807 (E.D. Va. 2004) ("18 U.S.C. § 3664(m) gives . . . the victim named in a restitution judgment the power to enforce a restitution judgment."). Moreover, a "federal court may exercise ancillary jurisdiction . . . to enable a court to function successfully, that is, to manage its proceedings, vindicate

FAS/27103/7/835396v1
01/04/08-HRT/

its authority, *and effectuate its decrees*." *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (emphasis added). "Where the post-judgment proceeding is an effort to collect a federal court judgment, the courts have permitted judgment creditors to pursue, under the ancillary enforcement jurisdiction of the court, the assets of the judgment debtor even though the assets are found in the hand of a third party." *Epperson v. Entertainment Express, Inc.*, 242 F.3d 100, 107 (2d Cir. 2001).

"[F]raudulent conveyance actions operate as simple collection mechanisms; they do not present a substantive theory seeking to establish liability on the part of a new party not otherwise liable." *Id. Epperson* permits the Plaintiffs, as judgment creditors, to seek enforcement of the restitution order with this fraudulent conveyance action brought against Gall, the judgment debtor. "[F]raudulent conveyance claims brought in a subsequent action [seeking the collection of a judgment do not] require an independent jurisdictional basis." *Id.* at 105. Because the Plaintiffs do not seek to establish the liability of any third party pursuant to the Restitution Order, *Epperson* permits this fraudulent conveyance action brought against Gall, the transferor of his interest in two properties, and Caro & Graifman, the transferee. *Id.* at 104. *Epperson* also permits the Court to exercise ancillary enforcement jurisdiction over this action to enforce the terms of the Restitution Order it imposed on Gall. *Id.* at 107.

## IV.   CHOICE OF LAW.

### A.   Connecticut Law Applies to the Causes of Action on which Connecticut and New York Law Do Not Conflict.

A federal court "sitting in diversity must look to the law of the forum state to

38

determine the rules governing the choice of law." *Zupnik v. Associated Press, Inc.*, 31 F. Supp. 2d 70, 72 n.1 (*citing Klaxon Co. v. Stentor Co.*, 313 U.S. 487 (1941)).  As with diversity jurisdiction, enforcement jurisdiction of the Court does not invoke substantive federal law, so the Court must still apply the forum's choice of law rules to determine which state's laws govern this dispute.  If the application of the forum's laws over the constitutionally applicable laws of any other jurisdictions would not affect the outcome of an action, no conflict of law exists, and the federal court sitting in diversity or enforcement jurisdiction applies the forum state's substantive laws.  *Lumbermens Mut. Cas. Co. v. Dillon Co.*, 9 Fed. Appx. 81, 83 (D. Conn. 2001) ("The threshold choice of law question in Connecticut, as it is elsewhere, is whether there is an outcome determinative conflict between the applicable laws of the states with a potential interest in the case.  If not, there is no need to perform a choice of law analysis, and the law common to the jurisdictions should be applied."); *see also Schneider v. Richter*, No. 3:01CV1798(DJS), 2004 U.S. Dist. LEXIS 19631, at *30-31 (D. Conn. Sept. 24, 2004) (*citing Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

Both Connecticut and New York have a potential interest in this case.  Caro & Graifman, a New York law firm, represented Gall and, allegedly, his companies, all predominantly doing business, prior to Gall's incarceration, out of offices in Connecticut.  The Mortgage encumbers two properties, UPACA and Trinity, both located in New York.  The New York and Connecticut statutes governing fraudulent transfers generally do not conflict.  *Compare* Conn. Gen. Stat. §§ 52-552a to 52-552*l*,

with N.Y. Debt & Cred. Law §§ 271-76; *see also Nat'l Council on Comp. Ins., Inc. v. Caro & Graifman, P.C.*, 259 F. Supp. 2d 172, 179 (D. Conn. 2003) ("Both New York and Connecticut fraudulent conveyance laws require that the defendant act with 'actual intent' to 'hinder, delay or defraud' the creditor."). Nor does Connecticut and New York law conflict with regard to the general validity of mortgages. *Compare Webster Bank v. Eierweiss*, No. CV-96-0395181-S, 1997 Conn. Super. LEXIS 1762, at *9 (Conn. Super. Ct. June 25, 1997) (recognizing lack of consideration, thereby invalidating the underlying obligation, as a defense to foreclosure of a mortgage), *with Coronet Capital Co. v. Spodek*, 265 A.D.2d 292, 292 (N.Y. App. Div. 1999) ("It has long been held that a mortgage is not valid and enforceable unless there is an underlying valid debt or obligation for which the mortgage is intended as security."). Because there is no conflict of law on these two subjects, the law of the forum state, Connecticut, applies. *Lumbermens Mut. Cas. Co.*, 9 Fed. Appx. at 83.

>     **B.**    **New York Law Applies to the Issue of Proof of the Quantum of Legal Services Provided by Caro & Graifman.**

While the general principles of Connecticut and New York law governing fraudulent transfers and the validity of mortgages do not generally conflict, *see supra* Section II.A, the law in each jurisdiction does differ with respect to the proof of consideration as that proof applies to mortgages and fraudulent transfers. More particularly, in this case, the legal services provided by Caro & Graifman function as the consideration that purportedly supports the Mortgage. The lack of any reliable evidence substantiating the legal services provided by Caro & Graifman to Gall both invalidates

the mortgage with respect to the first count of the Complaint and, with respect to the second and third counts of the Complaint, serves as one of the badges of fraud rendering the conveyance fraudulent. Connecticut and New York courts apply different standards for the proof of an attorney's work, and a conflicts of law analysis demonstrates that New York's, not Connecticut's, law applies.

As a threshold matter, the law of the forum state determines the rules governing the choice of law. *Zupnik*, 31 F. Supp. 2d at 72 n.1. In cases sounding in tort, Connecticut courts apply the law of the jurisdiction in which the plaintiff suffers an injury "unless to do so would produce an arbitrary or irrational result." *Macomber v. Travelers Prop. & Cas. Corp.*, 277 Conn. 617, 640 (2005). Accordingly, the causes of action asserting a fraudulent transfer, since they are deemed tort causes of action, *see, e.g.*, *Conn. Baptist Homes, Inc. v. Fries*, No. CV 980261203, 199 Conn. Super. LEXIS 1917, at *6 n.4 (Conn. Super. Ct. July 14, 1999) ("It should be noted that the ***tort*** of fraudulent transfer is premised on fraud." (emphasis added)), as well as the count seeking a declaration that the mortgage is invalid as a result of a defective underlying obligation, must be governed by the law of the state where the Plaintiffs suffered their injury. *Macomber*, 277 Conn. at 640.

In this case, any injury suffered by the Plaintiffs would occur in New York. More particularly, the Plaintiffs seek an invalidation of the Mortgage (1) due to a defective underlying obligation, i.e. the lack of consideration supporting Caro & Graifman's claim to allegedly outstanding legal fees or the fact that no objective evidence

41

demonstrates an agreement between Caro & Graifman and any entity or individual other than Gall, or (2) because the Mortgage represents a fraudulent transfer which the Court must set aside.  The Mortgage encumbers two properties located in New York, and the Plaintiffs would use the proceeds of the sale of those properties to satisfy, in part, Gall's restitution obligation.  Foreclosure of the Mortgage or any other interference with the satisfaction of the Restitution Order would cause the Plaintiffs to suffer injury in New York, not Connecticut.

      **i.**       **New York Requires Contemporaneous Time Records for an Attorney to Recover the Full Amount of Fees.**

With respect to the proof required to support the value of legal services provided to clients by attorneys, New York Courts preclude recovery of a full attorney's fee if an attorney does not maintain or submit to a court contemporaneous time records.  *Realuyo v. Diaz*, No. 98CV7684(GBD), 2006 U.S. Dist. LEXIS 11420, at *46 (S.D.N.Y. Mar. 17, 2006) ("Under New York law, an attorney, who fails to keep adequate contemporaneous records, is not entitled to recover the full amount he is seeking." (*citing Mar Oil, S.A. v. Morrisey*, 982 F.2d 830, 841 (2d Cir. 1993)).[1]  Caro & Graifman did not require its attorneys to keep any contemporaneous time records of the work performed for Gall during the relevant time period, Findings of Fact, *supra*,

---

[1] Even if the Court concludes that Connecticut's law applies to the proof of Caro & Graifman's legal services, Caro & Graifman has not supplied the Court with the required fairly stated description of the services provided to Gall.  *See* discussion *infra* Section III.A.  If an attorney in Connecticut elects to request compensation for legal services without submitting contemporaneous time records, that attorney must provide the court with a fairly stated description of those legal services.  *Robert M. Elliott, P.C. v. Stuart*, 53 Conn. App. 333, 345-46 (1999).  Although Connecticut courts do not require contemporaneous time records of attorneys seeking compensation in private actions, they do recognize that "***the better practice*** is for an attorney . . . to maintain time records . . . ."  *Id.* at 345 (emphasis added).

42

¶¶ 117-18, and such failure bars recovery of the $800,000 allegedly due from Gall.

**V.    THE MORTGAGE IS INVALID BECAUSE IT SECURES A DEFECTIVE UNDERLYING OBLIGATION.**

In the first count of their Complaint, the Plaintiffs seek a declaration from the Court invalidating the Mortgage because (1) Gall is not indebted to Caro & Graifman for $800,000 in allegedly outstanding legal fees, (2) Gall is not personally liable for the debts of other individuals or entities potentially liable for any outstanding legal fees owed to Caro & Graifman and (3) Caro & Graifman has not performed services for Gall worth the allegedly outstanding $800,000.  No reliable evidence was presented in this case to support the value of the legal services provided to Gall by Caro & Graifman during the relevant time period.  Moreover, the objective evidence of the agreement between Gall and Caro & Graifman does not include the provision of legal services to any individual or entity other than Gall.

**A.    The Record in This Case Contains No Reliable Evidence of Sufficient Consideration to Support the Mortgage.**

A mortgage secured by a defective underlying obligation is itself invalid.  *See, e.g.*, *Webster Bank v. Eierweiss*, No. CV-96-0395181-S, 1997 Conn. Super. LEXIS 1762, at *9 (Conn. Super. Ct. June 25, 1997) (recognizing lack of consideration, thereby invalidating the underlying obligation, as a defense to foreclosure of a mortgage); *Coronet Capital Co. v. Spodek*, 265 A.D.2d 292, 292 (N.Y. App. Div. 1999) ("It has long been held that a mortgage is not valid and enforceable unless there is an underlying valid debt or obligation for which the mortgage is intended as security."); *Sonnichsen v.*

FAS/27103/7/835396v1
01/04/08-HRT/

*Streeter*, 4 Conn. Cir. Ct. 659, 664 (1967) ("An agreement without consideration is a mere indulgence and unenforceable." (internal quotation marks omitted) (*quoting State ex rel. McClure v. Northrop*, 93 Conn. 558, 556 (1919)); *Beitner v. Becker*, 34 A.D.3d 406, 407 (N.Y. App. Div. 2006) ("All contracts must be supported by consideration, consisting of a benefit to the promisor or a detriment to the promisee . . . .")).

Gall's obligation to Caro & Graifman, evidenced by the $800,000 Demand Note and secured by the April 30, 2007 Mortgage, must fail for lack of any competent evidence in the record substantiating the legal services provided by Caro & Graifman to Gall during the relevant time period and for which Gall allegedly still owes Caro & Graifman. The failure of Caro & Graifman to require and to provide the Court with complete contemporaneous time records of the legal services performed for Gall during the relevant time period invalidates the Mortgage because the record contains no other credible or reliable evidence of the consideration supporting the underlying obligation.

The Second Circuit now requires contemporaneous time records to accompany applications for attorneys' fees in § 1983 actions. *E.g.*, *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147 (2d Cir. 1983) ("[A]ny attorney . . . who applies for court-ordered compensation in the [Second] Circuit for work done . . . must document the application with contemporaneous time records [that] . . . should specify, for each attorney, the date, the hours expended, and the nature of the work done."). Connecticut courts apply this same rule. *E.g.*, *Tedesco v. City of Stamford*, 24 Conn. App. 377, 384-85 (1991) (applying the *Carey* rule to a § 1983 case brought in

Connecticut state court), *rev'd on other grounds*, 222 Conn. 233 (1992).

In private actions, New York courts have held that the lack of contemporaneous time records denies an attorney recovery of the full amount sought by that attorney. *Realuyo v. Diaz*, No. 98CV7684(GBD), 2006 U.S. Dist. LEXIS 11420, at *46 (S.D.N.Y. Mar. 17, 2006) ("Under New York law, an attorney, who fails to keep adequate contemporaneous records, *is not entitled to recover the full amount he is seeking.*" (*citing Mar Oil, S.A. v. Morrisey*, 982 F.2d 830, 841 (2d Cir. 1993) (emphasis added)). Moreover, a New York attorney "has an ethical obligation to keep sufficiently accurate and detailed records from which . . . the reasonableness of his fee [can be determined], and *informal approximations of legal fees draws the court's close scrutiny.*" *Id.* (*citing In re Estate of Jackson*, 508 N.Y.S.2d 671, 675 (N.Y. App. Div. 1986)) (emphasis added).

The attorneys at Caro & Graifman, as attorneys licensed to practice in New York during the relevant time period (*e.g.*, Trial Tr., Caro Test. 141:25-142:6, Oct. 24, 2006), had "an ethical obligation to keep sufficiently accurate and detailed records" of the legal services provided to Gall during the relevant time period, *Realuyo*, 2006 U.S. Dist. LEXIS 11420, at *46, but Caro & Graifman did not require its attorneys to keep any such contemporaneous records of the legal services provided to Gall. Findings of Fact, *supra*, ¶¶ 117-18. Aside from the contemporaneous time records kept by Grossman and Graifman and Caro's incomplete diaries, Caro & Graifman only provided the Court with Caro's testimony of events, some more than thirteen years ago, as

FAS/27103/7/835396v1
01/04/08-HRT/

evidence of the legal services for which Gall allegedly still owes Caro & Graifman

payment in the amount of $800,000.

Caro & Graifman's failure to keep contemporaneous time records documenting

time spent by its attorneys on Gall matters during the relevant time period precludes

recovery of the $800,000 sought for that work. *Realuyo*, 2006 U.S. Dist. LEXIS 11420,

at *46. It is simply impossible for an attorney to recall with any semblance of accuracy

*how much time* he or a colleague may have spent on a particular task even one year ago

much less ten to thirteen years ago. It is one thing to recall, based upon review of a

particular file, that a motion for summary judgment was prepared on behalf of a client,

but it defies credulity that an attorney could accurately recall the amount of time he spent

on the matter, much less the dozens of matters, pleadings, motions and other tasks

performed by Caro for Gall. That is *precisely* why attorneys keep time records—because

they cannot possibly recall the time they spent on a matter after the fact.

Caro's strained testimony regarding the number of hours he and his colleagues

purportedly spent on Gall's matters more than ten years ago, stands in stark contrast to

the candid testimony of Mssrs. Grossman and Graifman, both of whom often could not

remember the cases, let alone the details, of the matters described in the

contemporaneous records they kept of their work on Gall matters. Findings of Fact,

*supra*, ¶ 137. Unlike Caro, both Graifman and Grossman candidly conceded that they

could not recall what specific work they had done for Gall other than in the most general

of terms. Findings of Fact, *supra*, ¶¶ 128, 137. Such an informal approximation as that

presented to the Court by Mr. Caro must be scrutinized closely, *Realuyo*, 2006 U.S. Dist. LEXIS 11420, at *46, and the evidence in the record does not withstand such scrutiny. The very difficulties confronted by Grossman and Graifman when asked to testify about their work for Gall during the relevant time period underscores the importance and necessity of maintaining a system to record the time spent on those matters.

Moreover, Mr. Caro's own records indicate that, as of March 13, 1997, Gall had paid Caro & Graifman a total of $646,138.57, which, under the fee agreement, translates to payment for 6,461 hours of work performed by attorneys at Caro & Graifman on Gall's legal matters over a period of approximately two and one-half years ($100 per hour, multiplied by 6,461 hours, yields $646,100 in fees according to the agreement's terms). Findings of Fact, *supra*, ¶ 23. By Caro's own admission, the shortfall which Gall would have owed Caro & Graifman by April 30, 1997 (the end date for which Caro & Graifman are claiming legal services, Findings of Fact, *supra*, ¶ 123) under the fee agreement would be only $335,011.43—less than half of the value of the $800,000 Demand Note and Mortgage. Findings of Fact, *supra*, ¶ 81.

Even Caro's own estimate of what Gall owed under the fee agreement should be completely discounted by the Court, precisely because Caro & Graifman kept no complete contemporaneous time records. There is absolutely no basis on which the Court can accurately determine whether Caro & Graifman spent the 6,641 hours on Gall matter for which they were, in fact, paid. Any rational basis for attempting to quantify

47

the amount of time Caro & Graifman spent on Gall's matters is further eroded by the fact

that Caro's credibility was shown during the trial of this case to be worthless.  Findings

of Fact, *supra*, ¶¶ 30-35; *see also* discussion *supra* Section II.

     **B.**     **No Objective Evidence Demonstrates an Underlying Obligation of Caro & Graifman to Provide Legal Services to Any Individuals or Entities other than Gall.**

     Furthermore, the only reliable evidence in the record shows that Caro &

Graifman entered into a fee agreement with Gall, pursuant to which Caro & Graifman

would "immediately begin servicing [Gall's] needs . . . ."  (Pl.'s Ex. 1.)  No reliable

documentary evidence demonstrates an enforceable contract pursuant to which Caro &

Graifman would provide legal services to any individual or entity other than Gall.

> To form a valid and binding contract . . . there must be a mutual understanding of the terms that are definite and certain between the parties. . . .  To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. . . .  If the minds of the parties have not truly met, no enforceable contract exists. . . .  An agreement must be definite and certain as its terms and requirements. . . .  So long as any essential matters are left open for further consideration, the contract is not complete.

*Geary v. Wentworth Labs., Inc.*, 60 Conn. App. 622, 627 (2000) (internal quotation

marks omitted); *see also Robison v. Sweeney*, 301 A.D.2d 815, 817 (N.Y. App. Div.

2003) ("To create a binding contract, there must be a manifestation of mutual assent

sufficiently definite to assure that the parties are truly in agreement with respect to all

material terms. . . .  Generally, courts look to the basic elements of the offer and

acceptance to determine whether there is an objective meeting of the minds sufficient to

FAS/27103/7/835396v1
01/04/08-HRT/

give rise to a binding and enforceable contract . . . ." (internal quotation marks omitted)).

The fee agreement (Pl.'s Ex. 1) evidences a contract between Caro & Graifman and Gall, not Caro & Graifman and any of the companies related to Gall. The lack of any evidence, other than the self-interested testimony of Gall and Caro, of mutual assent to the definite and certain terms between the parties to the fee agreement renders unenforceable any fee agreement allegedly between any parties other than Caro & Graifman and Gall. *Geary*, 60 Conn. App. at 627; *Robison*, 301 A.D.2d at 817. The unenforceable underlying fee agreement thereby invalidates the mortgage. *Coronet Capital Co.*, 265 A.D.2d at 292 ("It has long been held that a mortgage is not valid and enforceable unless there is an underlying valid debt or obligation for which the mortgage is intended as security.")

## VI.    THE TRANSACTION EVIDENCED BY THE NOTE AND MORTGAGE MUST BE SET ASIDE AS A FRAUDULENT CONVEYANCE UNDER CONNECTICUT LAW.

In the second and third counts of the Complaint, the Plaintiffs request that the Court set aside the Mortgage as a fraudulent transfer. The only reasonable inference from the evidence produced at trial is that Gall conveyed his interest in Trinity and UPACA to Caro & Graifman with the requisite intent for the Court to avoid the transfer as fraudulent under Connecticut law.

### A.    Connecticut's Uniform Fraudulent Transfer Act Applies to the Mortgage.

As noted above, there are no discernible differences between New York and

49

Connecticut fraudulent conveyance law. *Lincoln Sav. Bank, FSB v. Sittenfeld*, No. CV-89-0100188-S, 1991 Conn. Super. LEXIS 459, at *10 (Conn. Super. Ct. Mar. 6, 1991). "Both New York and Connecticut fraudulent conveyance laws require that the defendant act with 'actual intent' to 'hinder, delay or defraud' the creditor." *Nat'l Council on Comp. Ins., Inc. v. Caro & Graifman, P.C.*, 259 F. Supp. 2d 172, 179 (D. Conn. 2003).

Under the Connecticut Uniform Fraudulent Transfer Act (Conn. Gen. Stat. §§ 52-552a–52-552k), which largely adopts and clarifies the common law of fraudulent conveyance, *Robinson v. Coughlin*, 266 Conn. 1, 9 (2003):

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Conn. Gen. Stat. § 52-552e(a); *cf.* N.Y. Debt. & Cred. Law § 276 ("Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.").

> In determining actual intent under subdivision (1) of [§ 52-552e(a) of the Connecticut General Statutes], consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after

50

the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Conn. Gen. Stat. § 52-552e(2).

Connecticut's version of the Uniform Fraudulent Transfer Act also provides that a:

transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Id. § 52-552f(1); cf. N.Y. Debt. & Cred. Law § 275 ("Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."); N.Y. Debt. & Cred. Law § 273 ("Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.").

51

"A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Conn. Gen. Stat. § 52-552c(a); *cf.* N.Y. Debt. & Cred. Law § 271(1) ("A person is insolvent when the present fair salable value of his assets is less than the amount that he will be required to pay his probable liability on his existing debts as they become absolute and matured."); *id.* § 272 ("Fair consideration is given for property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or . . . [w[hen such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained."). Also, a "debtor who is generally not paying his debts as they become due is presumed to be insolvent." Conn. Gen. Stat. § 52-552c(b). "Assets . . . do not include property that has been transferred, concealed or removed with intent to hinder, delay or defraud creditors or that has been transferred in a manner making the transfer voidable under [Connecticut's Uniform Fraudulent Transfer Act]." Conn. Gen. Stat. § 52-552c(d).

> **B.**    **Gall Conveyed His Interests in the Subject Properties to Caro & Graifman with Actual Fraudulent Intent under the Connecticut Uniform Fraudulent Transfer Act.**

The determination of a defendant's fraudulent intent is a fact-intensive inquiry and is nearly always proven from surrounding circumstances rather than direct evidence. *E.g.*, *Dieter v. Dieter*, 54 Conn. App. 481, 487 (1999); *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 128 (N.Y. App. Div. 1986). The intent of Gall, the

52

transferor, is critical in determining whether the Mortgage and underlying Note constitute a fraudulent transfer. *O'Connell v. Chachkes*, No. CV-02-0394916-S, 2003 Conn. Super. LEXIS 1153, at \*3 (Conn. Super. Ct. Apr. 16, 2003). The Uniform Fraudulent Transfer Act ***no longer*** requires the participation of the transferee (Caro & Graifman) in the transferor's (Gall's) fraudulent intent. *See Wieselman v. Hoeniger*, 103 Conn. App. 591, 599 (2007) (noting, in dicta, the difference between common law and statutory fraudulent transfers).

The overwhelming evidence leads but to one conclusion in this case: Gall transferred his interest in the Bronx and Manhattan properties to Caro & Graifman with the actual intent to hinder, delay or defraud the Plaintiffs, his creditors. Conn. Gen. Stat. § 52-552e(a)(1); N.Y. Debt & Cred. Law § 276. All the circumstances surrounding the transaction between Gall and Caro & Graifman present sufficient badges of fraud for the Court to set it aside. *See* Conn. Gen. Stat. § 52-552e(b).

### i.     Gall Made the Transfer or Incurred the Obligation to an Insider.

If a debtor is an individual, such as Gall, the Connecticut Uniform Fraudulent Transfer Act includes "(i) a relative of the debtor or of a general partner of the debtor, (ii) a partnership in which the debtor is a general partner, (iii) a general partner in a partnership described in subparagraph (ii), or (iv) a corporation of which the debtor is a director, officer or person in control" in the definition of "insider". Conn. Gen. Stat. § 52-552b(7). While Mr. Caro and Caro & Graifman may not satisfy any of the categories of "insiders" delineated in the statute, the definition is inclusive, not exclusive. The

53

relationship between Gall and Caro (and Caro & Graifman) began before Caro

incorporated Caro & Graifman in September 1994.  Findings of Fact, *supra*, ¶¶ 7-8.

Then, after establishing his own firm, Caro essentially served as in-house counsel to

Gall.  Findings of Fact, *supra*, ¶ 10.  Even now, Caro still considers Gall a friend,

inviting him to family barbecues and sharing an office with him.  Findings of Fact,

*supra*, ¶¶ 104-05, 108-09.  Moreover, the two also live close to each other.  Findings of

Fact, *supra*, ¶ 106-07.

   During the twenty days following the sentencing hearing, Gall scrambled to

secrete his assets, ultimately executing the $800,000 Note in favor of Caro & Graifman,

a friendly party.  Findings of Fact, *supra*, ¶ 46.  He then granted the Mortgage to Caro

& Graifman, further conveying his interest in assets to an "insider."  The close

relationship between Gall and Caro, fostered, strengthened and still current, destroys any

semblance of an arms-length transaction and renders the Mortgage and Note a transfer

and obligation incurred to an "insider",  Conn. Gen. Stat. § 52-552b(7), and clearly

demonstrates Gall's actual fraudulent intent.  *Id*. § 52-552e(b)(1).  Moreover, the lack of

any consideration to support the mortgage modification further removes this transaction

from an ordinary, arms-length transaction and demonstrates that Gall and Caro, an

"insider," were working together to defraud Gall's creditors, including the Plaintiffs in

this case.  No reasonable debtor would agree to add an interest provision to an existing

mortgage obligation simply because the creditor, in this case Caro & Graifman, failed to

include interest in the initial agreement.  This fact alone clearly indicates that Gall

54

conveyed the Mortgage to an "insider" as defined under Connecticut law, thereby rendering the transaction a fraudulent conveyance. *Id.* § 52-552e(b)(1).

### ii.     Gall Retained Possession or Control of the Bronx and Manhattan Properties.

Gall specifically testified that he would not have quit claimed Trinity and UPACA to Caro & Graifman. Findings of Fact, *supra*, ¶ 53. By granting Caro & Graifman the Mortgage, he retained possession or control of the properties after the transfer of his interest in those properties to Caro & Graifman. The retention of possession or control of the properties satisfies yet another indicia of fraudulent intent as set forth in the Connecticut Uniform Fraudulent Transfer Act. Conn. Gen. Stat. § 52-552e(b)(2).

### iii.     Gall Concealed the Demand Note and Mortgage.

There should be no question in this case that Gall actively undertook steps to conceal the Demand Note and Mortgage. On April 25, 1997, only one day after executing the $800,000 Note, Gall submitted his court-ordered Financial Disclosure, signed under oath and threat of perjury, to the court for use in connection with the impending restitution order. Findings of Fact, *supra*, ¶¶ 54, 56. The Financial Disclosure fails to mention the $800,000 obligation incurred by Gall just one day before submitting the disclosure to the court. Findings of Fact, *supra*, ¶ 63. By contrast, Gall did include $61.81 in credit card debt on the personal financial statement, because, as he explained to the Court, his parole officer might be more "persnickety" than an average commercial lender. Findings of Fact, *supra*, ¶¶ 64-65. Gall claims to have attempted to list the allegedly secured debt owed to Caro & Graifman in the $645,000 described as

55

"Total Unsecured Debts" on the financial worksheet portion of his financial statement

(Trial Tr., Gall Test. 34:7-15, Oct. 24, 2007), which amount he further described as

"Credit Cards, etc., Legal," (Pl.'s Ex. 8.), but even he admitted at trial this would not

have alerted anyone to the existence of the $800,000 Note and ensuing Mortgage:

> THE COURT:         All right, now I understand.  You say you only
> owed on credit card debt $61.
>
> THE WITNESS:      Yes, based upon that, correct.
>
> THE COURT:         So why would you show $645,000 and call it
> credit card debt?
>
> THE WITNESS:      No, just the way it was written originally.  Before
> this credit was put in, that's why I say with the bifurcated part.
>
> THE COURT:         Would you concede it's very misleading?
>
> THE WITNESS:      *Definitely, sir* . . . .
>
> * * * *
>
> THE COURT:         But you would agree that someone reading this
> [financial statement], seeing your signature and the date of April 25th
> 1997 would obviously assume that it was signed on April 25th—
>
> THE WITNESS:      I would agree with that, sir, and *I would also
> agree with the fact . . . that the $800,000, had it stated it was a
> promissory note for $800,000 even further, that even though there was
> no mortgage at the time, that there was possibly going to be a
> mortgage, even if it disclosed one or there had not been, that that
> would allow someone to look at it and say, oh gee, he may have less
> than 1.345 [million] available* because the money he's owing your legal
> guys, that he's estimated only 650,000 would look like it was secured.
> And so, to that extent I agree with you.

(Trial Tr., Gall Test., 95:6-16, 104:24-105:13, Oct. 24, 2007.) (emphasis added)

As further evidence of the incomplete and misleading information submitted to the

court in connection with the Restitution Order, Gall did not include the lawsuit filed

FAS/27103/7/835396v1
01/04/08-HRT/

against him by Caro & Graifman in November 1996.  Findings of Fact, *supra*, ¶ 68.
And although Gall intended to mortgage Trinity and UPACA to Caro & Graifman when
he executed the $800,000 Note, he did not list any such mortgage on the Financial
Disclosure.  Findings of Fact, *supra*, ¶ 63.

Gall admitted that he submitted a misleading Financial Disclosure to the court.
(Trial Tr., Gall Test., 95:6-16, 104:24-105:13, Oct. 24, 2007.)  Caro also conceded that
he believed the financial statement was misleading, so much so that he claims to have
appeared at the July 24, 1997 restitution hearing to clarify Caro & Graifman's interest in
the $645,000 representing "Credit Cards, etc., Legal."  (Trial Tr., Caro Test. 598:17-
22, Oct. 26, 2007.)  Gall also admitted that if he had listed the $800,000 Note on the
Financial Disclosure as well as the possibility of the mortgage on the Bronx and
Manhattan properties that he eventually granted to Caro & Graifman on April 30, 2007,
then his creditors, including the Plaintiffs, could have pursued steps to protect their
claims.  (Trial Tr., Gall Test. 105:3-13, Oct. 24, 2007.)

Gall, continuing his pattern of obfuscating and fraudulent behavior, waited two
hours to disclose the promissory note and mortgage to the court at the July 24, 1997
restitution hearing.  Findings of Fact, *supra*, ¶ 88.  He made such disclosure **only** after
the court directly questioned whether Gall had transferred any assets or funds since the
preparation of his April 25, 1997 Financial Disclosure.  Findings of Fact, *supra*, ¶ 87.
Even then, Gall communicated this information to the Court indirectly, through his
attorney, but only after his attorney had stated to the court earlier in the hearing that the

57

Financial Disclosure was complete and accurate.  Findings of Fact, *supra*, ¶¶ 85-87.

This pattern of concealment, alone, provides ample evidence of Gall's fraudulent intent

when he mortgaged Trinity and UPACA to Caro & Graifman.  Conn. Gen. Stat. § 52-

552e(b)(3).

### iv.    Gall Had Been Sued Before Making the Transfer or Incurring the Obligation.

Caro & Graifman sued Gall in November of 1996, only months before they

entered into the transaction represented by the Mortgage and Note.  Findings of Fact,

*supra*, ¶ 29.  Prior to his conviction, Gall had also been involved in extensive civil

litigation with the Plaintiffs relating to issues similar to those raised in the criminal case

in which the court imposed the Restitution Order.  Findings of Fact, *supra*, ¶ 40.  Caro

& Graifman's lawsuit filed against Gall and Gall's entanglement in litigation with the

Plaintiffs, all which occurred prior to mortgaging his interest in Trinity and UPACA,

further renders the Mortgage fraudulent.  Conn. Gen. Stat. § 52-552e(b)(4).

### v.    Gall Transferred Substantial Assets to Caro & Graifman.

Gall transferred to Caro & Graifman his interests in property valued at $800,000,

reducing by more than half the net worth of $1,385,874 Gall represented in his Financial

Disclosure.  Findings of Fact, *supra*, ¶ 72.  This transfer constituted a substantial portion

of Gall's assets, which further indicates the fraudulent nature of the transaction. *See*

Conn. Gen. Stat. § 52-552e(b)(5).

58

**vi.    Gall Did Not Receive Reasonably Equivalent Value as Consideration for the Transfer or Obligation.**

The Mortgage secures an underlying obligation for which no reliable evidence exists to support the fact that Caro & Graifman provided Gall with legal services of a value for those services to serve as sufficient consideration.  Findings of Fact, *supra*, ¶¶ 115-37;  *see also* discussion *supra* Section V.A.  The absence of credible evidence substantiating the consideration provided to Gall by Caro & Graifman renders the transaction fraudulent.  Conn. Gen. Stat. § 52-552e(b)(8).

Caro, an attorney licensed in New York during the relevant time period, did not comply with nor did he require the attorneys employed by Caro & Graifman to comply with the "ethical obligation to keep sufficiently accurate and detailed records from which it can be determine[d] the reasonableness of [an attorney's] fee . . . ."  *Realuyo*, 2006 U.S. Dist. LEXIS 11420, at *46; Findings of Fact, *supra*, ¶¶ 117-18.  Caro also admits that Caro & Graifman cannot back up the expenses incurred on Gall matters by Caro & Graifman during the relevant time period.  (Trial Tr., Caro Test. 189:19-190:1, Oct. 24, 2007.)  Both Grossman and Graifman—neither of whom had any interest in the outcome of this case—had great difficulty testifying about events that took place during the relevant time period, even when provided with their respective contemporaneous time records.  Findings of Fact, *supra*, ¶¶ 128, 137.  Furthermore, Grossman's and Graifman's testimony often contradicted the substance of affidavits each prepared for this case in 2000 and 2001, respectively—revealing precisely how fragile human memory is when attempting to dredge up the kind of detail involved in recalling the amount of time

59

someone spent on a project more than a decade ago. Findings of Fact, *supra*, ¶¶ 130-35. The absence of any reliable or credible evidence showing that Caro & Graifman provided Gall with consideration reasonably equivalent in value to the $800,000 Mortgage renders the transaction fraudulent and mandates setting aside the mortgage. Conn. Gen. Stat. § 52-552e(8).

### vii.    The Transfer also Occurred Shortly Before Gall Incurred a Substantial Debt.

Gall executed the Note on April 24, 1997 and the Mortgage on April 30, 1997, all with knowledge of the impending Restitution Order, which the court entered on July 31, 1997. Findings of Fact, *supra*, ¶¶ 43-44, 46, 73. As of April 4, 1997, Gall knew that the court would impose restitution as part of his sentence for committing the federal offenses of conspiracy, mail fraud, wire fraud, false statements and failure to file tax returns. Findings of Fact, *supra*, ¶¶ 43-44. After hearing the testimony of representatives of the victims of his crimes at and to the court at the April 4, 1997 sentencing hearing (which lasted from 9:30 a.m. to 5:55 p.m.), Gall also had to have known that the Plaintiffs suffered losses in excess of $13 million. Findings of Fact, *supra*, ¶ 44. Accordingly, Gall transferred his interest in the Bronx and Manhattan properties to Caro & Graifman shortly before the $13 million restitution obligation was formally reduced to a judgment. Conn. Gen. Stat. § 52-552e(b)(10).

### viii.    Other Circumstances Surrounding the Mortgage Illustrate Gall's Fraudulent Intent.

The language of the April 24, 2007 $800,000 Note executed by Gall states that a

mortgage secured the note, but no such mortgage existed at the time.  Findings of Fact, *supra*, ¶ 51.  Gall continued the scramble to squirrel away whatever assets he could by executing the Mortgage on April 30, 2007, six days after signing the $800,000 Note.  Findings of Fact, *supra*, ¶ 73.  Then Gall, with blatant disregard for the Restitution Order's restriction on liquidating, transferring or alienating any of his assets, Findings of Fact, *supra*, ¶ 91, proceeded to execute a modification of the mortgage.  Findings of Fact, *supra*, ¶¶ 92-93.

The mortgage deed executed by Gall on April 30, 2007 contained many cross-outs, modifications, typographical errors, different typefaces and other evidence of hasty preparation, impropriety and the general underhandedness of the transaction between Gall and Caro & Graifman.  (Pl.'s Ex. 9.)   Neither Gall nor Caro claimed to know who prepared or altered the mortgage deed.  Findings of Fact, *supra*, ¶¶ 77-80.  The $800,000 value listed on the mortgage deed replaces a crossed-out "$340,000," an amount too close to the $335,011.43 Gall would have owed under the fee agreement to be a coincidence.  (Pl.'s Ex. 3; Pl.'s Ex. 9; Trial Tr., Gall Test. 44:4-9, Oct. 24, 2007.) Furthermore, the $800,000 value of the Note and Mortgage exactly matches the $800,000 combined value of Gall's equity in Trinity and UPACA reported on his Financial Disclosure.  Findings of Fact, *supra*, ¶ 70.  These additional facts further demonstrate Gall's actual intent to hinder, delay or defraud the Plaintiffs when he mortgaged his interest in the Bronx and Manhattan properties to Caro & Graifman.  *See* Conn. Gen. Stat. § 52-552e(b).  This fraudulent intent requires the Court to set aside the

61

mortgage, as the facts underlying the transaction clearly and convincingly exhibit a violation of the Uniform Fraudulent Transfer Act. *See* Conn. Gen. Stat. § 52-552e(a)(1).

### C.    Gall's Constructive Fraudulent Intent

The facts surrounding this transaction also demonstrate Gall's constructive fraudulent intent, which also violates the Connecticut Uniform Fraudulent Transform Act. Gall's Financial Disclosure submitted to the court for use in fashioning the Restitution Order revealed a net worth of only $1,385,874. Findings of Fact, *supra*, ¶ 71. The Demand Note and Mortgage cut Gall's net worth by more than half. Findings of Fact, *supra*, ¶ 72. The Restitution Order formally established Gall's $13 million obligation to the Plaintiffs, which by any interpretation of the relevant statutes, results in a constructive fraudulent transfer. When compared to his net worth, the $13 million ordered in restitution rendered Gall insolvent. *See* Conn. Gen. Stat. §§ 52-552c(a), 52-552c(d); *cf.* N.Y. Debt. & Cred. Law §§ 271(1), 273, 275, and the lack of consideration received from Caro & Graifman results in a fraudulent transfer. *See* Conn. Gen. Stat. 52-552f(1); *cf.* N.Y. Debt & Cred. Law §§ 272-73, 275. Thus, not only did Gall act with the actual intent to hinder, delay or defraud the Plaintiffs, his financial situation just before incurring the restitution obligation presents facts sufficient to constitute a constructively fraudulent transfer that the Court must set aside.

62

VII.  **THE PROCEDURAL POSTURE AND NATURE OF THE CLAIMS ASSERTED IN THIS CASE DO NOT ENTITLE CARO & GRAIFMAN TO INTEREST.**

The Plaintiffs request an equitable determination that Gall's mortgage is defective as a result of an unenforceable, invalid underlying obligation or an avoidance of the transaction evidenced by the Mortgage and Note due to Gall's fraudulent intent when he entered into that transaction with Caro & Graifman.  Neither the Plaintiffs' claims nor Caro & Graifman's counterclaims present the Court with any avenue by which interest may be awarded on the amount Caro & Graifman claims Gall allegedly owes.  Even more fundamentally, the Plaintiffs do not and cannot owe Caro & Graifman any interest, as the Plaintiffs cannot be found liable to Caro & Graifman for any amount of money due.

Gall executed the Note, payable on demand, in Caro & Graifman's favor.  *See* Findings of Fact, *supra*, ¶ 46.  Caro & Graifman never made demand on the Note.  *See* Findings of Fact, *supra*, ¶ 100.  Gall also executed the Mortgage, but Caro & Graifman never foreclosed.  *See* Findings of Fact, *supra*, ¶ 101.  With no demand on the Note or no foreclosure on the Mortgage, no money is payable to Caro & Graifman.

Prejudgment interest in Connecticut can only be awarded for the wrongful "detention of money *after it becomes payable*."  Conn. Gen. Stat. § 37-3a(a) (emphasis added); *see also Northrop v. Allstate Ins. Co.*, 247 Conn. 242, 254-55 (1998) (holding that courts can only award prejudgment interest for the wrongful detention of money after it becomes due and payable).  Similarly, under New York law, creditors can only

63

"recover prejudgment interest on unpaid interest and principal payments awarded from the date *each payment [becomes] due under the terms of the promissory note* . . . ." *Spodek v. Park Prop. Dev. Assocs. & Co.*, 96 N.Y.2d 577, 581 (2001); *see also* N.Y. C.P.L.R. § 5001. By not making demand on the Note or foreclosing on the Mortgage, Caro & Graifman has yet to establish entitlement to the payment of any money.

Moreover, the plain terms of the Note and Mortgage do not provide for any rate of interest on any amounts allegedly due thereunder. (Pl.'s Ex. 6; Pl.'s Ex. 9.) Additionally, Gall executed the October 23, 2007 mortgage modification in clear violation of the July 31, 2007 Restitution Order's directive not to transfer his assets, invalidating any provision for interest contained in that mortgage modification. The procedural posture, relief sought, and failure of Caro & Graifman to establish any right to payment preclude the award of interest on any amount to which Caro & Graifman claims entitlement.

## VIII. CARO & GRAIFMAN HAS NOT ESTABLISHED THE REQUIRED ELEMENTS OF ITS COUNTERCLAIMS.

The tangled thicket of allegations in Caro & Graifman's counterclaims and the evidence introduced at trial do not support any of the theories of liability Caro & Graifman potentially asserts against the Plaintiffs. The confusing allegations in Caro & Graifman's counterclaims appear to claim abuse of process, malicious prosecution, and/or vexatious litigation against the Plaintiffs. However, the Plaintiffs commenced this action in good faith, with no ulterior or illegal purpose, and with clear legal justification, so the Court cannot find in Caro & Graifman's favor with respect to the counterclaims.

64

To prevail on a claim for abuse of process, Caro & Graifman must prove "the misuse of process regularly issued to accomplish an unlawful ulterior purpose.  The gravamen of the [claim] is the use of process for a purpose not justified by law."  *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 256 Conn. 343, 360 n.16 (2001).  Slightly different than a claim for abuse of process, an

> action of malicious prosecution lies where a civil or criminal action has been instituted with malice and without probable cause, and has terminated unsuccessfully.  The [claimant] must allege and prove that the original action, whether civil or criminal was instituted without probable cause, with malice, and that it terminated in his favor.

*Id*.

Caro & Graifman has not proven that the Plaintiffs (1) commenced this action for a purpose not justified by law, (2) instituted this action with malice or without probable cause, or (3) that this action has terminated in Caro & Graifman's favor.  As stated by the Court when it denied Caro & Graifman's motion to dismiss:

> [d]espite [Caro & Graifman's] assertions to the contrary, the . . . complaint makes sufficient allegations that Gall fraudulently conveyed the $800,000 mortgage to [Caro & Graifman] . . . .  According to the plaintiffs, the mortgage note between Gall and [Caro & Graifman] was executed the very day before Gall submitted his personal financial statement to this court.  On that statement, Gall omitted any mention of the mortgage note, even though the Restitution Order explicitly prohibited him from liquidating, transferring, or alienating any assets except to satisfy the Order.  If the plaintiffs can prove that these allegations are true, the defendants' actions would constitute a clear attempt to circumvent the court's Restitution Order.  ***Furthermore, given the Defendants' haste to execute the mortgage prior to the Restitution Order's issuance and the omission of that transaction from Gall's personal financial statement, the court finds that the circumstances surrounding the transaction are more than adequate to support the complaint's allegation that the defendants acted with actual fraudulent***

65

*intent.*

*Caro & Graifman*, 259 F. Supp. 2d at 179 (emphasis added).  Plaintiffs clearly had more than sufficient information at the time they filed suit to reasonably believe there were grounds to bring this action in good faith.  That original good faith belief was buttressed by the overwhelming evidence introduced at trial demonstrating that Gall did, in fact, grant an invalid and fraudulent mortgage to Caro & Graifman, just as the Plaintiffs alleged.  With no illegal purpose, malice, lack of probable cause, or bad faith underlying the commencement of this action, the Court cannot find the Plaintiffs liable to Caro & Graifman with respect to the counterclaims.

Respectfully Submitted,

PLAINTIFFS:

NATIONAL COUNCIL ON
COMPENSATION INSURANCE, INC.,
AMERICAN INTERNATIONAL GROUP
& AMERICAN POLICY HOLDERS
INSURANCE COMPANY

By:_____/s/ David E. Rosengren_____
        David E. Rosengren (ct05629)
        drosengren@pepehazard.com
        Frank A. Sherer III (ct27149)
        fsherer@pepehazard.com
        Pepe & Hazard, LLP
        Its Attorneys
        225 Asylum Street
        Hartford, CT 06103
        Tel:    860-522-5175
        Fax:    860-522-2796

66

## <u>CERTIFICATION</u>

I hereby certify that on January 4, 2008, a copy of the foregoing was filed electronically and served by facsimile and/or mail on all parties and pro se parties of record.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

By:    /s/ David E. Rosengren
       David E. Rosengren (ct05629)
       Frank A. Sherer III (ct27149)
       Pepe & Hazard LLP
       Goodwin Square
       225 Asylum Street
       Hartford, CT  06103
       Phone:  (860) 522-5175
       Fax:  (860) 522-2796
       E-mail:  fsherer@pepehazard.com

FAS/27103/7/835396v1
01/04/08-HRT/