UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
NATIONAL COUNCIL ON          :
COMPENSATION INSURANCE, INC., :
ET AL.,                      :
            Plaintiffs       :
                             :
     v.                      :     Civ. No. 3:00-CV-1925(AHN)
                             :
CARO & GRAIFMAN, P.C.,       :
       ET AL.                :
            Defendants       :
```

MEMORANDUM OF DECISION

This action arises from the plaintiffs' efforts to enforce a restitution order entered by this court in the criminal case of United States v. Gall, No. 3:95CR98(AHN).  The defendant in that case, Joseph Gall ("Gall"), was convicted of conspiracy, mail fraud, wire fraud, making false statements, and failing to file tax returns.  The plaintiffs in this case, all victims named in the restitution order, claim that Gall fraudulently mortgaged an interest in two properties to his former attorneys, Caro & Graifman, P.C. ("Caro & Graifman"), in order to shield those assets from the plaintiffs and evade the court's restitution order.  The plaintiffs ask the court to declare the mortgage invalid so that they can apply the proceeds from the sale of those properties toward unpaid restitution.

The defendants, Gall and Caro & Graifman, deny these allegations.  In particular, Caro & Graifman claims that the mortgage constituted valid security for an antecedent debt, namely unpaid legal fees for work done on behalf of Gall and his

companies from 1994 to 1997. Caro & Graifman asks the court to declare the mortgage valid and enforceable and requests that the court award it interest and attorneys' fees incurred in defending the validity of the mortgage.

From October 24, 2007 through October 26, 2007, the parties tried these issues before the court. Now, based on the testimony of the witnesses and the documentary evidence presented at the trial, the court makes the following findings of fact and conclusions of law:

FINDINGS OF FACT

I.    The Parties and Other Relevant Individuals

1.    At all relevant times, the plaintiff National Council on Compensation Insurance, Inc. ("NCCI") was a corporation organized and existing under the laws of the state of Delaware with a principal place of business in Boca Raton, Florida. (Stip. of Uncontested Facts ¶ 1.)

2.    At all relevant times, the plaintiff American International Group, Inc. was a corporation organized and existing under the laws of the state of Delaware with a principal place of business in New York. (Id. ¶ 2.)

3.    At all relevant times, the plaintiff American Policyholders Insurance Company was a corporation organized and existing under the laws of the state of Massachusetts with a principal place of business in Burlington, Massachusetts. (Id. ¶

-2-

3.)

4.   At all relevant times, Caro & Graifman was a professional corporation organized and existing under the laws of the state of New York with a principal place of business in New York.  (<u>Id.</u> ¶ 4.)

5.   Gall is an individual who currently resides at 36 Woodside Avenue in Elmsford, New York.  (<u>Id.</u> ¶ 5; Trial Tr., Gall Test., 7:12-24, Oct. 24, 2007.)

6.   Chase Caro ("Caro") graduated from Princeton University and is admitted to the bars of various states and federal courts. (Trial Tr., Caro Test., 141:25-142:5; 143:22-144:5, Oct. 24, 2007.)  Following graduation from George Mason University Law School in 1986, Caro worked for Kilpatrick & Cody, as well as Skadden, Arps, Slate, Meagher & Flom and  Schneck, Waltman, Hashmall & Mischell.  (<u>Id.</u> at 142:7-143:16.)

7.   Brian Graifman ("Graifman"), Caro's partner at Caro & Graifman, worked at Skadden, Arps, Slate, Meagher & Flom as a litigation associate for six months after his graduation from New York University Law School in 1998 and returned to Skadden, Arps for three and a half years after a clerkship with the Second Circuit Court of Appeals.  (Trial Tr., Graifman Test., 503:24-505:9, Oct. 25, 2007.)  Immediately prior to forming Caro & Graifman, Graifman worked for Schreiber, Simmons, Machnight & Tweedy.  (<u>Id.</u> at 505:8-11.)

II.    The Relationship Between Gall and Caro

8.    In the 1990s, Gall was involved in civil litigation with, among others, the plaintiffs in this case.  (Trial Tr., Gall Test., 8:3-6, Oct. 24, 2007)

9.    Caro initially started working on matters for Gall while Caro was employed at Schneck, Weltman, Hashmall & Mischell. (Trial Tr., Caro Test., 144:7-14, Oct. 24, 2007.)

10.  After working on these matters at Schneck, Weltman, Hashmall & Mischell for several years, Caro decided to start Caro & Graifman, which he formed on September 24, 1994.  (Id. at 144:18-21.)

11.  Gall followed Caro and became one of Caro & Graifman's first clients.  (Id. at 144:22-145:1.)

12.  At the time Caro & Graifman was formed, Gall and his companies were the firm's sole clients.  (Id. at 144:20-145:6).

13.  For the first several months of their relationship, Caro & Graifman essentially served as in-house counsel to Gall. (Id. at 163:12-25.)

III.  The Fee Agreement and the Alleged Modification

14.  On or about September 24, 1994, Gall entered into a fee agreement with Caro & Graifman.  (Trial Tr., Gall Test., 8:7-15, 10:1-18, Oct. 24, 2007; Trial Tr., Caro Test., 144:18-145:1, Oct. 24, 2007.)

15.  The substance of the fee agreement between Caro &

-4-

Graifman and Gall is set forth in a September 24, 1994 letter from Caro on behalf of Caro & Graifman. (Pls.' Ex. 1; Trial Tr., Gall Test., 10:1-18, Oct. 24, 2007.)

16. Caro & Graifman agreed to provide Gall with "at least 300 hours per month worth of legal services" at an hourly rate not to "exceed $100 per hour, billed monthly," in return for Gall's pre-payment of a $30,000 retainer. (Pls.' Ex. 1.)

17. The agreement between Caro & Graifman and Gall covered legal services for civil matters only. (Trial Tr., Caro Test., 452:3-9, Oct. 26, 2007.)

18. Gall agreed to pay Caro & Graifman an initial retainer of $30,000, due on September 26, 1994. (Trial Tr., Gall Test., 11:25-12:4, Oct. 24, 2007; Trial Tr., Caro Test., 148:20-24, Oct. 24, 2007.)

19. The agreement further stated: "Beyond this initial retainer, any amounts paid to [Caro & Graifman] and not properly billed [would] be returned to [Gall] at a time of [Gall's] choosing." (Pls.' Ex. 1; Trial Tr., Gall Test., 12:5-11, Oct. 24, 2007.)

20. The fee agreement between Caro & Graifman contained no provision relating to penalties for Gall's nonpayment of the monthly retainer. (Pls.' Ex. 1; Trial Tr., Gall Test., 14:5-15:6, 123:7-12, Oct. 24, 2007.)

21. Gall never agreed to an alternative fee arrangement

-5-

with Caro & Graifman pursuant to which he would pay full hourly rates, i.e., more than $100 per hour, if he failed to pre-pay the monthly retainer:

> Q.   Sir, in fact, you never had an agreement that said [Gall] would pay in the alternative . . . your full rates if . . . he didn't come through with his retainer?
>
> A.   It did not specify what the alternative was.
>
> Q.   Right.  And he never agreed to any such alternative, did he?
>
> A.   He did not agree to that alternative.

(Trial Tr., Caro Test., 593:24-594:5, Oct. 26, 2007.)

22.   Although Caro, on behalf of Caro & Graifman, and Gall testified that they later altered the fee agreement so that Caro & Graifman would provide Gall with at least 400 hours of legal services per month at $100 per hour, no documentary evidence of this alleged modification exists.  (Trial Tr., Gall Test., 61:15-62:5, 110:10-13, Oct. 24, 2007.)

23.   Moreover, beside the defendants, no other witness definitively testified about the existence of the alleged oral modification to the fee agreement.  For example, Graifman, Caro's partner, prepared an affidavit in 2001 for this case, describing his work on matters related to Gall.  (Pls.' Ex. 25; Trial Tr., Graifman Test., 526:13-16, Oct. 26, 2007.)  In that affidavit, Graifman makes no mention of any modification to the original $30,000 per month fee arrangement between Caro & Graifman and

Gall in his affidavit.  (Pls.' Ex. 25; Trial Tr., Graifman Test., 527:15-528:15, Oct. 26, 2007.)  Further, Graifman has no independent recollection of the alleged oral modification to the fee agreement.  (See Trial Tr., Graifman Test., 517-:11-16, Oct. 26, 2007 ("You know, it's been suggested to me that it was [$]40,000 and that sounds familiar to me.  But I'm not completely 100 percent sure that I have an independent recollection of that number, but that would have been right.")

24.  The court finds that the defendants did not orally modify their agreement to $40,000 per month because: the documentary evidence indicates that the fee agreement was for a $30,000 retainer each month; Graifman could not definitively corroborate the alleged oral modification; and the only evidence supporting the agreement comes from the defendants, who are not credible given that they have an interest in testifying that they modified the agreement in order to substantiate the alleged $800,000 in outstanding legal fees.

IV.  The Evidence of Caro & Graifman's Work for Gall

25.  Caro & Graifman handled numerous matters for Gall from September 1994 and through April 1997.  (See, e.g., Trial Tr., Caro Test., 145:4-13, Oct. 24, 2007.)  However, no complete record exists documenting the number of hours Caro & Graifman allegedly worked on Gall's matters.  (Trial Tr., Caro Test., 549:11-550:2, 551:7-552:7, Oct. 26, 2007.)

26.   During the course of Caro & Graifman's representation of Gall, Caro & Graifman never provided Gall with any written documentation of the time spent by the attorneys employed by Caro & Graifman on matters for Gall.  (Trial Tr., Gall Test., 12:15-13:3, Oct. 24, 2007; Trial Tr., Gall Dep. Excerpt, 122:17-123:3, Oct. 24, 2007; Trial Tr., Caro Test., 149:17-19, Oct. 24, 2007.)

27.   Caro & Graifman did not have a billing system whereby it kept contemporaneous time records of work on matters related to Gall.  (Trial Tr., Caro Dep. Excerpt, 120:19-121:1, Oct. 24, 2007; Trial Tr., Grossman Test., 333:24-334:7, Oct. 25, 2007; Trial Tr., Caro Test., 559:25-560:3, Oct. 26, 2007.)

28.   In addition, Caro & Graifman did not require its attorneys to complete time slips documenting the time spent on matters related to Gall.  (Trial Tr., Caro Dep. Excerpt, 121:5-8, Oct. 24, 2007; Trial Tr., Grossman Test., 335:22-336:4, Oct. 25, 2007; Trial Tr., Caro Test., 559:25-560:3, Oct. 26, 2007.)

29.   Caro & Graifman's policy regarding maintenance of time records by employees on matters for the firm's clients depended on the requirements of each client.  (Trial Tr., Caro Test., 560:16-19, Oct. 26, 2007.)

30.   Caro & Graifman represented clients other than Gall for whom attorneys and other employees at the firm kept time records. (Trial Tr., Caro Test., 560:16-22, Oct. 26, 2007.)

-8-

31.  Prior to forming Caro & Graifman, Caro worked for law firms that kept records of the time spent on matters by attorneys.  (Trial Tr., Caro Test., 162:14-22, Oct. 24, 2007.)

32.  In the matter currently before the court, Caro & Graifman claims that Gall still owes it legal fees for work performed from September 1994 through April 1997.  Caro & Graifman does not seek fees for work performed after April 1997 because the parties purportedly reached a settlement agreement regarding this fee dispute, as discussed in more detail below. (See Trial Tr., Caro Dep. Excerpt, 121:12-21, Oct. 24, 2007; Trial Tr., Caro Test., 154:4-11, Oct. 24, 2007.)

33.  Notwithstanding the lack of complete contemporaneous time records, Caro testified that Caro & Graifman spent more than 14,000 hours on Gall matters from September 1994 through April 1997.  (Trial Tr., Caro Test., 230:12-23, Oct. 25, 2007.)

34.  At trial, Caro claimed he could accurately reconstruct the specific number of hours spent by each Caro & Graifman attorney on Gall's matters for each month during the period.  To accomplish this, he reviewed 198 boxes of Caro & Graifman's work product and other materials and documents related to Gall matters during the relevant time period.  (Def.'s Ex. BD.)  For example, Caro testified:

> We had approximately 198 boxes of files left over from the Gall representation.  I went through those boxes and through my incomplete notes on tasks that I had done and through

> Brian's notes on the tasks that he had done
> and also through the computer files on the --
> there's an exhibit that shows computer files
> that remain on our server that were prepared
> during the time period by various Caro &
> Graifman personnel, and I broke them up by
> month to determine what we were working on
> each month. And what depositions we had, what
> briefs we filed each month and what the major
> projects, not all the projects but what the
> major projects we were doing each month were.

(Trial Tr., Caro Test., 230:12-23, Oct. 25, 2007.)

35. A large portion of his estimate was based on work done by attorneys who did not testify in this case, including Eva Possavino, Natalie Feinstein, Mark Babilonia, and Larry Stone. (E.g., id. at 178:6-10; 279:1-16.)  There is no evidence that Caro contacted these attorneys when he estimated the time they spent on Gall's matters.  (See, e.g., id. at 230-328.)

36. Although Caro testified that he kept some form of contemporaneous records of hours he worked on Gall matters, he alleges that these records, along with records for at least one other attorney, were contained on a laptop that was stolen in 1998 or 1999.  No other copy of these records exists.  (Id. at 231:10-13; 560:23-25.)  This laptop was stolen after Gall was convicted and after Caro & Graifman allegedly reached an agreement with Gall on the fee dispute.  (Cf. Pls.' Ex. 6.)

37. Caro & Graifman offered into evidence Caro's diaries, which contained some of Caro's time entries for Gall matters. While these entries totaled 2,700 hours, Caro testified that the

-10-

entries in these books only represented approximately fifty to seventy percent of the time he spent on Gall matters. (Trial Tr., Caro Test., 574:24-25, Oct. 26, 2007.)

38. In attempting to reconstruct the time Caro & Graifman spent on matters related to Gall, Caro also relied on the contemporaneous time records kept by Graifman and Neil Grossman ("Grossman"), an associate employed by Caro & Graifman, for work during the relevant time period on the Gall matters. (Id. at 563:1-564:20.)

39. Although not required by Caro & Graifman, both Grossman and Graifman claim they kept contemporaneous records of the time they spent working on Gall's matters and other matters during the relevant time period. (Trial Tr., Grossman Test., 333:11-23, 335:22-24, Oct. 25, 2007; Trial Tr., Graifman Test., 507:6-12, 508:11-23, Oct. 26, 2007.)

40. Grossman testified that his "primary occupation at Caro & Graifman was to work on [Gall] matters." (Trial Tr., Grossman Test., 333:4-5, Oct. 25, 2007.)

41. Grossman conceded that at times even his own time entries could not refresh his recollection of the work he did on Gall matters. For example:

> Q. Now, with the NCCI case, you basically indicate in your entry of 6/14/96 that you were working on filing a notice of appeal?
>
> A. Uh huh. (Affirmative.)

-11-

Q.   Does that refresh your recollection as to
whether there was any appellate work that you
performed on that case?

A.   Well, I mean if I — you know, I don't
really have a recollection of that.  I see it
here, I believe the record but I don't have a
specific recollection of that.

(Id. at 367:7-16.)

42.   Unlike Caro, Grossman would not "hazard a guess" as to
the average time he billed each month on Gall matters during the
relevant time period, beyond what he had contemporaneously
recorded.  (Id. at 375:25-376:10.)

43.   In 2000, Caro asked Grossman to prepare an affidavit in
connection with this case "to the effect that [Grossman] spent a
lot of time working on Gall matters . . . ."  Id. at 372:1-3.)

44.   Grossman, however, does refer to his time records in
his affidavit.  (Id. at 372:9-11.)

45.   Graifman, the firm's co-founder, prepared a similar
affidavit in 2001 at Caro's request.  (Pls.' Ex. 25; Trial Tr.,
Graifman Test., 526:13-16, Oct. 26, 2007.)

46.   In this 2001 affidavit, Graifman claimed to have:

particular recollection of the period ending
1995 and beginning 1996 representing the five
(5) months prior to the birth of [his] first
daughter . . . on May 1, 1996.  Although [he]
was working day, night and overnight on the
Gall cases, there was no money for a draw
during this period, except for a small draw
just prior to [his daughter's] birth.

(Pls.' Ex. 25; Trial Tr., Graifman Test., 529:15-21, Oct. 26,

-12-

2007.)

47.  Graifman's time records, which he kept to document his work on Gall cases and other matters (Trial Tr., Graifman Test., 507:6-12, 509:9-17, Oct. 26, 2007), reflect that he spent no more than fifty hours on Gall-related matters during the five months described above.  These records contradict his representations in his affidavit, which state that he spent "day, night and overnight" on Gall matters.  (Id. at 530:3-531:8, 536:9-539:17.)

48.  Graifman admitted at trial that his time records did not corroborate the statements in his affidavit:

> Q.   [J]ust tell me what your own words were under oath sir?
>
> A.   Day, night and overnight on the Gall cases.
>
> Q.   . . . Sir, let me take you to your book for April of '96, if you would. . . .  Do you know looking at your book at how much time you spent in April working on Gall matters?
>
> A.   I see by that time I was working on many other matters and not much Gall.  I guess everybody else was carrying the load on the Gall cases.
>
> Q.   Right, so that month you weren't working day, night and all night on Gall cases, correct?
>
> A.   No, on that month apparently — I was working mostly on other cases, correct.
>
> Q.   Okay, and I counted it up for April, I count 5.4 hours on Gall matters.  Does that seem about right?
>
> A.   Could be.

Q.   And then if you'd look at the previous
month, in March of '96, could you look through
that, take the time that you need but tell me
what you were working on in March in the main.
Was it Gall cases?

A.   Well, there's some entries but mostly
other cases.

Q.   Right, well would it surprise you I
counted up everything I could find . . . I
come up with seven hours for March?

A.   Wouldn't be surprising.

Q.   Okay.  If you take a look at February,
the month previous.

A.   Yes, I see some Gall but, look, it's very
few and far between.  Obviously by this time I
shifted away from Gall.

Q.   So surprisingly in that month, February,
I come up with 3.4 hours; does that seem about
right?

A.   Could be.

* * * *

Q.   But you have very, very small entries for
time on Gall in February, didn't you?

A.   In February, that is correct.

* * * *

THE COURT:     Do they total four hours?

* * * *

THE WITNESS:  Yes.  I have, using time from
February 6, February 7, I'm sorry — February
8, February 9, February 12, February 16,
February 19, February 22nd, February 23 and
February 26, adding up to four hours and five
minutes.

-14-

> \* \* \* \*
>
> Q.   . . . I can tell you there were [by] my
> count 50 hours on Gall matters in January.
> Does that sound about right?
>
> \* \* \* \*
>
> A.   I mean I don't dispute it if the records
> reflect it.

(Id. at 529:25-536:18.)

49.  Even though Caro provided lengthy, detailed, and
itemized explanations and breakdowns of the work done and time
spent by Caro & Graifman attorneys on Gall matters during the
relevant time period, he admitted that he had no current
recollection of the time spent by the attorneys at Caro &
Graifman on matters related to Gall.  For example:

> Q.   You don't have any current recollection
> today about how much time Mr. Grossman spent
> on a motion for protective order in July of
> 1996, do you?
>
> A.   I have only my estimates based on what I
> see in the file.

(Trial Tr., Caro Test., 571:1-5, Oct. 26, 2007.)

50.  When asked to recount their work on Gall matters during
the relevant time period, both Grossman and Graifman conceded
they had little or no recollection of what took place ten to
thirteen years ago.  This testimony demonstrates that Caro cannot
estimate with any reasonable accuracy the amount of time he and
others in his office spent on particular matters occurring ten to
thirteen years ago.  (Trial Tr., Grossman Test., 333:1-10,

338:7-12. 339:25-340:3, 342:18-19; 344:18-19, 345:6, 345:15-16, 346:19-21, 349:7-8, 350:2-4, 350:17, 350:23, 351:5, 354:2-13, 354:25, 355:7-9, 355:12-24, 357:14-15, 357:21-358:1, 358:5-14; 358:19-23, 359:14-18, 360:25-361:4, 361:10-18, 364:6-7, 364:18-25, 365:1-17, 367:11-23, 368:17-20, 368:25-369:1, 369:16-17, 369:20-25, 379:19-20, Oct. 25, 2007; Trial Tr., Graifman Test., 514:21-23, 515:4-9, 516:9-10, 516:14-15, 517:5-6, 517:13-15, 520:16, Oct. 26, 2007.)

51. Therefore, while the evidence supports a claim that Caro & Graifman performed a substantial amount of work on matters related to Gall, the evidence does not support a finding that Caro & Graifman performed more than 14,000 hours of work from September 1994 through April 1997. For purposes of deciding the issues in this case, the court does not make any other finding as to the number of hours performed by Caro & Graifman during that period.

V. <u>Gall's Late Payments and Caro & Graifman's Financial Difficulties</u>

52. In September 1994, the first month of the fee agreement between Gall and Caro & Graifman, Gall paid the $30,000 monthly retainer. But after that, he never again paid a full monthly retainer. (<u>See</u> Pls.' Ex. 2 & 3.)

53. As a result of Gall's failure to make his agreed payments over the course of his relationship with Caro & Graifman, Caro & Graifman was "absolutely desperate" and

continuously begged Gall for payments as the firm was unable to meet its overhead expenses. (Trial Tr., Caro Test., 170:15-171:2). Caro repeatedly advised Gall that he "needed money badly," and that Caro & Graifman would not "be able to operate a law firm" if Gall did not pay the overdue balance. (Trial Tr., Gall Test., 63:18-23, 64:7-14, Oct. 24, 2007; Caro Test., 170:18-171:2, Oct. 24, 2007.)

54. Despite the financial pressures Gall caused by failing to remit payments under the defendants' agreement, Caro & Graifman never applied for relief or alerted any of the courts in which Gall's matters were pending to the financial strains allegedly being placed on the firm as a result of the arrangement with Gall. (Trial Tr., Caro Test., 183:5-14, Oct. 24, 2007.)

55. In addition, Caro & Graifman continued to perform work for Gall under the fee agreement. (Trial Tr., Caro Test., 589:17-20, Oct. 26, 2007.)

56. However, on November 19, 1996, Caro & Graifman sued Gall, seeking allegedly outstanding legal fees. (Stip. of Uncontested Facts ¶ 9; Pls.' Ex. 5; Trial Tr., Gall Test., 13:20-14:25, Oct. 24, 2007.)

VI.    The Lawsuit: Caro & Graifman v. Gall

57. On November 19, 1996, Caro & Graifman filed suit against Gall and others in the Supreme Court of the State of New York, New York County. (Stip. of Uncontested Facts ¶ 9; Pls.'

Ex. 5; Trial Tr., Gall Test., 13:20-14:25, Oct. 24, 2007.)

58.   The complaint alleged, in part, that:

> [i]n consideration for this retention [for
> legal services], [Gall] contracted and agreed
> . . . to pay [Caro & Graifman] and its
> officers in New York for all legal services
> rendered by it on [Gall's] behalf, at [Caro &
> Graifman's] customary rates, which are $350.00
> per hour for a partner's time, $175.00 per
> hour for an associate's time; [sic] and $75.00
> per hour for a paralegal's time.

(Pls.' Ex. 4, ¶ 8; <u>see</u> Trial Tr., Gall Test., 13:20-14:25, Oct.

24, 2007.)

59.   The foregoing allegations in the complaint lacked any

basis in fact.   Caro testified at trial that he knew the factual

allegations in the complaint to the effect that Gall owed

approximately $1.4 million in legal fees were not true:

> Q.   Now, in the complaint that you filed
> against [Gall] . . . it says in consideration
> for this retention, defendant contracted and
> agreed jointly and severally to pay Caro &
> Graifman and its officers in New York for all
> legal services rendered by it and on
> defendant's [sic] behalf at [Caro &
> Graifman's] customary rates of $250 [sic] an
> hour for partners [sic] time, $175 for an
> associate's time, $75 for a paralegal's time .
> . . ?
>
> * * * *
>
> A.   Yes, I see . . . that.
>
> Q.   Flatly untrue, right?
>
> A.   No.
>
> Q.   Never had an agreement with Mr. Gall that
> that [sic] was your agreement, correct?

-18-

A.   It was our position that for litigation purposes that if [Gall] wished us to do the work and he contracted and asked us to do the work, that it would be implied that he would pay our usual rates if he didn't prepay the retainer and thus entitles himself to the discount. . . .

THE COURT:     Does it say that in the complaint?  What you just said?

* * * *

THE WITNESS:   I do not believe it includes the arguments behind it.

THE COURT:     So why didn't the complaint recite what [Caro & Graifman's] arrangement was with [Gall], that he was to pay you 30 and then it was to go to 40 and he hadn't paid it, or he hadn't paid some of it, and just show what the balance was instead of coming up with this, these allegations?

THE WITNESS:   We believed we had a better chance of getting him to reach a settlement with us.

THE COURT:     But this really wasn't true, was it?

THE WITNESS:   I would not like to take that complaint to trial.

* * * *

THE COURT:     Where is the count alleging the agreement with Mr. Gall, the 30,000 and the 40,000?

THE WITNESS:   We did not put that in. We did not feel, A, he hadn't signed it and, B, he hadn't lived up to it.

-19-

> THE COURT:    That was the basis of your claim here, isn't it?  In terms of how much he owes you, you're not making a claim here in this case that he owes you money based on a, on paragraph eight of your complaint in the New York Supreme Court about your customary rates, 250 [sic] for partner—
>
> THE WITNESS:    You're absolutely correct, Your Honor.  We're not making that argument here.

(Trial Tr., Caro Test., 591:3-593:22, Oct. 26, 2007.)

60.  Gall testified at trial that he never agreed that he owed Caro & Graifman the approximately $1.4 million as claimed in Caro & Graifman's lawsuit against him.  (Trial Tr., Gall Test., 77:13-21, Oct. 24, 2007.)

61.  Caro & Graifman filed the New York lawsuit against Gall only "in the context of trying to pressure [Gall] to pay [Caro & Graifman] . . . ."  (Trial Tr., Caro Test., 184:10-11, Oct. 24, 2007.)

62.  Caro ultimately admitted that Gall never agreed to a fee arrangement in which Caro & Graifman received regular hourly rates, i.e., more than $100 per hour, as payment for legal services.  (Trial Tr., Caro Test., 591:3-592:17, Oct. 26, 2007.)

63.  While the lawsuit was still pending, Caro & Graifman continued to represent Gall.  (Trial Tr., Gall Test., 15:24-16:15, Oct. 24, 2007.)

64.  Gall purportedly signed a written conflict waiver pursuant to which Caro & Graifman continued to represent him. (Trial Tr., Gall Test., 72:12-15, Oct. 24, 2007.)

-20-

65.   Caro did not consult with legal counsel before determining whether Caro & Graifman could, pursuant to the rules of ethics, continue representing Gall after filing suit against him.  (Trial Tr., Caro Test., 556:18-24, Oct. 26, 2007.)

VII. <u>Gall's Remittances to Caro & Graifman Between September 1994 and April 1997</u>

66.   Caro maintained a spreadsheet on which he kept track of any payments made by Gall to Caro & Graifman (hereinafter "Payments Spreadsheet").  He updated the Payments Spreadsheet each month to reflect the current total of Gall's payments and any outstanding balances.  (Pls.' Ex. 3; Trial Tr., Caro Test., 583:1-585:21, Oct. 25, 2007.)

67.   According to the Payments Spreadsheet, Caro & Graifman received $646,138.57 from Gall as of March 13, 1997, which translates to 6,461 hours of work under the fee agreement. (Pls.' Ex. 3; Trial Tr., Gall Test., 16:22-17:14, Oct. 24, 2007; Trial Tr., Caro Dep. Excerpt, 121:22-122:11; Trial Tr., Caro Test., 151:13-20, Oct. 24, 2007.)

68.   The payments from Gall to Caro & Graifman through March 13, 1997 averaged approximately $21,000 per month.  (Pls.' Ex. 3; Trial Tr., Caro Test., 170:3-8, Oct. 24, 2007.)

69.   As of March 13, 1997, approximately one month before Caro & Graifman stopped working on matters related to Gall, the Payments Spreadsheet indicates that Gall was "$335,011.43 short." (Pls.' Ex. 3.).

70.  Gall testified that Caro & Graifman gave him the Payments Spreadsheet as a record of what outstanding fees he owed:

Q.  It says $335,011.43 short?

A.  Correct.

Q.  Was that your understanding of what Mr. Caro was showing as the balance owed under your fee agreement?

A.  Well, it's what the record shows.  I thought actually[,] I thought in addition that he was owed, subsequently probably more than that.  I thought it was actually more myself, but that is what it shows, yes.

Q.  All right, and that would essentially be the difference between 30,000 of retainer a month, and what you had paid with some expenses in addition to the 30,000 retainer?

A.  I'm not, I've not done the calculation but that would appear to be the case.  Though I thought at one point we raised that dollar amount from 30 to more than that, to 40,000 a month, but I don't recall.  I'm pretty sure we did.

Q.  But that's the tally Mr. Caro gave you with regard to payments against his account, correct?

A.  Yes, sir.

* * * *

Q.  And did you understand these spreadsheets to represent all fees and expenses billed to your account through the dates of these two documents, Exhibit two and three?

A.  Based on the fact that they were sent to us from the law firm I imagine that they included everything, yes, sir.

-22-

(Trial. Tr., Gall Test., 18:2-20:10, Oct. 24, 1997.)

71.   While Caro & Graifman and Gall testified that Gall owed Caro & Graifman approximately $646,000, this estimate is based on the alleged oral modification of $40,000 per month, which the court has already found unsupported by the evidence.  (See Pls.' Ex. 3 at 3 (showing Caro's written calculations based on a $40,000 per month retainer, which he claims to have made in April 1997 on the back of the second page this exhibit).)

72.   Moreover, the court finds Caro's testimony regarding the fees untrustworthy because he has twice misrepresented the amount of legal fees that Gall owed Caro & Graifman.  As discussed already in paragraph 59, Caro sued Gall for outstanding legal fees, and in the complaint, Caro represented that Gall owed Caro & Graifman $1.4 million in legal fees, even though he could not prove this figure.  In addition, at the July 2007 hearing on Gall's restitution before this court, Caro told the court that Gall owed Caro & Graifman "a million and-a-half" in unpaid legal fees:

> The Court:  So you're telling me you've got $800,000 in legal fees coming to you?
>
> Mr. Caro:  We had Schneck Weltman, Summit Solomon receive two and-a-half million.  We were at a million and-a-half.  We settled for a half and we took 800,000.

(Id. at 60:1-4.)  These representations contradict Caro's current claim that Gall only owed Caro & Graifman $646,000 in outstanding

-23-

fees.  (<u>Compare</u> Pls.' Ex. 4, ¶ 8 <u>with</u> <u>id.</u> at 593:13-22, Oct. 26, 2007.)

73.   Therefore, the court finds that the typewritten table in the Payments Spreadsheet represents the most accurate and trustworthy evidence of outstanding legal fees.  The Payments Spreadsheet shows that Gall owed Caro & Graifman $334,011.43, as of March 19, 1997.  While Gall may have owed Caro & Graifman additional fees and expenses related to work performed over the remaining month of their attorney-client relationship, the court finds that no evidence – and no reasonable inference drawn from any evidence – that could account for the difference, some $311,000, between what the Payments Spreadsheet reflects and what the defendants claim was owed.  The court, however, is unable to make a finding as to the exact amount still owed to Caro & Graifman by Gall.

VIII.   <u>Gall's Criminal Conviction</u>

74.   While involved in civil litigation with, among others, the plaintiffs in this case, Gall was indicted for fraud and other related offenses, all stemming from the events related to or surrounding the civil litigation.  (Pls.' Ex. 11.)

75.   Gall was found guilty after a jury trial.  (Pls.' Ex. 11; Trial Tr., Gall Test., 7:17-22, Oct. 24, 2007.)

76.   Gall's sentencing hearing was held on April 4, 1997, at which time the court sentenced Gall to eight years and four

months in prison and five years of supervised release (Pls.' Ex. 5) for committing the federal offenses of conspiracy, mail fraud, wire fraud, false statements, and failure to file tax returns. (Pls.' Ex. 11; Trial Tr., Gall Test., 7:17-22, Oct. 24, 2007.)

77. At that sentencing hearing, Gall understood that the court would also later issue a restitution order in favor of the plaintiffs. In addition, the court found that the losses sustained by the victims of his fraud exceeded $10 million, but was likely around $13 million:

> Q.  And on April 4, 1997, you attended a sentencing hearing, did you not?
>
> A.  Yes, sir.
>
> * * * *
>
> Q.  And one of the purposes of that hearing was as you understood it, to determine the issue of the loss suffered by the plaintiffs in this case as a result of your acts and omissions for which you were convicted in 1996?
>
> A.  I would think that would be part of the sentencing, yes.
>
> Q.  Yes, and do you recall that several witnesses took the stand to testify about the loss to each of the three insurance companies that are the plaintiffs in this case?
>
> A.  They took the stand and I think that was the purpose of the testimony, yes, or should have been the purpose.
>
> * * *
>
> Q.  Now, you also understood at that hearing that the court made a determination that the

three insurance companies, and I'll refer to
them collectively as NCCI so we can shorten it
up; is that okay with you?

A.   Yes, sir.

Q.   That what was owed to NCCI with [sic] as
a total loss calculation was in excess of $13
million?

A.   Yes, sir, except that actually rather
than the loss, that is what was owed to them.
They basically testified as to what was owed
as opposed to making a nexus between what was
owed as a result of fraud as opposed to what
was owed.

Q.   Okay, but I guess my question is that the
court, you understood that the court found as
a total loss calculation something greater
than $13 million?

A.   The   court   eventually   reached   that
calculation.   As opposed to owed, it was
transposed to what had manifested as fraud,
yes, sir.

* * * *

Q.   Now, at the time of that hearing, sir, on
April 4th, 1997, you did understand that the
court   was   moving   towards   ordering   a
restitution order in your case?

A.   Yes, sir, the restitution order, there
would be a restitution order at some point.
It was not made at that time, correct.

(Trial Tr., Gall Test., 20:15-23:1, Oct. 24, 2007; Pls.' Ex. 5,

at 191:1-192:15.)

78.   At the sentencing hearing, the court stated, "[c]learly

an order of restitution is in order" and instructed counsel for

the parties to meet and "arrive at an agreed[-]upon figure and an

-26-

agreed[-]upon schedule of payment for restitution."  (Pls.' Ex. 5 251:25-252:5.)  The court also specifically ordered Gall "to provide . . . to the Government and to the probation officer complete and total financial disclosure, including financial statements, tax returns, and a complete disclosure of all interest[s] that [Gall had] in any entity, whether it be as an individual, whether it be in a corporate entity, whether it be a limited partnership or any other form of ownership . . . " (hereinafter "Financial Disclosure").  (Id. at 252:7-13; Trial Tr., Gall Test., 23:5-9, Oct. 24, 2007.)  Gall understood that the Financial Disclosure would be used by the court to fashion a restitution order.  (Pls.' Ex. 5, at 251:23-252:14.)

    IX.    The $800,000 Note

    79.  Following his sentencing hearing, on April 24, 1997, Gall executed an $800,000 note (hereinafter the "Note") in favor of Caro & Graifman, payable on demand.  The Note purported to be "secured by a mortgage . . . dated as of [April 24, 1997] . . . made by [Gall] to [Caro & Graifman] . . . ."  (Stip. of Uncontested Facts ¶ 11; Pls.' Ex. 6; Trial Tr., Gall Test., 24:14-21, 25:12-17, Oct. 24, 2007.)

    80.  The document identification number in the lower left corner of the Note contains the date of March 31, 1997.  (Pl's Ex. 6; Trial Tr., Gall Test., 101:11-102:3, Oct. 24, 2007.)

    81.  The Note also states that a mortgage, which purportedly

served as security for the Note, encumbered "the premises known as 2105 Daly Ave., Bronx, New York [and] 130 East 117th Street, New York, [New York] held by [Gall] . . . ."  (Pls.' Ex. 6; Trial Tr., Gall Test., 25:22-26:9, Oct. 24, 2007.)

82.  The Bronx property is commonly referred to as "Trinity" and the Manhattan property as "UPACA."  (Trial Tr., Gall Test., 26:10-19, Oct. 24, 2007.)  Hereinafter, the court refers to these properties by these common names.

83.  Gall owned fifty percent of Trinity and UPACA, sharing ownership with Thomas McLaughlin, his business partner.  (Pls.' Ex. 9; Trial Tr., Gall Test., 30:3-7, Oct. 24, 2007.)  Currently, both properties have been sold and the proceeds are being held in escrow according to an agreement between the parties.  (See Compl. Ex. D.)

84.  At the time the Note was executed on April 24, 1997, Gall had not yet executed a mortgage in favor of Caro & Graifman encumbering either Trinity or UPACA.  (Pls.' Ex. 9; Trial Tr., Gall Test., 25:17-21, 33:3-5, 105:20-24, 106:20-22, Oct. 24, 2007.)

85.  Gall nonetheless testified that at the time he executed the Note, he intended to grant an $800,000 mortgage to Caro & Graifman on Trinity and UPACA.  (Trial Tr., Gall Test., 106:24-107:2, Oct. 24, 2007.)  Gall, however, did not have any intention of quitclaiming his entire interest in Trinity and UPACA to Caro

-28-

& Graifman.  (Id. at 061:24-107:2.)

86.  The $800,000 Note, according to Gall, represented a settlement of the lawsuit Caro & Graifman brought against Gall for $645,000 in unpaid legal fees.  (Id. at 76:22-21.)  Gall could not provide a clear explanation of why Caro & Graifman claimed $645,000 in unpaid legal fees or why an $800,000 note, payable on demand, allegedly satisfied Caro & Graifman's claim to unpaid legal fees:

> Q.  Now, do you have – could you give the court an explanation how you arrived at the amount of $645,000 cash or $800,000 mortgage? Why did you, how did you arrive at that number?
>
> * * * *
>
> A. . . . Now, as far as going through and calculating and going over with [] Mr. Caro, not knowing the monies that were paid or not paid and what was due, of course I totally disagreed with the $1.4 million but however, in going back and forth and using, you know, his breakdown that was here,[1] it was based pretty much as he has on this one over here, that I agreed with it was 640 some-odd thousand dollars and he was owed in that range, when we finally finished the work.
>
> Q.  So it was fair to say that the settlement you ultimately reached in the lawsuit with Caro & Graifman was substantially the same as the unsigned retainer agreement of September 24th?
>
> A.  Yes, would have put the billing rates approximately $100 to $125 an hour, correct.

---

[1]  Gall is referring to Caro's handwritten calculations on the third page of the plaintiffs' Ex. 3.

        * * * *

        And also I would say that if I paid Mr. Caro,
        Caro & Graifman immediately, I think they
        would have taken the $645,000 in cash in lieu
        of, in exchange for the $800,000 amount.

Id. at 77:1-25, 99:2-5.)

        X.    Gall's Financial Disclosure and the April 24, 1997
              Hearing Before this Court

        87.   On April 25, 1997, the day after he executed the Note,
Gall submitted the Financial Disclosure to the court.  (Pls.' Ex.
8; Trial Tr., Gall Test., 26:20-27:2, 28:14-17, Oct. 24, 1997.)

        88.   The Financial Disclosure was prepared using a form
provided by the United States Probation Office.  (Pls.' Ex. 8;
Trial Tr., Gall Test., 99:8-17, Oct. 24, 2007.)

        89.   Gall signed his Financial Disclosure under penalty of
perjury.  (Pls.' Ex. 8; Trial Tr., Gall Test., 98:10-17, 99:18-
25, Oct. 24, 2007.)

        90.   The Financial Disclosure required Gall to list "Other
Debts (not included elsewhere)" and to identify to whom they were
owed, his relationship with those creditors, the amount owed to
each creditor, the nature of the obligation, and the monthly
payment for each of these other debts.  (Id. Ex. 8.)

        91.   The Financial Disclosure also asked Gall whether he,
"[w]ithin the last three years, [had] . . . encumbered or
disposed of any asset or property with a cost or fair market
value of more than $1,000" and if so, to provide the date,

                              -30-

amount, property transferred and to whom.  (Id. Ex. 8.)

92.  The Financial Disclosure further required Gall to disclose "Real Estate (Include home equity loans under mortgage balance)."  (Id. Ex. 8.)

93.  On the Financial Disclosure, Gall disclosed properties he owned and mortgages on those properties, but made no mention of the mortgage on Trinity and UPACA, the alleged collateral for the $800,000 Note.  (Pls.' Ex. 8; Trial Tr., Gall Test., 34:20-23, Oct. 24, 2007.)

94.  The financial worksheet form attached to Gall's Financial Disclosure also required him to disclose his "Equity in other Assets (Market value less mortgages and other liens)." (Pls.' Ex. 8.)

95.  This financial worksheet also required Gall to disclose his "Unsecured Debts (Not secured by mortgages or other liens)." (Id.)

96.  The foregoing requirements notwithstanding, Gall never disclosed the Note or any mortgages purportedly securing that Note on his Financial Disclosure.  (Pls.' Ex. 8; Trial Tr., Gall Test., 28:18-22, 29:22-30:1, 34:7-9, Oct. 24, 2007.)

97.  While Gall did disclose $645,000 in "Total Unsecured Debts [-] Credit Cards, etc., Legal," (Pls.' Ex. 8 at 4), the Financial Disclosure does not provide any details regarding the individual debts that comprised that debt figure.  Other than

-31-

this one entry, the Financial Disclosure does not describe any outstanding legal fees.  (See id.)  Gall did, however, disclose outstanding credit card debt of $61.81.  (Id.; Trial Tr., Gall Test., 95:6-10, Oct. 24, 2007.)

98.  Gall testified that he included the insignificant credit card debt because he wanted to be complete:

> THE COURT:     Did you ever see anything
> where you showed that you owed 60 dollars or
> 70 dollars on a financial statement?
>
> THE WITNESS:  Well, if that was left out,
> the problem is what it was prepared for.
> Prepared for a probation officer as opposed —
> sure, if I was preparing that for a bank to
> make a loan, of course I would never put that
> in there, or to get a mortgage, but under the
> circumstances, the question are you preparing
> it and you're going to be held to, you know,
> someone's going to be pernickety [sic] and
> say you left this out, if it's a dollar, two
> dollars—

(Trial Tr., Gall Test., 112:24-113:10, Oct. 24, 2007.)

99.  Gall ultimately admitted at trial that the Financial Disclosure was misleading:

> THE COURT:     All right, now I understand.
> You say you only owed on credit card debt
> $61.
>
> THE WITNESS:  Yes, based upon that, correct.
>
> THE COURT:     So why would you show $645,000
> and call it credit card debt?
>
> THE WITNESS:  No, just the way it was
> written originally.  Before this credit was
> put in, that's why I say with the bifurcated
> part.

> THE COURT:     Would you concede it's very
> misleading?
>
> THE WITNESS:   Definitely, sir . . . .
>
> * * * *
>
> THE COURT:     So this financial statement is
> very misleading, is it not?
>
> THE WITNESS:   The entire financial
> statement, sir?
>
> THE COURT:     Well, I mean if you looked at
> it and said $645,000 credit card legal and
> then you looked at this credit card, $61, and
> you can't find legal anywhere else, correct.
>
> * * * *
>
> THE WITNESS:   Yes, correct.
>
> THE COURT:     Doesn't show the legal
> anywhere, does it?
>
> WITNESS:   That is correct.

(Id. at 95:8-97:7.)

100. The Financial Disclosure also provided space for Gall
to indicate whether he had "ever been a party to any civil suit .
. . [and i]f so, [to] give, date, place, persons involved and
explain." (Pls.' Ex. 8.)

101. Notwithstanding the foregoing requirement, Gall failed
to list the still-pending lawsuit that Caro & Graifman had filed
against him five months earlier in November, 1996, seeking
outstanding legal fees. (Id.; Trial Tr., Gall Test., 36:8-37:14,
Oct. 24, 2007.)

102. Gall, however, listed thirteen other civil lawsuits to

-33-

which he had been a party, at least some of which had been filed against Gall prior to the Caro & Graifman lawsuit.  (Pls.' Ex. 4; Pls.' Ex. 8.)

103. The value of Gall's equity in Trinity and UPACA, as reported on Gall's Financial Disclosure, exactly matched the amount of the Note, i.e., $800,000.  (Pls.' Ex. 8.)

104. On his Financial Disclosure, Gall represented that his net worth was $1,385,874.  (Id.; Trial Tr., Gall Test., 58:13-18, Oct. 24, 2007.)

105. Gall's mortgage to Caro & Graifman of an $800,000 interest in Trinity and UPACA thus reduced his reported $1,385,874 net worth, as reported in his Financial Disclosure, by more than fifty-percent.  (See Pls.' Ex. 8; Trial Tr., Gall Test., 58:13-18, Oct. 24, 2007.)

XI.   The Mortgage on Trinity and UPACA

106. On April 30, 1997, just six days after executing the Note and five days after the court held a hearing on the Financial Disclosure, Gall executed a mortgage deed (the "Mortgage") in favor of Caro & Graifman transferring an interest in Trinity and UPACA.  (Pls.' Ex. 9; Trial Tr., Gall Test., 42:7-21, Oct. 24, 2007.)  Caro & Graifman recorded this mortgage in the New York County Clerk's Office on May 9, 1997.  (Stip. of Uncontested Facts ¶ 12.)

107. Gall intended the Mortgage as security for the Note he

gave to Caro & Graifman.  (Trial Tr., Gall Test., 42:18-21, Oct. 24, 2007.)

108. The April 30, 1997 Mortgage deed contains the typewritten "$340,000" figure, which was crossed out and replaced by the typewritten "$800,000" figure.  (Pls.' Ex. 9; Trial Tr., Gall Test., 43:13-20, Oct. 24, 2007.)

109. Gall testified that Graifman traveled to Milford, Connecticut, where Gall's business offices were then located and presented the Mortgage as it currently appears, with all the alterations, to Gall for signature.  (Trial Tr., Gall Test., 45:1-2, 46:17-23, Oct. 24, 2007.)

110. At trial, neither Gall nor Caro claimed to know who altered the "$340,000" figure already typed in the Mortgage. (Id. at 43:18-44:3; Trial Tr., Caro Test., 546:1-15, Oct. 26, 2007.)

111. Gall testified that neither he nor anyone in his office had anything to do with preparing the Note or Mortgage.  (Trial Tr., Gall Test., 44:13-14, 101:8-9, Oct. 24, 2007.)

112. Although he cannot recall specifically, Caro believes an attorney at the New York office of Ross & Hardies prepared the Mortgage.  (Trial Tr., Caro Test., 545:9-25, Oct. 26, 2007.)

113. Caro, however, could only speculate as to Ross & Hardies' preparation of the Mortgage because Caro & Graifman typically used that firm to prepare notes and mortgage

instruments and because the Mortgage, unlike the Note, did not have any document identification number in the lower left corner. (Trial Tr., Caro Test., 553:25-555:6, Oct. 26, 2007.)

114. The crossed-out "$340,000" figure closely corresponds to the $335,011.43 shortfall listed by Caro on the Payments Spreadsheet.  (Pls.' Ex. 3; Trial Tr., Gall Test., 44:4-9, Oct. 24, 2007; Trial Tr., Caro Test., 587:23-588:1, Oct. 26, 2007.)

115. Caro claims that the "$340,000" figure was negotiated by Caro & Graifman and Gall eight months prior to the April 30, 1997 execution of the Mortgage:

> Q.   Was the [$340,000] some kind of figure
> that you were negotiating with Mr. Gall?
>
> A.   Eight months earlier, 340 was a figure
> we were negotiating for a cash payment.

(Trial Tr., Caro Test., 548:5-8, Oct. 26, 2007.)  The court does not find this testimony credible because it directly contradicts the Payments Spreadsheet, which is more reliable evidence given that it was made closer in time to – if not contemporaneously with – the events in question; because the previous testimony of Gall and Caro indicates that Caro regularly used the Payments Spreadsheet to track Gall's payments to Caro & Graifman; and, as discussed above, Caro & Graifman presented it to Gall as an accurate representation of the amount Gall still owed Caro & Graifman as of March 1997.

XII. <u>The Restitution Order</u>

116. On July 24, 1997, the court conducted a restitution hearing in the criminal case <u>United States v. Gall</u>, No. 3:95CR98(AHN) (Stip. of Uncontested Facts ¶ 13; Pls.' Ex. 12; Trial Tr., Gall Test., 37:15-21, Oct. 24, 2007.)

117. At the outset of the hearing, Gall's attorney stated that "the financial statement is it. Gall has sworn to it, he will reaffirm it, and the rumor and innuendo that somehow it's incomplete has no substantiation in this record or in fact." (Pls.' Ex. 12 at 16:10-13.)

118. Gall did not advise his attorney at the restitution hearing of the existence of the Note and Mortgage. (<u>Id.</u> Ex. 12 at 58:24-59:1.)

119. Gall only disclosed the Note and Mortgage after the court specifically inquired at the conclusion of the restitution hearing whether there had "been any other transfer of any assets or funds by Gall since he prepared [his] financial statement." (<u>Id.</u> at 56:13-15.)

120. Gall waited two hours before informing the court of the Note and Mortgage. (<u>Id.</u> at 58:16-18.)

121. Caro, too, was present at the hearing, and he also waited two hours before alerting the court to the existence of the Note and Mortgage:

> THE COURT:      And is the attorney who's one
> of the attorneys on that mortgage sitting
> there in the courtroom?
>
> MR. ZIMMERMAN: Yes, Your Honor.
>
> THE COURT:      And he didn't disclose it to
> you or make it known to you?
>
> MR. ZIMMERMAN: No.
>
> THE COURT:      He's been sitting here for two
> hours, heard this conversation, he obviously
> knows what the court is trying to accomplish
> here this morning.  Is he concealing it?

(Id. at 59:2-11.)

122. At the end of that hearing, the court entered a restitution order against Gall in favor of the plaintiffs in the amount of $13,717,630.00 (hereinafter "Restitution Order"). (Stip. of Uncontested Facts ¶ 14; Pls.' Ex. 13; Trial Tr., Gall Test., 51:24-52:13, Oct. 24, 2007.)

123. In the Restitution Order, the court further ordered "that Mr. Gall neither liquidate, transfer, or alienate any assets, nor close or transfer any personal or corporate bank accounts, except in satisfaction of this Order . . . ."  (Pls.' Ex. 13.)

XIII.     The Mortgage Modification Agreement

124. Notwithstanding the express terms of the court order, Gall proceeded to execute — without any consideration — a modification of the Mortgage.  (Pls.' Ex. 15; Trial Tr., Gall Test., 47:13-20, 49:2-18, Oct. 24, 2007.)

125. On October 23, 1997, while incarcerated at Allenwood prison camp and unrepresented by counsel, Gall executed a mortgage modification agreement (the "Modification Agreement"), which purports to modify the Mortgage to provide for interest. (Pls.' Ex. 15; Trial Tr., Gall Test., 47:13-20, 49:2-18, Oct. 24, 2007.)

126. Caro delivered the Modification Agreement to Gall at Allenwood on one of his several personal and business visits to Gall. (Trial Tr., Gall Test., 48:3-49:1, Oct. 24, 2007; Trial Tr., Caro Test., 499:8-16, Oct. 26, 2007.)

127. Caro explained to Gall that he needed Gall to sign the Modification Agreement in order to provide for the payment of interest. (Trial Tr., Gall Test., 50:19-24, Oct. 24, 2007; Trial Tr., Caro Test., 194:20-195:4, Oct. 24, 2007.)

128. Caro had previously discussed modifying the Mortgage with Gall in a telephone conversation. (Trial Tr., Gall Test., 51:7-12, Oct. 24, 2007; Trial Tr., Caro Test., 499:17-25, Oct. 26, 2007.)

129. Gall did not have counsel representing him in connection with the Modification Agreement. (Trial Tr., Caro Test., 500:5-9, Oct. 26, 2007.)

130. Caro does not recall whether he advised Gall to consult an attorney before signing the Modification Agreement. (Trial Tr., Caro Test., 557:3-6, Oct. 26, 2007.)

131. Although Caro insisted Gall execute the Modification Agreement, Caro never made demand on behalf of Caro & Graifman on the Note. (Trial Tr., Gall Test., 108:4-109:1, Oct. 24, 2007; Trial Tr., Caro Test., 194:20-195:4; Trial Tr., Caro Test., 497:19-22, Oct. 26, 2007.)

132. Caro & Graifman never foreclosed on the April 30, 2007 Mortgage. (Trial Tr., Caro Test., 195:5-12, Oct. 24, 2007.) The Modification Agreement contains handwritten alterations, all initialed, unlike the alterations that had previously been made to the Mortgage itself. (Pls.' Ex. 15; Trial Tr., Gall Test., 47:21-48:1, Oct. 24, 2007.)

XIV. <u>Gall's Release from Prison</u>

133. Gall was released from incarceration on April 27, 2005. (Trial Tr., Gall Test., 7:23-8:2, Oct. 24, 2007.)

134. Caro currently considers Gall a friend. (Trial Tr., Caro Test., 561:1-3, Oct. 26, 2007.)

135. Gall sometimes still visits Caro's office, which Caro has maintained up through the trial of this matter. (Trial Tr., Caro Test., 561:6-15, Oct. 26, 2007.)

136. Gall lives a few blocks away from Caro's office in White Plains, New York. (Trial Tr., Caro Test., 562:7-16, Oct. 26, 2007.)

137. Gall's residence is only a few miles from Caro's residence in White Plains, New York. (Trial Tr., Caro Test.,

561:25-562:5, Oct. 26, 2007.)

138. Gall has visited Caro socially, at Caro's home, on occasion.  (Trial Tr., Caro Test., 561:16-19, Oct. 26, 2007.)

139. Gall last visited Caro's home at the beginning of July, 2007 for a family barbecue.  (Trial Tr., Caro Test., 561:20-24, Oct. 26, 2007.)

XV.  Caro's Guilty Plea

140. On June 21, 2007, after this case began, Caro pleaded guilty in a pending criminal action in New York Supreme Court, captioned People of the State of New York v. Chase Caro, Indictment Nos. 0382S/2007 and 0383S/2007, to the class C felony of grand larceny.  (Stip. of Uncontested Facts ¶ 15; Pls.' Ex. 14 at 4:12-5:21, 16:6-8; Trial Tr., Caro Test., 557:13-17, Oct. 26, 2007.)

141. The conviction stemmed from Caro's theft of client funds.  (Pls.' Ex. 14 at 10:7-18, 12:12-20, 13:25-14:13; Trial Tr., Caro Test., 557:16-17, Oct. 26, 2007.)

142. As part of Caro's impending criminal sentence, he must make restitution to the victims of his crimes in the amount of $780,000.  If he makes full restitution, the court will sentence him to five years' probation.  (Pls.' Ex. 14 at 3:7-17; Trial Tr., Caro Test., 557:18-22, Oct. 26, 2007.)

143. If Caro makes payment of $180,000, he would face a possible reduced prison sentence of one to three years.  (Pls.'

Ex. 14 at 3:22-4:2.)

144. If Caro does not make restitution, he faces a potential prison sentence of two to six years.  (Id. Ex. 14 at 3:18-21.)

CONCLUSIONS OF LAW

I.    The Plaintiffs' Claims

145. The plaintiffs' complaint alleges three claims: (1) a declaratory judgment that the Mortgage is invalid ("First Count"); (2) fraudulent conveyance pursuant Conn. Gen. Stat. § 52-552a ("Second Count"); and (3) fraudulent conveyance under common law ("Third Count").

A.    The Court Has Ancillary Enforcement Jurisdiction over the Plaintiffs' Claims

146. As discussed in the court's ruling on Caro & Graifman's motion to dismiss, the court has ancillary enforcement jurisdiction over the plaintiffs' claims because they seek to enforce a Restitution Order granted in their favor by the court. The Mandatory Victims Restitution Act "(MVRA") gives victims named in restitution orders the right to bring actions to enforce those orders.  See 18 U.S.C. § 3664(m)(1)(B) (setting forth enforcement mechanisms available to victims identified in restitution orders); see also United States v. Hawkins, 392 F. Supp. 2d 757, 759 (W.D. Va. 2005) ("Under the [Mandatory Victims Restitution Act], a victim named in a restitution order has an independent right to enforce the restitution . . . ."); United States v. James, 312 F. Supp. 2d 802, 807 (E.D. Va. 2004) ("18

U.S.C. § 3664(m) gives . . . the victim named in a restitution judgment the power to enforce a restitution judgment."); see also Lyndonville Sav. Bank & Trust Co. v. Lussier, 211 F.3d 697, 701 (2000) (holding that a district court correctly exercised federal question jurisdiction over a private plaintiff's claim based on a restitution order entered under 18 U.S.C. § 3664(h)(1994) of the Victim and Witness Protection Act ("VWPA"), a predecessor to the MVRA, and stating that "an order for restitution may be enforced . . . . by a victim named in the order to receive the restitution, in the same manner as a judgment in a civil action").[2]

---

[2] The court recognizes that § 3664(h) of the VWPA, on which Lyndonville relied, has now been repealed and amended by § 3664(m)(1)(B) of the MVRA and that § 3664(m)(1)(B) no longer states that restitution orders can be enforced "in the same manner as a judgment in a civil action." Instead, that section provides a mechanism by which a victim can request from a district court "an abstract of judgment certifying that a judgment has been entered in favor of such victim in the amount specified in the restitution order," at which point the "abstract of judgment shall be a lien on the property of the defendant located in [the state in which the district court is located] in the same manner and to the same extent and under the same conditions as a judgment of a court of general jurisdiction in that State." 18 U.S.C. § 3664(m)(1)(B). Despite the elimination of § 3664(h), the court finds that the MVRA still gives the court jurisdiction to enforce a restitution order in federal court. Nowhere does the MVRA foreclose victims from enforcing restitution orders in federal court. Although not as explicit as § 3664(h), § 3664(m)(1)(B) assumes that a restitution order shall be treated like "a judgment has been entered in favor of [a] victim in the amount specified in the restitution order." The MVRA also contemplates that victims can bring a "subsequent Federal civil proceeding" and that the "restitution order shall estop the defendant from denying the essential allegations of the offense." 18 U.S.C. § 3664(l). Thus, Lyndonville's holding that

147. Aside from jurisdiction under the MVRA, the court generally has ancillary jurisdiction to enforce its judgments. See Epperson v. Entm't Express, Inc., 242 F.3d 100, 104 (2d Cir. 2001) (stating that "[w]here the post-judgment proceeding is an effort to collect a federal court judgment, the courts have permitted judgment creditors to pursue, under the ancillary enforcement jurisdiction of the court, the assets of the judgment debtor even though the assets are found in the hands of a third party"). Because the plaintiffs, all victims named in the Restitution Order, claim that Gall fraudulently mortgaged an interest in Trinity and UPACA in order to shield those assets from collection, the plaintiffs' action falls within the court's ancillary enforcement jurisdiction. See id. (stating that a district court has enforcement jurisdiction in a fraudulent conveyance case "because no court should be powerless to enforce its own judgment when a defendant fraudulently conveys assets to avoid that judgment")[3]

a district court can exercise jurisdiction over a subsequent action to enforce a restitution order remains intact. But see United States v. Perry, 360 F.3d 519, 524 (6th Cir. 2004) (citing § 3664(m)(1)(A) and stating that "the MVRA has removed victim discretion to enforce restitution orders; enforcement of such orders now rests exclusively with the United States) (Gibbons, J., dissenting).

[3] The court does not find it material that Epperson stemmed from a civil judgment and this action stems from a criminal restitution order because § 3664(m)(i)(B) of the MVRA entitles a victim to an "abstract of judgment certifying that a judgment has been entered in the amount specified in the restitution order . .

148. The court now turns to the plaintiffs' claims, starting with the Second Count.

B.  Fraudulent Transfer under the Fraudulent Transfer Act, § 52-552a (Second Count)

(1)  Choice of Law

149. In the court's prior opinion denying Caro & Graifman's motion to dismiss, the court reserved its ruling on whether the court should apply New York or Connecticut law to the substantive issues presented in this action.  See National Council on Comp. Ins., Inc. v. Caro & Graifman, P.C., 259 F. Supp. 2d 172, 178 n.1 (D. Conn. 2003).

150. Typically, a federal court "sitting in diversity must look to the law of the forum state to determine the rules governing the choice of law."  Zupnik v. Assoc. Press, Inc., 31 F. Supp. 2d 70, 72 n.1 (D. Conn. 1998) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)).  As with diversity jurisdiction, ancillary enforcement jurisdiction of the court does not invoke substantive federal law, so the court must still apply the forum's choice of law rules to determine which state's laws govern this dispute.

151. While the parties argue that either Connecticut or New York law should apply to various aspects of this case, they do

. ."  § 3664(m)(i)(B) (emphasis added).  Thus, the restitution order is equivalent to a civil judgment, which the court has jurisdiction to enforce under Epperson.

not dispute that "New York and Connecticut law do not differ on
the prima facie requirements for a fraudulent conveyance . . . ."
Indeed, "[b]oth New York and Connecticut fraudulent conveyance
laws require that the defendant act with 'actual intent' to
'hinder, delay or defraud' the creditor."  National Council on
Comp. Ins., Inc., 259 F. Supp. 2d at 179; compare Conn. Gen.
Stat. §§ 52-552a to 52-552l with N.Y. Debt. & Cred. Law §§
271-76.

        152. Because Connecticut and New York law on fraudulent
conveyances do not generally conflict, the court need not conduct
a choice of law analysis and can instead apply the law common to
both jurisdictions.  As stated by a Connecticut court:

                Under modern conflicts-of-law theory, where
                there is a 'false conflict' such that the laws
                of both states relevant to the set of facts
                are the same, or would produce the same
                decision in the lawsuit, there is no real
                conflict between them.  In such a case, the
                case ought to be decided under the law that is
                common to both states.  It is only after a
                determination is made that there is indeed an
                actual conflict between the laws of the
                particular jurisdictions that the interests of
                the respective jurisdictions are analyzed.

Haymond v. Statewide Grievance Comm., 45 Conn. Super. 481, 488-89
(1997), aff'd, 247 Conn. 436 (1998) (internal citations and
quotation marks omitted); see Walzer v. Walzer, 173 Conn. 62, 76
(1977) ("When the applicable law of a foreign state is not shown
to be otherwise, [Connecticut] presume[s] it to be the same as
[its] own.").  Thus, the court will formally use Connecticut law

                               -46-

as the standard.[4]  See Jacobs v. Yale Univ., No. 277513, 2000 WL
1530030, at *9 (Conn. Super. Sept. 21, 2000) ("The formal use of
Connecticut law as the governing standard will do no violence to
modern choice of law analysis or the legitimate policy interests
of New York.")

(2)  The Fraudulent Transfer Act

153. Under Connecticut's Uniform Fraudulent Transfer Act, "a
transfer made or obligation incurred by a debtor is fraudulent as
to a creditor" if:

> the creditor's claim arose before the transfer
> was made or the obligation was incurred and if
> the debtor made the transfer or incurred the
> obligation . . . [w]ith actual intent to
> hinder, delay or defraud any creditor of the
> debtor . . . .

Conn. Gen. Stat. § 52-552e(a)(1); accord N.Y. Debt. & Cred. Law §
276 ("Every conveyance made and every obligation incurred with
actual intent, as distinguished from intent presumed in law, to
hinder, delay, or defraud either present or future creditors, is
fraudulent as to both present and future creditors.").

154. The determination of a defendant's fraudulent intent is
a fact-intensive inquiry and is nearly always proven from
surrounding circumstances rather than direct evidence.  E.g.,
Dietter v. Dietter, 54 Conn. App. 481, 487 (1999); accord Marine

---

[4]  Therefore, although formally using Connecticut law as the
governing standard, the court reaches the same conclusion under
New York law.

Midland Bank v. Murkoff, 120 A.D.2d 122, 128 (N.Y. App. Div.
1986).  In determining "actual intent" under subsection (1) of
§52-552e(a), consideration may be given, among other factors, to
whether:

> (1) The transfer or obligation was to an
> insider, (2) the debtor retained possession
> or control of the property transferred after
> the transfer, (3) the transfer or obligation
> was disclosed or concealed, (4) before the
> transfer was made or obligation was incurred,
> the debtor had been sued or threatened with
> suit, (5) the transfer was of substantially
> all the debtor's assets, (6) the debtor
> absconded, (7) the debtor removed or concealed
> assets, (8) the value of the consideration
> received by the debtor was reasonably
> equivalent to the value of the asset
> transferred or the amount of the obligation
> incurred, (9) the debtor was insolvent or
> became insolvent shortly after the transfer
> was made or the obligation was incurred, (10)
> the transfer occurred shortly before or
> shortly after a substantial debt was incurred,
> and (11) the debtor transferred the essential
> assets of the business to a lienor who
> transferred the assets to an insider of the
> debtor.

Conn. Gen. Stat. § 52-552e(2); accord Capital Distrib. Serv.,
Ltd. v. Ducor Exp. Airlines, Inc., 440 F. Supp. 2d 195, 204
(E.D.N.Y. 2006) (describing how, under New York law, courts
determine fraudulent intent by looking to "badges of fraud,"
including "lack or inadequacy of consideration, family,
friendship, or close associate relationship between transferor
and transferee, the debtor's retention of possession, benefit, or
use of the property in question, the existence of a pattern or

-48-

series of transactions or course of conduct after the incurring of debt, and the transferor's knowledge of the creditor's claim and the inability to pay it").  "The determination of whether a conveyance is fraudulent is a question of fact which must be proved by clear, precise and unequivocal evidence." Tyers v. Coma, 214 Conn. 8, 10 (1990); accord Marine Midland Bank, 120 A.D.3d at 128 (requiring proof by clear and convincing evidence).

155.  "Under the [Fraudulent Transfer Act], the transferee's intent is irrelevant to the statutory finding of an intentional fraudulent transfer, which is based instead solely on the transferor's intent as determined pursuant to the factors set forth in § 52-552e(b)." Lightowler v. Esparo, No. CV040491205S, 2007 WL 4733096, at *2 (Conn. Super Dec. 18, 2007) (citing Wieselman v. Hoeniger, 103 Conn. App. 591, 598-99, cert. denied, 284 Conn. 930 (2007)); see N.Y. Debt. & Cred. Law § 276.  Thus, the plaintiffs must only prove that the transferor, Gall, intended to defraud them; they need not also prove that the transferee, Caro & Graifman, shared in the transferor's intent. See Wieselman, 103 Conn. App. at 598-99; but see In re Kovler, 249 B.R. 238, 243 (Bankr. S.D.N.Y. 2000) (stating that, under N.Y. Debt. & Cred. Law § 276, "[m]utual fraudulent intention on the part of both parties to the transaction is required in order to invoke the protection of the law prohibiting fraudulent conveyances; fraudulent intent on the part of one of the parties

is insufficient").[5]

156. Every conveyance made with the actual intent to defraud creditors is fraudulent as to creditors and will be set aside. See Yale New Haven Hosp. v. Hicks, No. CV970058626, 1999 WL 74019, at *2 (Conn. Super. Feb. 9, 1999) (quoting Rocklen, Inc. v. Radulesco, 10 Conn. App. 271, 277-78 (1987)); In re Monahan Ford Corp. of Flushing, 340 B.R. 1, 38 (Bankr. E.D.N.Y. 2006) ("If there was an actual intent to hinder, delay or defraud creditors, the conveyance may be set aside under [N.Y. Debt. & Cred. Law] § 276 regardless of the adequacy of the consideration given or the solvency of the transferor.")

---

[5] To the extent that Connecticut's Fraudulent Transfer Act differs from New York Fraudulent Conveyance Law in that the Connecticut act does not require the plaintiffs to prove that Caro & Graifman shared in Gall's fraudulent intent, the court does not believe that a choice of law analysis is necessary because: (1) as discussed under the Third Count, Connecticut common law, as opposed to the Fraudulent Transfer Act, requires the plaintiffs to prove fraudulent intent on the part of Caro & Graifman, and therefore the "differences" in the laws of the states ultimately amount to a "false conflict," which does not require a choice of laws analysis; and (2) the court finds, for the reasons discussed in the Third Count, that the plaintiffs have demonstrated by clear and convincing evidence that Caro & Graifman shared in Gall's fraudulent intent as to the Mortgage conveyance. Thus, the plaintiffs have proven more than is required as to fraudulent intent under the Connecticut Fraudulent Transfer Act and exactly what is required as to fraudulent intent under Connecticut common law and the New York Fraudulent Conveyance Law.

(3)    <u>The Plaintiffs are Creditors Whose Claims</u>
       <u>Arose Before the Transfer was Made</u>

157. The plaintiffs are creditors who have a claim within the meaning of the Fraudulent Transfer Act.  Under the act, a "creditor" is "a person who has a claim."  Conn. Gen. Stat. § 52-552b(4); <u>accord</u> N.Y. Debt. & Cred. Law § 270.  The plaintiffs are "persons" because that term means "an individual, partnership, corporation, limited liability company, association, organization, government or governmental subdivision or agency, business trust, estate, trust or any other legal or commercial entity."  Conn. Gen. Stat. § 52-552b(9).  The plaintiffs also have a "claim" stemming from the losses incurred as a result of Gall's fraud.  <u>See</u> Conn. Gen. Stat. § 52-552b(3) (stating that a "claim" means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"); <u>see</u> N.Y. Debt. & Cred. Law § 270.

158. Gall is also a "debtor" under the Fraudulent Transfer Act because that terms means "a person who is liable on a claim."  Conn. Gen. Stat. § 52-552b(5); <u>accord</u> N.Y. Debt. & Cred. Law § 270.

159. Further, the Mortgage was a "transfer" of an "asset" within the meaning of the Fraudulent Transfer Act.  Under § 52-

552b, the term "asset" means "property of a debtor,"[6] and the term "property" means "anything that may be the subject of ownership." Conn. Gen. Stat. § 52-552b(2) & (10); accord N.Y. Debt. & Cred. Law § 270.  In addition, the term "transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance."  Conn. Gen. Stat. § 52-552b(12); accord N.Y. Debt. & Cred. Law § 270.  In addition, a "lien" means "a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common law lien or a statutory lien."  Conn. Gen. Stat. § 52-552b(8).  Here, by granting the Mortgage on Trinity and UPACA, Gall transferred an asset by creating an $800,000 lien on those properties in Caro & Graifman's favor. See, e.g., Shawmut Bank v. Brooks Dev. Corp., 46 Conn. App. 399, 408 (1997) (upholding trial referee's finding that defendants committed actual fraud under the Fraudulent Transfer Act for

---

[6]  The term "asset" does not include" "(A) Property to the extent it is encumbered by a valid lien, (B) property to the extent it is generally exempt under nonbankruptcy law, or (C) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant."  None of these exceptions apply in this case.

executing mortgage deeds to avoid repayment of a note).

160. Moreover, the plaintiffs' claim "arose before the transfer was made or the obligation was incurred," as required by § 52-552e(a)(1). Under the Fraudulent Transfer Act, "[a] transfer is made . . . [w]ith respect to an asset that is real property . . . when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee." While Gall executed the Mortgage in April 1997 and Caro & Graifman recorded it in May 1997, before the court entered the Restitution Order in July 1997, the plaintiffs' claim arose before the Mortgage was recorded because, as discussed above, a claim "means a right to payment, whether or not the right is reduced to judgment . . . ." Conn. Gen. Stat. § 52-552b(3). Under this definition, the plaintiffs had a right to payment that arose before the transfer because: before Gall executed the mortgage or Caro & Graifman recorded it, the plaintiffs brought civil litigation seeking damages based on Gall's fraud; a jury convicted Gall of fraud; and the court, at Gall's sentencing, indicated that the victims suffered more than $13 million in losses from that fraud and that it would enter a restitution order for those losses.

(4)  <u>Gall Conveyed the Mortgage with Actual
Fraudulent Intent</u>

161. For the reasons discussed below, the plaintiffs have
demonstrated by clear and convincing evidence that Gall granted
the Mortgage with actual fraudulent intent to defraud the
plaintiffs, as required for relief under Conn. Gen. Stat. § 52-
552e(1).

(i)  <u>Neither Caro nor Caro & Graifman are
Insiders under § 52-552e(b)(1)</u>

162. Although the plaintiffs argue that Caro and Caro &
Graifman are "insiders," neither Caro nor Caro & Graifman fall
within § 52-552e(b)(1)'s definition of that term.  Under the act,
if a debtor is an individual, such as Gall, an "insider"
includes: "(i) a relative of the debtor or of a general partner
of the debtor, (ii) a partnership in which the debtor is a
general partner, (iii) a general partner in a partnership
described in subparagraph (ii), or (iv) a corporation of which
the debtor is a director, officer or person in control."  Conn.
Gen. Stat. § 52-552b(7).  Under this definition, neither Caro nor
Caro & Graifman are insiders.

(ii) <u>Gall Retained Possession or Control of
Trinity and UPACA, § 52-552e(b)(2)</u>

163. Gall retained control of Trinity and UPACA after
granting the Mortgage to Caro & Graifman.  In particular, Gall
testified that he would not have quitclaimed Trinity and UPACA to
Caro & Graifman.  Conn. Gen. Stat. § 52-552e(b)(2).

(iii) <u>Gall Concealed the Mortgage,</u>
<u>§ 52-552e(b)(3)</u>

164. Gall also undertook steps to conceal the Note and Mortgage.  On April 25, 1997, only one day after executing the Note, Gall submitted his court-ordered Financial Disclosure, signed under oath and threat of perjury, to the court for use in connection with the impending Restitution Order.  The Financial Disclosure fails to mention the Note or the Mortgage.  This omission stands in stark contrast to details in other aspects of the Financial Statement, such as the inclusion of $61.81 in credit card debt.

165. Moreover, Gall attempted to conceal his debt to Caro & Graifman by including it in the "Total Unsecured Debts" section of the financial worksheet portion of the Financial Disclosure. While he listed the sum of $645,000 as "Credit Cards, etc., Legal," (Pls.' Ex. 8.), he admitted at trial this would not have alerted anyone to the existence of the Note, much less the Mortgage that he intended to execute after the April 24th hearing on the Financial Disclosure.

166. The misleading nature of the Financial Disclosure is further supported by the fact that Caro appeared in person at the July 24, 1997 restitution hearing to clarify Caro & Graifman's interest in the $645,000 debt.

167. Gall admitted that if he had listed the Note on the Financial Disclosure, as well as the Mortgage he eventually

granted to Caro & Graifman on April 30, 2007, then his creditors, including the plaintiffs, could have taken steps to protect their claims.

168. Further, while Gall eventually disclosed the existence of the Note and the Mortgage to the court at the end of the July 24, 1997 restitution hearing, he only made this disclosure after the court directly questioned him about whether he had transferred any assets or funds since he submitted the Financial Disclosure to the court.

169. This pattern of omission and obfuscation demonstrates Gall's fraudulent intent to conceal the Mortgage.  These circumstances satisfy § 52-552e(b)(3).

> (iv) <u>Gall Conveyed the Mortgage after he had Been Sued or Threatened with Suit, § 52-552e(b)(4)</u>

170. Prior to executing the Mortgage, Gall had been involved in civil litigation with the plaintiffs concerning issues similar to those raised in the criminal case in which the court imposed the Restitution Order.  Those prior lawsuits, plus the court's indication that it would order more than $13 million in restitution, threatened to eliminate Gall's interests in those properties.  These circumstances satisfy § 52-552e(b)(4).

> (v) <u>The Mortgage Amounted to Substantially all of Gall's Assets, § 52-552e(b)(5)</u>

171. Gall's conveyance of the Mortgage shielded more than half of the $1,385,874 in assets that he identified in his

Financial Disclosure.  However, given that Gall executed the Note after he became aware that the court would likely order restitution in an approximate amount of $13 million, he was basically insolvent when he mortgaged his interest in Trinity and UPACA.  See, e.g., Conn. Gen. Stat. § 52-552c(a) (stating that a debtor is insolvent, under the Fraudulent Transfer Act, "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.")  Thus, the court finds that the Mortgage constituted a substantial portion of Gall's assets, satisfying § 52-552e(b)(5).

> (vi) <u>The Value of Caro & Graifman's Legal Fees Owed by Gall was not Reasonably Equivalent to the Value of the Mortgage, § 52-552e(b)(8)</u>

172. While the evidence indicates that an agreement existed between Caro & Graifman and Gall for legal services worth $30,000 a month (300 hours at $100 per hour) and that Caro & Graifman's attorneys worked a substantial number of hours on behalf of Gall and his companies, no reliable evidence substantiates Caro & Graifman's claim that Gall owed the firm $800,000 in unpaid legal fees and interest.  See Conn. Gen. Stat. § 52-552d (defining "value" as consideration of an antecedent debt); N.Y. Debt. & Cred. Law § 272 (defining "fair consideration" as satisfaction of an antecedent debt).

173. As discussed in the court's findings of fact, Caro's attempt to re-create the number of hours Caro & Graifman

attorneys spent on matters related to Gall between September 1994 and April 1997 failed to substantiate that Caro & Graifman billed more than 14,000 hours on matters related to Gall. Caro cannot estimate, with any reasonable accuracy, the amount of time that other attorneys spent on work performed more than a decade ago. The flaws inherent in Caro's "method" for re-creating the time spent on Gall matters was particularly evident when former Caro & Graifman attorneys, Grossman and Graifman — neither of whom have any interest in the outcome of this case — had great difficulty testifying about events that took place during the relevant time period, even when provided with their own respective contemporaneous time records. Moreover, the testimony of Grossman and Graifman often contradicted the substance of affidavits each of them prepared for this case in 2000 and 2001, respectively. Indeed, Graifman could not definitively verify this modification.

174. In addition, as discussed above, the Payments Spreadsheet contemporaneously kept by Caro to track payments by Gall represents the most reliable piece of evidence as to the amount still owed by Gall. (See Pls.' Ex. 3.) The Payments Spreadsheet indicates that Gall paid Caro & Graifman $646,138.57 as of March 13, 1997 and that Gall was still "$335,011.43 short." This evidence as to the amount of unpaid fees is corroborated by the fact that the "$335,011.43" figure on the Payments

Spreadsheet closely matches the "$340,000" figure that had been crossed-out on the Mortgage.[7]

175. While the defendants claim that Gall still owes them $646,000 in outstanding fees plus interest, this figure cannot be reasonably substantiated.  The figure is premised on the defendants' testimony that they increased the original fee agreement from a $30,000 retainer each month to a $40,000 retainer each month.  But as the court has already found, no documentary evidence exists to support such a modification and the defendants' testimony as to this modification is not credible.

176. Nevertheless, even if the court assumes that Gall still owes Caro & Graifman $646,000, this does not support the $800,000 Mortgage, which amounts to an increase of $144,000, nearly twenty

---

[7]  Caro & Graifman argues that the parol evidence rule precludes the court from considering the crossed-out "$340,000" figure in the Mortgage.  The court disagrees.  To the extent the parol evidence rule prevents a party to a contract from relying on a crossed-out term where a superceding term is not ambiguous, that rule is not applicable to this case because the issue before the court is not whether Gall agreed to an $800,000 mortgage or a $340,000 mortgage on Trinity and UPACA.  Clearly, he agreed to an $800,000 mortgage; he does not dispute this.  Rather, the issue is whether Gall agreed to grant the mortgage for more than he owed Caro & Graifman for their legal services in order to shield those assets from the plaintiffs.  Therefore, the parol evidence rule has no application to this issue, and the court considers the alteration to the Mortgage as very probative evidence of impropriety, especially considering that the defendants have no knowledge about how the "$340,000" figure came to be typed there, later crossed out, and then replaced with an "$800,000" figure, which exactly matched Gall's equity in the properties.

percent, more than they allege.  While Caro & Graifman contends that the additional $144,000 was "to compensate Caro & Graifman for interest on past due balances that would not be paid in the near future," this contention is an unsupported, post-hoc rationalization.  Neither Caro nor Gall testified in any detail about how they agreed upon $144,000 in interest at the time the parties executed the Note.

177. Therefore, with regard to § 52-552e(b)(8), the court finds that the plaintiffs have proven that Gall did not owe Caro & Graifman $800,000 for unpaid legal services and interest at the time Gall executed the Mortgage.[8]

### (vii)  Gall Executed the Mortgage Shortly Before He Incurred a Substantial Debt

178. Gall executed the Mortgage in advance of the Restitution Order.  As to the April 4, 1997 sentencing hearing, Gall knew that the court would impose restitution as part of his sentence for committing the federal offenses of conspiracy, mail fraud, wire fraud, false statements, and failure to file tax returns.  The testimony of the crime victims' representatives at the April 4, 1997 sentencing hearing demonstrated that the

---

[8]  As discussed above, the court only finds that the value of the unpaid legal services performed by Caro & Graifman for Gall was not reasonably equivalent to the value of the $800,000 Mortgage and was more likely around $340,000, as indicated by the Payments Spreadsheet and the cross-out on the Mortgage.  The court makes no finding about the actual amount of any unpaid legal fees owed to Caro & Graifman by Gall.

plaintiffs suffered losses in excess of $13 million.  To help in fashioning a proper restitution order, the court ordered Gall to make complete and total financial disclosure to the Government and the Probation Department.  Thereafter, on April 24, 1997, one day before the hearing on the loss suffered by the victims, Gall executed the Note.  Then, on April 30, 1997, shortly after the court indicated that it would order restitution around $13 million, Gall executed the Mortgage in favor of Caro & Graifman. These circumstances satisfy § 52-552e(b)(10).

> (viii) <u>Other Circumstances Surrounding the Mortgage Illustrate Gall's Fraudulent Intent</u>

179. There are other circumstances that support the conclusion that the Mortgage was conveyed with actual fraudulent intent.

180. First, the timing of Gall's execution of the Note and Mortgage indicate haste to complete the transaction before the restitution order and shield assets from his creditors.  For instance, Gall executed the Note after Gall's sentencing and one day before he submitted his Financial Disclosure to the court. The Note states that it was secured by a mortgage, but Gall did not execute the mortgage when he executed the Note.  Instead, Gall executed the Mortgage a few days after the court indicated it would order restitution of approximately $13 million.

181. Second, neither Gall nor Caro can say exactly who

prepared the Mortgage, which further undermines its reliability as evidence supporting the claimed amount of legal fees and interest Gall owed Caro & Graifman.

182. Third, the Mortgage contains many cross-outs, modifications, typographical errors, and different typefaces, which further undermines its legitimacy and suggests impropriety. As mentioned above, the most significant alteration is the value of the Mortgage. The "$800,000" figure listed on the Mortgage, which allegedly corresponds to the claimed value of legal work performed by Caro & Graifman for Gall, replaces the crossed-out "$340,000" figure, which closely corresponds to the $335,011.43 owed under the fee agreement according to the Payments Spreadsheet. The similarity of these two figures supports the conclusion that Gall never owed Caro & Graifman $800,000 in unpaid legal fees and interest. Moreover, neither Gall nor Caro can say exactly who crossed out this figure.

183. Fourth, the $800,000 value of the Note and Mortgage exactly matches the combined value of Gall's equity in Trinity and UPACA as reported on his Financial Disclosure. The similarity of these values indicates that the transfer was intended to shield Gall's assets, not to compensate Caro & Graifman for $800,000 in unpaid legal fees and interest.

184. Fifth, while Caro and Caro & Graifman are not "insiders" as defined in § 52-552b(7), the relationship between

Caro and Gall indicates that the Mortgage was not an arm's length transaction.  Caro and Gall have remained close friends, in spite of Gall's repeated refusal to pay Caro & Graifman according to the parties' fee agreement.  In particular, Caro sued Gall to collect fees but then never pursued that litigation.  Even now, Caro still considers Gall a friend and they see each other socially.  Moreover, Gall executed the Modification Agreement requiring him to pay interest to Caro & Graifman without receiving any consideration.  No reasonable debtor would agree to add an interest provision to an existing mortgage obligation simply because the creditor failed to include interest in the initial agreement.  Further, Caro never foreclosed on the Mortgage, which indicates that he was not interested in collecting Caro & Graifman's outstanding legal fees.  These circumstances remove this transaction from an ordinary, arm's length transaction and indicate that Gall and Caro were working together to shield Gall's assets from collection by the plaintiffs.

185. Sixth, Gall generally lacks credibility because he has been convicted of crimes involving dishonesty.  <u>See</u> Fed. R. Evid. 609(b) (permitting evidence of a conviction involving dishonesty if less than ten years has elapsed "since the release of the witness from the confinement imposed for that conviction").

186. In sum, the plaintiffs have demonstrated by "clear,

precise and unequivocal evidence" that Gall executed the Mortgage

on Trinity and UPACA in favor of Caro & Graifman with actual

fraudulent intent, satisfying § 52-552e(a)(1).  In particular,

the plaintiffs are creditors whose claims arose before Gall

executed the Mortgage on Trinity and UPACA in favor of Caro &

Graifman.  In addition, after having specifically considered the

factors enumerated in § 52-552e(b) and the evidence and the

inferences drawn therefrom, the court finds that the plaintiffs

have demonstrated by "clear, precise and unequivocal evidence"

that Gall acted with actual intent to hinder, delay, or defraud

the plaintiffs' efforts to collect restitution by conveying the

Mortgage on those properties to Caro & Graifman.[9]

187. Accordingly, the court enters judgment avoiding the

Mortgage pursuant to Conn. Gen. Stat. § 52-552h(a)(1) (permitting

as a remedy "[a]voidance of the transfer or obligation to the

extent necessary to satisfy the creditor's claim")).[10]  See

Chemical Bank v. Dana, 234 B.R. 585, 595 (Bankr. D. Conn. 1999)

("Under Connecticut law, a creditor who prevails in a fraudulent

---

[9]  The plaintiffs also argue that the mortgage demonstrated
constructive fraudulent intent under § 52-552e(a)(2).  Because
the court has found that Gall executed the Mortgage with actual
fraudulent intent, the court does not consider whether the
plaintiffs have also demonstrated Gall's constructive fraudulent
intent.

[10]  To the extent further action is necessary from the court
to effectuate the recovery of the funds, the plaintiffs may apply
to the court for such relief.

conveyance action may avoid a transfer to the extent necessary to satisfy the creditor's claim.")

        C.    <u>Fraudulent Conveyance under Common Law (Third Count)</u>

188. In the Second Count, the plaintiffs allege that the Mortgage was a fraudulent conveyance under the common law. The Fraudulent Transfer Act and common law fraudulent conveyance require, for the most part, the same proof. <u>See</u> <u>Robinson v. Coughlin</u>, 266 Conn. 1, 9 (2003). However, "[p]rior to the adoption of the [Fraudulent Transfer Act], the plaintiff had to prove (1) that the transferor had intent to defraud the creditor and (2) <u>that the transferee shared in the transferor's fraudulent intent</u>." <u>Wieselman</u>, 103 Conn. App. at 598 (emphasis added); <u>accord</u> <u>In re Kovler</u>, 249 B.R. at 243. By contrast, the Fraudulent Transfer Act does not require a plaintiff to prove the transferee's intent; rather, the act only "addresses the fraudulent intent of the debtor and makes no mention of the fraudulent intent of the transferee." <u>Id.</u> Therefore, in order for the plaintiffs to establish a claim of fraudulent conveyance under the common law, they must establish that Caro & Graifman shared in Gall's intent to defraud.

189. As the court has already discussed, the plaintiffs have proven by clear and convincing evidence that Gall intended to defraud the plaintiffs and that the mortgage was a fraudulent transfer under the Fraudulent Transfer Act, § 52-552e(a)(1).

190. The plaintiffs have also demonstrated, by clear and convincing evidence, that Caro & Graifman shared in Gall's actual fraudulent intent.  Caro & Graifman's fraudulent intent is evidenced by the following facts: Caro & Graifman, with knowledge of an impending $13 million Restitution Order, accepted an $800,000 Mortgage for an antecedent debt in unpaid legal fees and interest worth less than $800,000; Caro and Gall remain close friends, despite Gall's refusal to live up to the parties' fee agreement; Caro claims to have no knowledge about who prepared the Mortgage or who altered the "$340,000" figure; Caro visited Gall in prison so that Gall could execute, without legal representation or consideration, the Modification Agreement; Caro & Graifman never foreclosed on the Mortgage; and Caro has twice misrepresented the legal fees owed to Caro & Graifman, once in the lawsuit against Gall and again before this court at the hearing concerning Gall's restitution.

191. Therefore, the court finds in favor of the plaintiffs on the Third Count and will enter judgment accordingly.[11]

D.    Declaration Invalidating the Mortgage (First Count)

192. In the First Count of the complaint, the plaintiffs seek a declaration from the court invalidating the Mortgage

---

[11] As mentioned above, the court formally applies Connecticut common law but reaches the same conclusion under New York law.

-66-

because, among other things, Gall is not indebted to Caro &
Graifman in the amount of $800,000 representing allegedly
outstanding legal fees.

193. A mortgage secured by a defective underlying obligation
is itself invalid.[12]  See, e.g., Webster Bank v. Eierweiss, No.
CV-96-0395181-S, 1997 Conn. Super. LEXIS 1762, at *9 (Conn.
Super. Ct. June 25, 1997) (recognizing lack of consideration,
thereby invalidating the underlying obligation, as a defense to
foreclosure of a mortgage); accord Coronet Capital Co. v. Spodek,
265 A.D.2d 292, 292 (N.Y. App. Div. 1999) ("It has long been held
that a mortgage is not valid and enforceable unless there is an
underlying valid debt or obligation for which the mortgage is
intended as security.").

194. The court has already found, in ruling that the
Mortgage was a fraudulent transfer, that the plaintiffs have
shown that Caro & Graifman was not entitled to $800,000 in unpaid
legal fees and interest.  Therefore, the mortgage was not
supported by adequate consideration and is invalid and

---

[12]  Connecticut and New York law also do not conflict with
regard to the general validity of mortgages.  Compare Webster
Bank v. Eierweiss, No. CV-96-0395181-S, 1997 Conn. Super. LEXIS
1762, at *9 (Conn. Super. Ct. June 25, 1997) (recognizing lack of
consideration, thereby invalidating the underlying obligation, as
a defense to foreclosure of a mortgage), with Coronet Capital Co.
v. Spodek, 265 A.D.2d 292, 292 (N.Y. App. Div. 1999) ("It has
long been held that a mortgage is not valid and enforceable
unless there is an underlying valid debt or obligation for which
the mortgage is intended as security.").

unenforceable.  See Webster Bank, 1997 Conn. Super. LEXIS 1762,
at *9; Coronet Capital Co., 265 A.D.2d at 292.  Accordingly, the
court also finds in favor of the plaintiffs on the First Count.

    II.  Caro & Graifman's Counterclaim

    195. Caro & Graifman asserts a counterclaim declaring the
Mortgage valid and enforceable in the amount of $800,000 plus
interest.  It also requests prejudgment interest and attorneys'
fees incurred defending the validity of the Mortgage in this
court.  However, because the court has found, for the reasons
discussed above, that the Mortgage was a fraudulent conveyance
and not supported by adequate consideration, the court finds in
favor of the plaintiffs on Caro & Graifman's counterclaim.  See
Chemical Bank, 234 B.R. at 595 (treating a fraudulent conveyance
as though it never occurred under § 52-552h(a)(1)); Murphy v.
Dantowitz, 142 Conn. 320 (Conn. 1955) (finding that under
Connecticut common law, "[p]roperty fraudulently conveyed may, as
to the creditors of the grantor, be treated as if no conveyance
of it had been made, if proper legal proceedings are taken to
appropriate it to the satisfaction of the grantor's debts.");
accord In re Monahan Ford Corp. of Flushing, 340 B.R. at 38.  In
addition, because the court has not found in Caro & Graifman's
favor on any counts, no basis exists for awarding prejudgment
interest or attorneys' fees to Caro & Graifman.

    196. Caro & Graifman asserted a number of other

counterclaims in its Amended Answer [doc. # 68].  As far as the court can discern, these claims included slander, libel, and vexatious litigation.  However, at the start of trial, Caro & Graifman withdrew all counterclaims, except the counterclaim seeking to enforce the Mortgage.  (See Trial. Tr., 6:18-24, Oct. 24, 2007 ("So basically in summary, Your Honor, the only thing that the defendant is proceeding with is the counterclaim to declare the mortgage valid and resolve restraints on mortgage, to release monies held in escrow and to award damages in the form of interest, attorney's fees and costs as set forth in the original mortgage."))  Therefore, the court considers all other counterclaims withdrawn and does not address them.

<u>CONCLUSION</u>

For the foregoing reasons, the court finds that the Mortgage on Trinity and UPACA in favor of Caro & Graifman is a fraudulent conveyance.  Accordingly, the court finds in favor of the plaintiffs on all counts in the complaint [doc. # 1] and also finds in favor of the plaintiffs on Caro & Graifman's amended counterclaim [doc. # 68].  In light of those rulings, the court denies Caro & Graifman's motion for costs and fees [doc. # 156].

The Clerk is directed to enter judgment accordingly and close this case.

SO ORDERED this 15th day of February 2008, at Bridgeport, Connecticut.

_____/s/_____
Alan H. Nevas
United States District Judge
